# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

PAMELA RICARD,

*Plaintiff*,

*v.*

USD 475 GEARY COUNTY SCHOOLS SCHOOL BOARD MEMBERS—Ron Johnson, Kristy Haden, Anwar Khoury, Jim Schmidt—in their official and individual capacities; Beth Hudson, Mark Hatcher, Jason Butler—in their official capacities; REGINALD EGGLESTON, Superintendent, USD 475 Geary County Schools, in his official and individual capacities; KATHLEEN BRENNAN, Principal, Fort Riley Middle School, in her official capacity.

*Defendants.*

Case No: 5:22-cv-04015

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... ii

INTRODUCTION ................................................................................................... 1

STATEMENT OF FACTS ....................................................................................... 2

ARGUMENT .......................................................................................................... 11

    I.      Ms. Ricard is likely to succeed in showing Defendants are violating her rights. . 11

          A.     Defendants are violating Ms. Ricard's right to free speech. ..................... 12

               1.     None of Ms. Ricard's valid official duties compel her to mislead parents or use whatever pronouns students select. ........................ 12

               2.     Ms. Ricard's use of pronouns consistent with sex implicates a matter of public concern. ............................................... 17

               3.     Ms. Ricard's interests outweigh any of Defendants' interests. ...... 19

               4.     Defendants threaten Ms. Ricard with additional adverse action... 20

               5.     Defendants' threatened action is because of Ms. Ricard's speech. .......................................................................... 20

          B.     Defendants are violating Ms. Ricard's right to free exercise of religion. . 20

               1.     Defendants' Policies are subject to strict scrutiny. ...................... 20

               2.     Defendants' Policies fail strict scrutiny. ...................................... 23

          C.     Defendants are violating Ms. Ricard's right to due process of law. ......... 24

    II.     Ms. Ricard is suffering irreparable injury. ........................................... 25

    III.    Ms. Ricard's injury outweighs any injury to Defendants from an injunction. ..... 26

    IV.    Enjoining Defendants' unlawful conduct serves the public interest. .................... 26

CONCLUSION ...................................................................................................... 26

# TABLE OF AUTHORITIES

**<u>Cases</u>**

*American Civil Liberties Union v. Johnson,*
194 F.3d 1149 (10th Cir. 1999) ......................................................................................... 26

*Belcher v. City of McAlester,*
324 F.3d 1203 (10th Cir. 2003) ......................................................................................... 20

*Butler v. Board of County Commissioners for San Miguel County,*
920 F.3d 651 (10th Cir. 2019) ..................................................................................... 17, 18

*Casey v. West Las Vegas Independent School District,*
473 F.3d 1323 (10th Cir. 2007) ................................................................................... 13, 14

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
508 U.S. 520 (1993) ............................................................................................... 21, 22, 23

*Elrod v. Burns,*
427 U.S. 347 (1976) ........................................................................................................... 25

*Employment Division Department of Human Resources of Oregon v. Smith,*
494 U.S. 872 (1990) ........................................................................................................... 21

*Fulton v. City of Philadelphia,*
141 S. Ct. 1868 (2021) ....................................................................................................... 23

*Grace United Methodist Church v. City of Cheyenne,*
451 F.3d 643 (10th Cir. 2006) ..................................................................................... 20, 21, 22

*Grayned v. City of Rockford,*
408 U.S. 104 (1972) ........................................................................................................... 24

*Helget v. City of Hays,*
844 F.3d 1216 (10th Cir. 2017) ................................................................................... 12, 19

*Homans v .City of Albuquerque,*
264 F.3d 1240 (10th Cir. 2001) ......................................................................................... 11

*Hurley v. Irish-American Gay, Lesbian, and Bisexual Group of Boston,*
515 U.S. 557 (1995) ........................................................................................................... 16

*Jackler v. Byrne,*
658 F.3d 225 (2d Cir. 2011) .............................................................................................. 13

*Janus v. American Federation of State, County. & Municipal Employees., Council 31,*
138 S. Ct. 2448 (2018) ....................................................................................... 2, 13, 16, 17

*Kikumura v. Hurley,*
      242 F.3d 950 (10th Cir. 2001) ........................................................................ 13

*Lincoln v. Maketa,*
      880 F.3d 522 (10th Cir. 2018) ........................................................................ 13

*Meriwether v. Hartop,*
      992 F.3d 492 (6th Cir. 2021) .............................................................. 15, 16, 18

*Meyer v. Nebraska,*
      262 U.S. 390 (1923) ................................................................................. 15, 16

*Monteiro v. Tempe Union High School District,*
      158 F.3d 1022 (9th Cir. 1998) ........................................................... 12, 13, 15

*National Institute of Family & Life Advocates v. Becerra,*
      138 S. Ct. 2361 (2018) .................................................................................. 24

*Prairie Band of Potawatomi Indians v. Pierce,*
      253 F.3d 1234 (10th Cir. 2001) ..................................................................... 11

*Reinhardt v. Albuquerque Public Schools Board of Education,*
      595 F.3d 1126 (10th Cir. 2014) ............................................................... 12, 15

*Russo v. Central School District No. 1, Towns of Rush, et al.*
      469 F.2d 623 (2d Cir. 1972) .......................................................................... 15

*Shelton v. Tucker,*
      364 U.S. 479 (1960) ...................................................................................... 15

*Sherbert v. Verner,*
      374 U.S. 398 (1963) ................................................................................. 22, 23

*Sweezy v. New Hampshire,*
      354 U.S. 234 (1957) ...................................................................................... 15

*Tandon v. Newson,*
      141 S. Ct. 1294 (2021) .............................................................................. 19, 24

*Thomas v. City of Blanchard,*
      548 F.3d 1317 (10th Cir. 2008) ............................................................... 12, 13

*Trant v. Oklahoma,*
      754 F.3d 1158 (10th Cir. 2014) ............................................................... 12, 19

*United States v. Virginia,*
      518 U.S. 515 (1996) ...................................................................................... 17

*Utah v. Licensed Beverage Association v. Leavitt,*
    256 F.3d 1061 (10th Cir. 2001) ................................................................. 25, 26

*Weiman v. Updegraff,*
    344 U.S. 183 (1952) ............................................................................... 15

*West Virginia Board of Education v. Barnette,*
    319 U.S. 624 (1943) ............................................................................ 2, 15

## Statutes

Kansas Statute Ann.§72-6147(a)(1)(A) ........................................................ 7

## Other Authorities

*Ohio lawmakers propose parental rights bill similar to controversial Florida legislation,*
    Fox News (April 6, 2022) ......................................................................... 18

*The Mental Health Establishment is Failing Trans Kids,*
    Washington Post (November 24, 2021) ..................................................... 3

Hannah Natanson, *Virginia Supreme Court affirms judge's ruling reinstating Loudoun
    teacher who refused to use transgender pronouns,*
    Washington Post (August 31, 2021) ......................................................... 18

## INTRODUCTION

On April 9, 2021, Plaintiff Pamela Ricard was suspended from her job at USD 475 Geary County School District ("the District") for three days. Her infraction? Referring to a student by that student's legal, enrolled last name, when no existing policy forbade using a student's last name, and no District practice punished any other teachers who use a student's last name.

In the months following her suspension, Defendants created new policies targeting staff who, like Ms. Ricard, have religious and scientific objections to using names and pronouns at a student's request that conflict with the student's sex. These new policies also require Ms. Ricard and other teachers to mislead students' parents about whether that student is using a new name or set of pronouns—that is, undergoing a "social transition"—at school. Defendants' policies both restrict Ms. Ricard's speech and compel her to say things that she believes are harmful and untrue to students and parents alike. This subjects her to an ongoing irreparable injury by violating her constitutional rights to free speech and free exercise of religion.

This case is about whether the government can punish public school teachers, not for what they say, but for what they refuse to say. At stake is whether the government, under the guise of regulating an employee's "official duties," can force teachers to affirm the state's orthodoxy about sex, gender, and human identity—even when that orthodoxy offends the teacher's conscience, contradicts biological fact, is harmful to the students, and requires dishonesty to parents.

Defendants developed their policies to target and suppress Ms. Ricard's religious viewpoint. Defendants punished Ms. Ricard for using a student's legal last name instead of terms that conflict with the student's sex despite knowing about her religious reason for doing so. Moreover, Defendants have no policy against using last names and do not punish other employees that use last names for non-religious reasons.

1

Defendants' actions violate the "cardinal constitutional command" that "'no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or *force citizens to confess by word or act their faith therein*.'" *Janus v. Am. Fed'n of State, Cnty. & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2463 (2018) (quoting *W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943)). Because Ms. Ricard is substantially likely to prevail on the merits and all other factors for preliminary relief favor enjoining Defendants' unconstitutional acts, this Court should grant her motion for a preliminary injunction and temporary restraining order.

## STATEMENT OF FACTS

*Ms. Ricard's Experience, Religious Beliefs, and Scientific Understanding*

Ms. Ricard has taught at Fort Riley Middle School in the District since 2005. Compl., Doc. 1 at ¶ 1. In that time, she has had an exemplary professional record. *Id.*

Ms. Ricard is a Christian. Her faith informs her understanding of gender and sexuality, including her belief that God immutably creates each person as male or female, and that these sexes are distinct and complementary. *See* Compl., Doc. 1 at ¶¶ 84–86. Ms. Ricard's faith also commands her not to lie. *Id.* at ¶¶ 88–89. Consequently, Ms. Ricard's faith prohibits her from referring to a male student with "she/her" pronouns or to a female student with "he/him" pronouns because that would be lying to the student about whether that student is male or female. *Id.* at ¶¶ 87–89. Ms. Ricard is also duty-bound not to lie or mislead parents about how she interacts with their children in school. *Id.* at ¶ 88.

Through her education and experience, Ms. Ricard is aware that school-age children do not have a fully developed capacity to understand the long-term consequences of their actions, especially decisions that could alter the trajectory of their sexual development. Compl., Doc. 1 at ¶¶ 70–71. This includes decisions to undergo medical treatment including puberty blockers, cross-sex hormone treatment, and surgery that could eliminate sexual or reproductive functioning.

Ms. Ricard also understands that using new names and pronouns consistent with subjective gender identity rather than sex is called "social transition," that children who go through social transition are more likely to seek medical transition, and that there is a rapid increase in children asserting a gender identity inconsistent with their sex in many countries, especially in the United States. Decl. of Pamela Ricard in Supp. of Mot. for Prelim. Inj. ("Ricard Decl.") at ¶¶ 8–10. *See also* Laura Edwards-Leeper and Erica Anderson, *The Mental Health Establishment is Failing Trans Kids*, WASH. POST (Nov. 24, 2021). Because the rate of increase of these cases radically departs from what historical data would predict, Ms. Ricard believes (along with many psychiatrists) that the rapid change in the rate of cases indicates that social factors in the relevant communities play a significant role. *Id. See also* Ricard Decl. at ¶¶ 8–10.

Consistent with her faith, her training and practice as an educator, and her own experience as a parent, Ms. Ricard also believes that parents have an important role in nurturing a child's physical and emotional health, their academic success, and in giving informed consent for medical or psychiatric treatment where the child is incompetent to do so. *See* Compl., Doc. 1 at ¶¶ 74–76. Because of the child's incapacity, the role of social factors in the increase in the rate of gender dysphoria, and the important role of parents, Ms. Ricard believes that teachers should not be compelled to participate in a student's social transition at school, and that teachers should not be compelled to mislead parents about whether a student is undertaking social transition at school. *See* Ricard Decl. at ¶ 10; Compl., Doc. 1 at ¶ 88.

*Ms. Ricard's Practice: Treat All Students Equally and Honestly*

As a result of her faith and her understanding of science, Ms. Ricard treats all students equally: she refers to them using terms that are consistent with the students' legal names and with pronouns consistent with the students' biological sex. *See id.* at ¶ 169. Ms. Ricard does not

discriminate against any student on the basis of gender identity. But, if one student asks Ms. Ricard to be treated differently from Ms. Ricard's normal practice, Ms. Ricard's conscience allows her to accommodate that request by (1) refraining from using names or terms the student asks her not to use, and (2) using the student's requested name, while (3) declining to use terms that are inconsistent with the student's sex. *See* Ricard Decl. at ¶ 4.

Ms. Ricard cannot use pronouns that are inconsistent with a student's biological sex because referring to a person as "she" directly communicates that the person is female. On the other hand, Ms. Ricard's conscience permits her to use a student's requested name since English proper names do not directly communicate a message about a person's sex in the way that pronouns do. Therefore, out of consideration for her students, Ms. Ricard is able to use a requested name but cannot grant a request to use pronouns inconsistent with sex, because the latter would cause Ms. Ricard to cross the line into dishonesty. *See* Compl., Doc. 1 at ¶¶ 88–89.

To illustrate the practice Ms. Ricard's conscience requires: suppose a biologically male student legally named John Doe asks Ms. Ricard to deviate from her normal practice of using names and sex-based pronouns for every student, requesting to be called Jane and to be referred to with "she/her" pronouns. In referring to this student, Ms. Ricard would (1) refrain from using "John" or "he/him" pronouns, (2) use "Jane" or "Doe," and (3) refrain from using any pronouns to address the student, since the student disclaims "he/him" and Ms. Ricard's beliefs and scientific understanding prevent her from saying "she/her." *See* Ricard Decl. at ¶ 5.

While Ms. Ricard's conscience will permit her to use a student's preferred name, she does not believe that it is fair to require teachers to use any name under any circumstances. *See id.* at ¶ 6. Ms. Ricard maintains that she and her colleagues require fair notice of the terms that are actually mandatory for them to use. *See* Compl., Doc. 1 at ¶ 157–59. Therefore, consistent with her

conscience, she is willing to use any name to refer to a student once that name is reflected in the school's "Skyward" record system. *See* Ricard Decl. at ¶ 6. Ms. Ricard objects to any policy that orders teachers to use any name a student requests as soon as any student communicates the request. *See id.*

<u>*Principal Molt Orders District Staff to Use Students' Preferred Names*</u>

On March 31, 2021, then-Principal Shannon Molt sent an email to all Fort Riley Middle School teachers stating, "When we have a student that requests to go by a preferred name that is different than their given name, our district honors the request. Once you are aware of a preferred name, use that name for the student." Compl. Exhibit A, Doc. 1-1 at 2. Principal Molt did not cite any Board policy requiring such a practice or authorizing her to require such a practice. Principal Molt's email did not prohibit using last names to refer to students. No Board policy prohibits using last names to refer to students. Both before and since March 31, 2021, other teachers have routinely used last names to refer to students, including students who have requested to be addressed with another name. *See* Ricard Decl. at ¶ 16.

<u>*District Officials Punish Ms. Ricard for Addressing a Student by Last Name*</u>

On April 7, 2021, Ms. Ricard learned, in an email from Jason Lubbers, a school counselor, that one of her female students ("Student 1") wished to be addressed with a different first name. *See* Compl. Exhibit B, Doc. 1-2 at 2. Mr. Lubbers did not tell Ms. Ricard that she was prohibited from using the student's last name. In addition, Mr. Lubbers referred to Student 1 with the feminine pronoun, "she." Defendants took no disciplinary action against Mr. Lubbers for using "she" with reference to Student 1, even though the Reprimand issued to Ms. Ricard prohibits her from using "she" with reference to Student 1. Ricard Decl. at ¶ 14.

After receiving the April 7 email, Ms. Ricard conferred with Assistant Principal Terry Heina about Ms. Ricard's religious and scientific objections to granting a request to deviate from her normal practice of referring to all students with pronouns consistent with biological sex. *See* Compl., Doc. 1 at ¶ 111. Ms. Ricard determined that the best practice would be to refer to the student by last name.

Ms. Ricard referred to Student 1 by last name on April 7 and April 8. *See id.* at ¶¶ 114, 117. Student 1 never complained to Ms. Ricard or asked Ms. Ricard to use a different name. However, another female student, who also now requests to be addressed with a different name and "he/him" pronouns ("Student 2"), objected to Ms. Ricard's issuance of a disciplinary sanction against Student 2 for unauthorized email use during class. *Id.* at ¶ 119. Upset with the discipline, Student 2 threw Ms. Ricard's discipline form in the trash and left a note accusing Ms. Ricard of being "visibly transphobic" because Ms. Ricard referred to Student 1 by last name. *Id.* ¶¶ 119–123.

Ms. Ricard reported Student 2's behavior to school officials. On April 9, 2021, the school suspended Ms. Ricard for three days after learning that she referred to Student 1 with Student 1's legal last name. *See id.* at ¶¶ 124, 132–33; Compl. Exhibit C, Doc. 1-3 at 2.

*District Officials Suspend Ms. Ricard Under Inapplicable Policies*

On her return to school on April 15, Ms. Ricard received a "Witten Reprimand," concluding that her use of a student's last name on April 7 and 8 violated Board Policy GAACB, Board Policy GAAE, and Board Policy GAF. *See* Compl., Doc. 1 at ¶ 134; Compl. Exhibit D, Doc. 1-4 at 4.

Policy GAACB provides, "All employees . . . are expected to exhibit conduct that reflects dignity, respect and inclusion at all times during the instructional day and at all other district-

sponsored programs and events." *See id.* Policy GAACB does not prohibit referring to a student by last name. Prior to Ms. Ricard's Written Reprimand, no District official interpreted Policy GAACB to prohibit referring to a student by last name. Since Ms. Ricard's Written Reprimand, other employees have referred to students by last name, including students who have requested to be addressed by another preferred name, without being disciplined under Policy GAACB. *See* Ricard Decl. at ¶¶ 16–18.

Policy GAAE prohibits "bullying in any form by any . . . staff member" and provides that "the term 'bullying' shall have the meaning ascribed to it in Kansas law." *See* Compl. Exhibit R, Doc. 1-18 at 2. Kansas law defines bullying as a "verbal . . . or physical act or threat that is sufficiently severe, persistent or pervasive that creates an intimidating, threatening or abusive educational environment . . . that a reasonable person . . . knows or should know will have the effect of" harming a student, damaging their property, or placing the student in reasonable fear thereof. Kan. Stat. Ann. § 72-6147(a)(1)(A). Policy GAAE does not prohibit referring to a student by last name. Prior to Ms. Ricard's Written Reprimand, no District official interpreted Policy GAAE to prohibit referring to a student by last name. Since Ms. Ricard's Written Reprimand, other employees have referred to students by last name, including students who have requested to be addressed by another preferred name, without being disciplined under Policy GAAE. *See* Ricard Decl. at ¶¶ 16–18.

Policy GAF provides, "Staff members shall maintain professional relationships with students which are conducive to an effective educational environment. Staff members shall not have any interaction of a romantic and/or sexual nature with any student at any time regardless of the student's age or consent." *See* Compl. Exhibit R, Doc. 1-18 at 4. As with Policies GAACB and GAAF, Policy GAF does not prohibit referring to a student by last name and had not been

interpreted to prohibit referring to a student by last name prior to Ms. Ricard's suspension. Likewise, employees other than Ms. Ricard have referred to students by last name, including students who have requested to be addressed by another preferred name, without being disciplined under Policy GAF. *See* Ricard Decl. at ¶¶ 16–18.

Ms. Ricard ultimately agreed that she would use a student's preferred name. *See* Compl., Doc. 1 at ¶¶ 131, 151, 169. Ms. Ricard continues to object to any policy compelling her to use any name a student requests as soon as a student makes the request because this is unfair to teachers. *See* Compl., Doc. 1 at ¶¶ 157–59. Ms. Ricard is willing to use any name reflected in the Skyward system. *See* Ricard Decl. at ¶ 6. But the Reprimand also established future performance expectations, including an order, not required by any policy enacted at the time, that "[p]referred names *and pronouns* will be utilized." Compl. Exhibit D, Doc. 1-4 at 4 (emphasis added). For reasons of scientific, conscientious, and religious belief, Ms. Ricard cannot comply with the order to use pronouns inconsistent with a student's sex.

*Defendants Develop Post Hoc Justifications for the Written Reprimand*

Between April and September 2021, Defendants promulgated interim policies and post-hoc rationalizations for their April 15 order that Ms. Ricard use any names and pronouns a student may request. For example, on April 21 (six days after Ms. Ricard's Written Reprimand), Principal Molt sent another email containing two documents: a "Diversity Training" document, dated April 7, 2021 (the same day as Ms. Ricard's initial alleged infraction) and a "Use of Preferred Names and Pronouns" document, dated April 14, 2021 (the day before Ms. Ricard's Written Reprimand). Compl., Doc 1. at ¶ 139. While Ms. Ricard does not know the date these documents were created or whether they had been previously distributed, Ms. Ricard was not aware of them nor ever saw them publicly distributed prior to Principal Molt's April 21 email. *Id.* at ¶ 140.

The "Diversity Training" document asserts that "refusing to call someone by their preferred name or pronoun" constitutes "discrimination," but fails to explain how such a decision involves differential treatment. Compl. Exhibit F, Doc. 1-6 at 5. For example, if a teacher's practice is to always use terms based on sex, refusing to use terms based on preference is equal treatment, not discrimination. *See*, *e.g.*, Ricard Decl. at ¶¶ 3–4. The "Use of Preferred Names and Pronouns" document states that a student's "preferred name and pronouns will be utilized by staff in the building" and instructs officials to "contact the parents/guardians of the student to inform them that the school will honor the request of the student." Compl. Exhibit G, Doc. 1-7 at 2. The document also authorizes a staff member to request that others use a staff member's "preferred name and pronouns," but prohibits staff from communicating different names/pronouns to students within the same school year: "Students will be advised of the name change at the end of the school year to prevent confusion for the student." *Id.*

<u>Defendants Reject Ms. Ricard's Appeals and Proposed Accommodation</u>

Between April and September 2021, Ms. Ricard appealed her suspension and Written Reprimand to various authorities and, ultimately, to the Defendant school board members. On September 7, 2021, the school board, after initially denying her appeal in a secret meeting in violation of the Kansas Open Meetings Act, *see id.* at ¶¶ 177-79; Compl. Exhibit O, Doc. 1-15 at 6–7, formally denied her appeal and rejected Ms. Ricard's request for an accommodation. *See* Compl., Doc. 1 at ¶ 183–84. On the same day, Defendants adopted amendments to the policies at issue in this case: GAACB-Diversity and Inclusion and JGECB-Student Diversity and Inclusion. *Id.* at ¶ 186. Those amendments added a single line to each respective policy:

"Employees will be called by their preferred name and pronouns."

"Students will be called by their preferred name and pronouns."

*Id.* at ¶ 186.

At the same meeting, Defendants rejected Ms. Ricard's proposed accommodation, which said,

> Employees may refer to a student by only their first and/or last name and refrain
> from using a student's preferred gendered pronouns or salutations. For purposes
> of this section, the teacher shall refer to a student only by preferred first and/or
> last name(s) as listed in the official enrollment records of the district and
> maintained in the Skyward system.

*Id.* at ¶ 169.

### *Defendants' Policies Require Ms. Ricard to Violate Her Conscience and Mislead Parents*

On October 8, 2021, after the board amended policies GAACB and JGECB, Defendant Brennan sent an email to all District parents from Defendant Eggleston describing the new policies. Compl., Doc. 1 at ¶ 188. Consistent with the board's amendments, Defendant Eggleston wrote, "Students will be called by their preferred name and pronouns." But, contradicting the previous "Use of Preferred Names and Pronouns" document, Defendant Eggleston now stated that "USD 475 will *not* communicate this information to parents unless the student requests the administration or counselor to do so . . . ." *Id.* at ¶ 189 (emphasis added).

Consequently, under Policy GAACB, Policy JGECB, and Defendant Brennan's October 8 email (collectively, "the Policies"), Ms. Ricard is now expressly obligated to (1) use whatever name and pronoun a student requests as soon as the student communicates the request, and (2) mislead parents about the student's use of a new name or pronoun unless the student authorizes Ms. Ricard to share that information. Ms. Ricard has at least two students in her classes requesting to be referenced with pronouns that signify a gender other than the student's sex. *Id.* at ¶ 193. Neither of the students have authorized Ms. Ricard to share this information with their parents. Ricard Decl. at ¶ 11. Therefore, Ms. Ricard is under an obligation to mislead the parents by referring to the students using a name and pronoun in communications with the parents that is

different than the name and pronoun being used at the school (i.e., referring to the student using the student's legal name and biological pronoun when talking to the parents but using the student's preferred name and pronoun in communications during school). *See* Ricard Decl. at ¶ 12. Under Defendants' Policies, Ms. Ricard is subject to unlimited and uncertain obligations. She is also prohibited from doing what her conscience demands—refraining from dishonest communications with both parents and students—and is under imminent threat of additional punishment for doing what her conscience demands. *See* Compl., Doc. 1 at ¶ 195.

## ARGUMENT

Ms. Ricard is entitled to a preliminary injunction and temporary restraining order prohibiting Defendants from (i) requiring her to use any name a student requests instead of the name reflected in the Skyward system, (ii) punishing her for refraining from referring to students using pronouns inconsistent with a student's biological sex, and (iii) ordering her to mislead parents about the way she addresses their children. Preliminary injunctive relief is appropriate where the moving party shows "(1) that it has a substantial likelihood of prevailing on the merits; (2) that it will suffer irreparable harm unless the preliminary injunction is issued; (3) that the threatened injury outweighs the harm the preliminary injunction might cause the opposing party; and (4) that the preliminary injunction if issued will not adversely affect the public interest." *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1246 (10th Cir. 2001). All four factors favor Ms. Ricard.

**I.      Ms. Ricard is likely to succeed in showing Defendants are violating her rights.**

In constitutional cases, the likelihood of success on the merits factor is the most important, since "demonstrat[ing] a substantial likelihood of success" will implicate the "public interest . . . [in] protecting the core First Amendment right of political expression." *Homans v. City of Albuquerque*, 264 F.3d 1240, 1244 (10th Cir. 2001) (per curiam). Here, Ms. Ricard is substantially

likely to prevail in showing that Defendants are violating her right to free speech, free exercise of religion, and due process of law.

### A.  Defendants are violating Ms. Ricard's right to free speech.

The Tenth Circuit applies the "familiar *Garcetti/Pickering*" test to free speech claims by public employees.

> The test consists of five steps: "(1) whether the speech was made pursuant to an employee's official duties; (2) whether the speech was on a matter of public concern; (3) whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests; (4) whether the protected speech was a motivating factor in the adverse employment action; and (5) whether the defendant would have reached the same employment decision in the absence of the protected conduct."

*Helget v. City of Hays,* 844 F.3d 1216, 1221 (10th Cir. 2017) (quoting *Trant v. Oklahoma*, 754 F.3d 1158, 1165 (10th Cir. 2014). Ms. Ricard is substantially likely to prevail on all five factors.

### 1.  None of Ms. Ricard's valid official duties compel her to mislead parents or use whatever pronouns students select.

Because the general rule is "that employee speech made pursuant to the employee's professional duties is not afforded First Amendment protection," the first step is to determine whether the employee's speech at issue falls within the employee's official duties. *Reinhardt v. Albuquerque Pub. Schs. Bd. of Educ.*, 595 F.3d 1126, 1135 (10th Cir. 2010). In making this determination, "[t]he key is 'whether the speech was made pursuant to the employee's job duties or, in other words, whether the speech was commissioned by the employer.'" *Id.* (quoting *Thomas v. City of Blanchard*, 548 F.3d 1317, 1323 (10th Cir. 2008).

That the speech was "commissioned" by the government, however, is not the end of the inquiry, as the government does not have the power to "commission" whatever speech it wants and then force teachers to repeat it in schools. *See*, *e.g.*, *Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022, 1032 (9th Cir. 1998) (the government may not "indoctrinate their young charges

with racist concepts"). Defendants' Policies exceed the limits of valid official duties under *Garcetti*. First, Defendants compel Ms. Ricard to make false and misleading statements to parents about their child's "social transition" in school; and second, compel Ms. Ricard to recite the state's orthodoxy to school children in violation of her own conscience and in contradiction to biological fact.

### a. Ms. Ricard has no valid official duty to make false or misleading statements to parents about a student's "social transition."

The Tenth Circuit has acknowledged that the state's authority to define an employee's "official duties" and then regulate related speech is limited. "[I]t would be going too far to hold that every time a public employee discovers alleged wrongdoing related to his job and brings it to the attention of law enforcement or other outside parties, the speech is unprotected." *Thomas*, 548 F.3d at 1324. *See also Casey v. W. Las Vegas Indep. Sch. Dist.*, 473 F.3d 1323, 1331 (10th Cir. 2007) ("we do not mean to suggest that every agent who disregards a principal's instructions not to disclose information is barred from suit by *Garcetti*"). By the same token, an employer cannot *command* an employee to *lie* to outside parties and then claim that telling this lie is an "official duty" simply because it was commanded. *See Jackler v. Byrne*, 658 F3d 225, 242 (2d Cir. 2011) (holding that employee's claim that he was "terminat[ed] in retaliation for his refusal to . . . make false statements" was not barred by *Garcetti*).[1]

---

[1] While "[t]he Tenth Circuit has not spoken on this issue," *Lincoln v. Maketa*, 880 F.3d 533, 539 (10th Cir. 2018), the rule against *compelled* false statements is consistent with the logical limits of *Garcetti*. *See Janus*, 138 S. Ct. at 2473 ("it is not easy to imagine a situation in which a public employer has a legitimate need to demand that its employees recite words with which they disagree"). In addition, the Tenth Circuit's finding that the law on compelled false statements was not clearly established for purposes of qualified immunity does *not* prohibit this Court from granting prospective injunctive relief on that basis. *See Kikumura v. Hurley*, 242 F.3d 950, 962–63 (10th Cir. 2001) ("Qualified immunity . . . does not apply to claims for equitable relief.").

In this case, Defendants condition Ms. Ricard's job on her willingness to lie to parents about how their students are being addressed in school, and whether that student is undergoing "social transition" by using a different name and pronouns. Compl., Doc. 1 at ¶ 189. The government has no authority to make lying to parents part of a public school teacher's official duties. *See Janus*, 138 S. Ct. at 2473 (stating that, under *Garcetti*, "the employer may insist that the employee deliver any *lawful* message") (emphasis added). This Court should hold that this case is an example of what the Tenth Circuit said in *Casey*: an "agent who disregards a principal's instructions not to disclose information is [not] barred from suit by *Garcetti*." *Casey*, 473 F.3d at 1331.

> **b.  Ms. Ricard has no valid official duty to personally affirm the state's orthodoxy about sex and gender identity.**

Ms. Ricard also has no valid "official duty" to personally affirm the state's orthodoxy about sex and gender by using any pronoun the student requests because Defendants have no power to impose such a duty in the first place. In *Garcetti* itself, the Court "reject[ed] . . . the suggestion that employers can restrict employees' rights by creating excessively broad job descriptions." 547 U.S. 410, 424 (2006). In *Janus*, the Supreme Court acknowledged *Garcetti*'s framework "fits much less well where the government" employer "does not simply restrict potentially disruptive speech but commands that its employees mouth a message on its own behalf . . . ." 138 S. Ct. at 2473. While an employer may require an "employee [to] deliver any *lawful* message . . . it is not easy to imagine a situation in which a public employer has a legitimate need to demand that its employees recite words with which they disagree." *Id.* (emphasis added). *Garcetti*, then, does not expand the realm of what the government *may* compel, it only relieves the government of the *Pickering* balancing when an employee speaks in the context of an otherwise valid official duty.

There are, therefore, many limits on what type of speech may be "commissioned" by the government and mandated for repetition by employees. *Reinhardt*, 595 F.3d at 1135. To give a few examples:

- The government may not require teachers to "indoctrinate their young charges with racist concepts." *Monteiro*, 158 F.3d at 1032.

- The government may not jail professors for their refusal to discuss the content of their academic lectures. *Sweezy v. New Hampshire*, 354 U.S. 234, 250–55 (1957).

- The government may not compel prospective employees to swear loyalty oaths as a condition of employment. *Weiman v. Updegraff*, 344 U.S. 183, 190–91 (1952).

- The government may not compel teachers to disclose all of their recent associations in order to be hired at a public school. *Shelton v. Tucker*, 364 U.S. 479, 489–90 (1960).

- The government may not prohibit the instruction in languages other than English. *Meyer v. Nebraska*, 262 U.S. 390, 401 (1923).

- The government may not compel students to pledge allegiance to the American flag. *Barnette*, 319 U.S. at 642.

- The government may not compel teachers to lead students in the pledge. *Russo v. Cent. Sch. Dist. No. 1, Towns of Rush, et al.*, 469 F.2d 623, 633–34 (2d Cir. 1972).

These holdings do not merely identify assorted, specific prohibited governmental acts. Rather, they flow from a recognition that there are some governmental *objectives* that are improper, and that compulsive attempts to attain them are unconstitutional. Because "[t]eachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding," *Sweezy*, 354 U.S. at 250, it "cannot be" that the state possesses "alarming power to compel ideological conformity." *Meriwether v. Hartop*, 992 F.3d 492, 506 (6th Cir. 2021). For

the same reason, it is unconstitutional to use compulsive methods "to foster a homogeneous people with American ideals." *Meyer*, 262 U.S. at 402. Where the government uses compulsive means "to produce a society free of the corresponding biases . . . . it is a decidedly *fatal objective*." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 578–79 (1995) (emphasis added).

Defendants' Policies are an attempt to craft an official duty requiring Ms. Ricard to repeat its orthodoxy to "compel ideological conformity," *Meriwether*, 992 F.3d at 506, in pursuit of a "fatal objective." *Hurley*, 515 U.S. at 579. Therefore, Defendants' Policies convey neither a "lawful message" nor stem from a "legitimate need," and impose no valid official duty on Ms. Ricard under *Garcetti*. *Janus*, 138 S. Ct. at 2473.

In addition to Defendants' constitutionally impermissible objective, the facts also show that Defendants have no "legitimate need" to demand that Ms. Ricard use pronouns that convey a message about sex and gender identity "with which [she] disagree[s]." *Id.* The absence of any legitimate need is evident from the facts that: (1) Ms. Ricard has agreed to refer to students with their preferred first name, (2) other teachers have used and continue to use last names to refer to students, (3) teachers rarely use pronouns to refer to a student in that student's presence at all, (4) the District Policies themselves presume a male/female *binary* for pronouns and students while punishing teachers for maintaining that binary,[2] and (5) the District regards a *single nonuse* of a preferred name or pronoun as punishable "discrimination" when done by a teacher while subjecting employees to the same alleged "discrimination" for up to a full school year merely "to prevent confusion for the student." *See* Compl. Exhibit G, Doc. 1-7 at 2. Defendants cannot have it both ways: they cannot claim an interest as mundane as preventing student "confusion" justifies

---

[2] *See* Exhibit A at 3 ("When the masculine pronoun is used throughout these policies, it is intended to refer to *both* feminine and masculine *antecedents*") (emphasis added)

subjecting employees to an act they define as "discrimination." They have no "legitimate need" to force Ms. Ricard to use pronouns inconsistent with a student's sex. *Janus*, 138 S. Ct. at 2473.

The facts further demonstrate that the particular message Defendants compel Ms. Ricard to communicate is not a "lawful message." *Janus*, 138 S. Ct. at 2473. By requiring teachers to use any name and pronoun a student requests, regardless of a student's sex, Defendants force teachers to communicate that there are no inherent or enduring differences between men and women. According to the message Defendants force Ms. Ricard to send, what makes someone a male or female is *solely* the person's claim to be a male or female. But the Supreme Court has already recognized a distinction between the sexes based on biology. In *United States v. Virginia*, the Supreme Court stated, "Physical differences between men and women, however, are *enduring*" and that "'[*i]nherent differences*' between men and woman, we have come to appreciate, remain cause for celebration . . . ." 518 U.S. 515, 533 (1996) (emphasis added). Defendants can hardly claim a "legitimate need" to force public school teachers to pretend such differences do not exist and cannot seriously maintain this is a "lawful message." *Janus*, 138 S. Ct. at 2473.

Because Ms. Ricard's valid official duties do not include a duty to lie to parents or to contradict her own beliefs and "mouth support for views [she] find[s] objectionable," the government has no "legitimate need to demand" these expressions and Ms. Ricard's claim is not barred by *Garcetti*. *Janus*, 138 S. Ct. at 2463, 2473.

## 2. Ms. Ricard's use of pronouns consistent with sex implicates a matter of public concern.

Ms. Ricard's use of pronouns consistent with sex, her refusal to use pronouns inconsistent with sex, and her refusal to lie to parents about ongoing social transition, implicate matters of public concern. "Generally, a matter of public concern relates to any matter of political, social, or

other concern to the community." *Butler v. Bd. of Cnty. Comm'rs for San Miguel Cnty.*, 920 F.3d 651, 653 (10th Cir. 2019). Ms. Ricard's speech relates to all three areas of public concern.

The question of how to treat children who identify as transgender or suffer from gender dysphoria is of ongoing political debate in many public spheres including sports, access to public facilities, and use of pronouns in schools. Most obviously, the elected school board in Geary County addressed this issue. *See* Compl., Doc. 1 at ¶¶ 183–187. But the matter has roiled communities, school boards, and legislatures across the country.[3] *See Meriwether*, 992 F.3d at 508 ("From courts to schoolrooms this controversy [over gender pronouns] continues.").

Ms. Ricard's practice is to treat every student the same unless a student requests to be treated differently. *See* Ricard Decl. at ¶¶ 3–4. If a student requests a different name, she is willing to accommodate the student by using a preferred first name (provided the school first updates the first name in the Skyward system) or their last name. Despite having no policy against it at the time, Defendants punished Ms. Ricard for using a student's last name. They now threaten additional punishment for her refusal to use pronouns inconsistent with sex. Defendants' actions demonstrate that they understand "Pronouns can and do convey a powerful message implicating a sensitive topic of public concern." *Meriwether*, 992 F.3d at 508. It is *because* the use of pronouns addresses a matter of public concern that Defendants seek to conscript teachers to mouth support for Defendants' preferred side of the issue.

---

[3] *See* Hannah Natanson, *Va. Supreme Court affirms judge's ruling reinstating Loudoun teacher who refused to use transgender pronouns*, WASH. POST (Aug. 31, 2021), https://www.washingtonpost.com/local/education/tanner-cross-virginia-supreme-court-transgender-pronouns/2021/08/31/52f94c62-0a71-11ec-9781-07796ffb56fe_story.html; Andrew Mark Miller, *Ohio lawmakers propose parental rights bill similar to controversial Florida legislation*, FOX NEWS (April 6, 2022), https://www.foxnews.com/politics/ohio-lawmakers-propose-parental-rights-bill-similar-controversial-florida-legislation.

### 3.   Ms. Ricard's interests outweigh any of Defendants' interests.

Ms. Ricard's interest in speaking honestly to parents, and consistent with her conscience and her understanding of biology to her students, outweighs any of Defendants' interests. "'The *only* public employer interest that outweighs the employee's free speech interest is avoiding *direct disruption*, by the speech itself, of the public employer's internal operations and employment relationships.'" *Helget*, 844 F.3d at 1222 (quoting *Trant,* 754 F.3d at 1166) (emphasis added).

Ms. Ricard's practice of calling students by their name but without any pronoun they might request will not disrupt any of Defendants' services. First, her practice is substantially the same as other teachers who commonly use last names. The only difference between Ms. Ricard's practice and these teachers is Ms. Ricard's known religious motivation. But motive is not a constitutional basis for the state to treat a religious practice differently than an otherwise identical secular practice. *See Tandon v. Newsom*, 141 S. Ct. 1294, 1297 (2021) (per curiam) (the government may not "treat[] some comparable secular activities more favorably than . . . religious exercise").

Second, another District policy shows that, in other contexts, Defendants place very little weight on the non-use of preferred pronouns. If a District employee notifies Defendants of a new name or pronoun at the beginning of the school year, Defendants do *not* require students to refer to that employee by those terms, even though refusal to use such terms allegedly constitutes "discrimination" under the same policies used to punish Ms. Ricard. *See* Compl. Exhibit F, Doc. 1-6 at 5. Rather, merely to avoid "confusion," Defendants will subject their employees to what they would in other cases define as discriminatory conduct for up to an entire school year. *Id.* If Defendants are willing to excuse use of names *and* pronouns for all students with reference to employees merely to avoid "confusion," Defendants can claim no interest in forcing Ms. Ricard to use pronouns when she is already willing to use last names or preferred names that are added to the Skyward system.

### 4.   Defendants threaten Ms. Ricard with additional adverse action.

Ms. Ricard faces additional discipline—up to termination—for her refusal to use pronouns inconsistent with a student's sex, including with reference to the two students in her class who have already made such a request. *See* Compl., Doc. 1 at ¶¶ 193, 195. Termination is unquestionably adverse action, and Defendants' existing threat of disciplinary action under the Written Reprimand's performance expectations also constitutes adverse action. *See Belcher v. City of McAlester*, 324 F.3d 1203, 1207 n.4 (10th Cir. 2003).

### 5.   Defendants' threatened action is because of Ms. Ricard's speech.

Any adverse action Ms. Ricard suffers under the Policies will uncontestably be inflicted on account of her speech. None of Ms. Ricard's valid official duties include a duty to make false statements to parents or to mouth the state's orthodoxy about sex and gender to her students in violation of her conscience by using pronouns inconsistent with her students' sex. The Policies compel her to speak on matters of public concern. Ms. Ricard's interest in speaking truthfully and refraining from speaking falsely outweigh any of Defendants' interests. She is at risk of suffering adverse action on account of her protected speech. Therefore, Ms. Ricard is substantially likely to prevail in showing Defendants are violating her free speech rights.

### B.  Defendants are violating Ms. Ricard's right to free exercise of religion.

Ms. Ricard is also substantially likely to prevail in showing that Defendants are violating her right to free exercise of religion. Defendants punished Ms. Ricard for using last names or declining to use pronouns for religious reasons. But Defendants do not punish other teachers that use last names or fail to use a student's "preferred pronoun" for secular reasons.

### 1.   Defendants' Policies are subject to strict scrutiny.

The first step in evaluating a claim under the Free Exercise Clause is to determine whether the restriction in question is a "neutral rule[] of general applicability." *Grace United Methodist*

*Church v. City of Cheyenne*, 451 F.3d 643, 652 (10th Cir. 2006). Generally, a "law is neutral so long as its object is something other than the infringement or restriction of religious practices." A law is generally applicable if it applies to everyone without any exemption that "'invite[s] [the] consideration of the particular circumstances'" of any person that requests an exemption. *Id.* at 651 (quoting *Emp. Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 884 (1990)). Defendants' Policies fail in both respects, because they target Ms. Ricard's religious practice and because Defendants offer exemptions to their Policies based on an individualized analysis of the reasons behind a teacher's behavior.

### a. Defendants' Policies are not neutral.

In evaluating neutrality, courts must examine the facts. "Facial neutrality is not determinative. . . . Official action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality. The Free Exercise Clause protects against governmental hostility which is masked, as well as overt." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993).

The facts of this case illustrate that the purpose behind Defendants' Policies was to penalize Ms. Ricard (and any other teachers who believe as she does) for her religious beliefs. Ms. Ricard's original punishment was for referring to a student by last name, even though no policy at the time prohibited doing so. Compl. Exhibit D, Doc. 1-4 at 4. Ms. Ricard's Written Reprimand described her use of the student's last name as discriminatory, even though her practice is not, and no policy has ever expressly prohibited using a last name. *Id.* Ms. Ricard's Written Reprimand also included a requirement to use preferred pronouns in addition to preferred names, when no policy had been promulgated that required use of pronouns. *Id.* at 3.

Immediately after Ms. Ricard received her Written Reprimand, Defendants promulgated documents that were seemingly backdated to the day of Ms. Ricard's initial "infraction" and to the

day before she received her Written Reprimand. These documents for the first time interpreted the Policies to require use of pronouns, and defined nonuse of pronouns as "discrimination." *See* Compl. Exhibit F, Doc. 1-6 at 5; Compl. Exhibit G, Doc. 1-7 at 2. As additional evidence of targeting, another teacher that referred to Student 1 as "she," has not been punished, *See* Compl. Exhibit B, Doc. 1-2 at 2. And other teachers that routinely refer to students with last names have not been punished. Ricard Decl. at ¶ 16. Defendants' enforcement against Ms. Ricard, specifically because they knew the nature of her religious objection, their continued adjustment of the Policies to justify their punishment, and their ongoing mandate, illustrates an unconstitutional "religious gerrymander" against Ms. Ricard and teachers who believe as she does. *Lukumi*, 508 U.S. at 535 (quotation omitted).

### b. Defendants' Policies are not generally applicable.

Nor are Defendants' Policies generally applicable. The Supreme Court's decision in *Sherbert v. Verner*, 374 U.S. 398 (1963) is "[t]he classic example of" a "system of individualized exceptions" that renders a law not generally applicable. *Grace United*, 451 F.3d at 650. In *Sherbert*, the South Carolina Employment Security Commission denied a request for unemployment compensation benefits because the Commission determined that the applicant's unavailability for work on Saturdays for religious reasons did not constitute "good cause." In contrast, the Commission determined that other similar secular reasons may constitute "good cause." 374 U.S. at 401. The Court also found it significant that the Commission excused *other* religious reasons for being unavailable, including refusal to work on Sundays. *Id.*

Here, Defendants decide whether a teacher has "good cause" to use a student's last name based on the teacher's religious beliefs. Because they knew that Ms. Ricard did not agree with Defendants' orthodoxy about sex and gender and used last names initially for religious reasons, they punished her. Now, they know she is willing to use names (if updated in the Skyward system)

but cannot use pronouns, and they continue to threaten her with punishment. All the while, like the workers who objected to work on Sunday in *Sherbert*, Defendants excuse other teachers who use last names for secular reasons, and even allow students to "discriminate" against staff merely to avoid "confusion."

Because Defendants' development and enforcement of their Policies show they are hostile toward Ms. Ricard's religion and are not generally applicable, they must satisfy strict scrutiny. But they fail to do so.

### 2. Defendants' Policies fail strict scrutiny.

"A government policy can survive strict scrutiny only if it advances 'interests of the highest order' and is narrowly tailored to achieve those interests." *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1881 (2021) (quoting *Lukumi*, 508 U.S. at 546). Defendants' Policies and practices cannot satisfy either element of the test.

#### a. Defendants have no compelling interest in enforcing their Policies against Ms. Ricard.

Defendants have no compelling interest in forcing Ms. Ricard to use pronouns inconsistent with students' sex when she is already willing to use requested names. Defendants can claim no interest in combatting discrimination because (1) Ms. Ricard's practice is nondiscriminatory and (2) Defendants *authorize* what (under their own definitions) would constitute "discrimination" against other staff members by students merely to avoid "confusion." Compl. Exhibit G, Doc. 1-7 at 2. To the extent Defendants invoke an interest in nondiscrimination, they must show "not whether the [Defendants have] a compelling interest in enforcing [their] non-discrimination policies generally, but whether [they] ha[ve] such an interest in *denying an exception* to" Ms. Ricard. *Fulton*, 141 S. Ct. at 1881 (emphasis added). Since Defendants grant much broader exceptions both to other teachers and to other students, they can show no compelling interest in

23

denying Ms. Ricard's modest requested accommodation to use student's requested name as listed in the Skyward system but not pronouns inconsistent with the student's sex. *See* Compl., Doc. 1 at ¶ 169.

      **b.  Defendants' Policies are not narrowly tailored to achieve any compelling interest.**

Defendants' selective enforcement of their Policies against Ms. Ricard also demonstrate the Policies' lack of narrow-tailoring. A law that leaves "unburdened those speakers whose messages are in accord with its own views," while burdening those that disagree is not narrowly tailored. *Nat'l Inst. of Fam. and Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2378 (2018) (quotation omitted). When the government regulates some religious activity to ameliorate some alleged danger, it cannot permit other secular activity that raises similar danger: "Where the government permits other activities to proceed with precautions, it must show that the religious exercise at issue is more dangerous than those activities even when the same precautions are applied." *Tandon*, 141 S. Ct. at 1297. Here, Defendants engage in no punishment when teachers use a last name or a sex-based pronoun for a secular reason, but they target and restrict teachers who refrain from using pronouns inconsistent with sex for religious reasons. Defendants' Policies fail strict scrutiny. Therefore, Ms. Ricard is substantially likely to prevail on the merits of her free exercise claim.

    **C.  Defendants are violating Ms. Ricard's right to due process of law.**

The Due Process Clause requires "that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that [s]he may act accordingly." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). Defendants' Policy JGECB simply states, "Students will be called by their preferred name and pronouns." Compl., Exhibit R, Doc. 1-18 at 5. But Ms. Ricard has no effective notice of what names she *actually* must say on pain of punishment. Policy

JGECB says only "preferred," and does not specify whether the "name" or "pronouns" must correspond to any particular gender or known set of pronouns in order to become compulsory. This policy does not say how long a student must identify by the new name or pronouns, or whether the terms become immediately compulsory.

And there is an unlimited universe of potential terms that Ms. Ricard might be obligated to use, some putting her in jeopardy of violating *other* school policies. For example, one student logged onto a Zoom class session using the name "Cumsock." *Id.* at ¶ 159. A reasonable teacher would conclude that the name a student uses to log onto Zoom is the name that student prefers to be called by, triggering the rule's obligations. There is perhaps nothing so far removed from providing a "reasonable opportunity to know what is prohibited" than a policy that places teachers at the mercy of a middle schooler's imagination. *Grayned*, 408 U.S. at 108. On the other hand, Ms. Ricard has identified a workable alternative: allow students to use preferred names, but only make a name mandatory once it has been listed in the Skyward system. Such a policy would give teachers notice of what they are actually required to say. But Defendants rejected this proposal. *See* Compl., Doc. 1 at ¶¶ 169, 184. Therefore, Ms. Ricard is substantially likely to prevail on her claim that Policy JGECB violates her right to due process of law.

## II.       Ms. Ricard is suffering irreparable injury.

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). The Tenth Circuit applies this presumption on motions for preliminary injunction that demonstrate substantial likelihood of success on the merits. *See Utah Licensed Beverage Ass'n v. Leavitt*, 256 F.3d 1061, 1076 (10th Cir. 2001). Because Ms. Ricard is substantially likely to prevail on the merits, she also has shown that she is suffering irreparable injury. *Id.*

**III.        Ms. Ricard's injury outweighs any injury to Defendants from an injunction.**

Similarly, substantial likelihood of success on a constitutional claim undermines a government defendant's claim of injury from a requested injunction. *Am. Civ. Liberties Union v. Johnson*, 194 F.3d 1149, 1163 (10th Cir. 1999) ("We further agree with the district court's conclusion that the threatened injury to Plaintiffs' constitutionally protected speech outweighs whatever damage the preliminary injunction may cause Defendants' inability to enforce what appears to be an unconstitutional statute.") (quotation omitted). Therefore, Ms. Ricard's showing of substantial likelihood of success also demonstrates that Defendants will suffer no injury from the requested injunction. *Id.*

**IV.        Enjoining Defendants' unlawful conduct serves the public interest.**

Finally, because Ms. Ricard is substantially likely to prevail on the merits, enjoining Defendants' violation of her constitutional rights serves the public interest. *See id. See also Leavitt*, 256 F.3d at 1076 ("Because we have held that [the] challenged statutes also unconstitutionally limit free speech, we conclude that enjoining their enforcement is an appropriate remedy not adverse to the public interest."). The interests of all teachers, parents, students, and the public are served by an injunction prohibiting the enforcement of Defendants' unconstitutional policies. *Id.*

## CONCLUSION

This Court should enjoin Defendants from enforcing their unconstitutional policies against Ms. Ricard.

Respectfully submitted this 13th day of April, 2022.


By: *s/ Tyson C. Langhofer*
Tyson C. Langhofer, KS Bar No. 19241
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(480) 444-0020
tlanghofer@adflegal.org

Joshua A. Ney, KS Bar No. 24077
Ryan A. Kriegshauser, KS Bar No. 23942
Alan M. Vester, KS Bar No. 27892
15050 W. 138th St., Unit 4493
Olathe, KS 66063
Telephone: 913 303-0639
firm@knlawgroup.com

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that on the 13 day of April, 2022, I electronically filed the foregoing with

the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to:

David R. Cooper
Fisher, Patterson, Sayler & Smith, LLP
3550 S.W. 5th Street
Topeka, KS 66606
(785) 232-7761
dcooper@fpsslaw.com

Attorney for Defendants

*s/ Tyson C. Langhofer*
Tyson C. Langhofer
*Attorney for Plaintiff*