**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

PAMELA RICARD,

                Plaintiff,

    vs.                                        Case No. 5:22-cv-04015-HLT-GEB

USD 475 GEARY COUNTY SCHOOLS SCHOOL
BOARD MEMBERS—Ron Johnson, Kristy Haden,
Anwar Khoury, Jim Schmidt—in their official and
individual capacities; Beth Hudson, Mark Hatcher,
Jason Butler—in their official capacities; REGINALD
EGGLESTON, Superintendent, USD 475 Geary
County Schools, in his official and individual
capacities; and KATHLEEN BRENNAN, Principal,
Fort Riley Middle School, in her official capacity,

                Defendants.

---

**Response to Motion for Temporary Restraining Order and Preliminary Injunction**

    Defendants submit this response in opposition to Plaintiff's motion for a temporary restraining order and preliminary injunction.

**Nature of the Case**

    Plaintiff Ricard, a middle school math teacher, seeks a temporary restraining order and preliminary injunction to prevent USD 475 Geary County Schools from enforcing its anti-discrimination and anti-bullying policies against her while she performs her teaching duties. District policies forbid intentional, unlawful discrimination and require equal treatment of students regardless of age, color, national origin, disability, ethnicity, socio-economic status, sex, gender identity and sexual orientation. The District adopted these policies in accordance with their federal and state mandated duties owed to the students in the District's care.

Plaintiff Ricard was not disciplined for "merely" referring to a student by his legal last name. Rather, Plaintiff was disciplined for intentionally treating a transgender student differently than cisgender students on the basis of sex. Such intentional discrimination violates not only District policies but the Equal Protection Clause and Title IX. Plaintiff Ricard asks this court to not only to countenance her previous discriminatory conduct but to give her a license (in the form of a preliminary injunction) to do so for all time. The relief requested by Plaintiff Ricard is a court order permitting her to discriminate against transgender students on the basis of sex. Plaintiff Ricard's motion should be denied, and her claims dismissed.

## Statement of Facts

Plaintiff Ricard's Complaint and memorandum in support of her request for a temporary restraining order refer to Student 1 and Student 2. This memorandum refers to these students as Student E.S. and Student J.K. The initials should better enable the reader to discern between the students when reviewing the exhibits.

1.     The USD 475 Faculty Handbook advised all teachers, including Plaintiff Ricard

### NOTICE OF NON-DISCRIMINATION

Geary County USD #475 does not discriminate on the basis of race, color, national origin, sex, disability, or age in its programs ….

….

### Title IX Statement

Pursuant to Title IX and the requirements therein for the dissemination of policy, notice is hereby given that the Geary County schools, USD #475, do not discriminate on the basis of sex in the educational programs and activities offered by the district.

The board of education is committed to providing a positive and productive learning and working environment free from discrimination on the basis of sex, including sexual harassment and/or sexual violence. Any such conduct shall not be tolerated in the school district.

Doc. 11-11 Faculty Manual 2020-2021.

2.      District Policy GAACB provides, in part, that "All employees, students and the Board of Education are expected to exhibit conduct that reflects dignity, respect and inclusion at all times during the instructional day and at all other district-sponsored programs and events." Doc. 1-4; Doc. 11-2.

3.      District Policy GAAE-Bullying by Staff, provides

The board of education prohibits bullying in any form by any student staff member, or parent towards a student or a staff member on or while using school property, in a school vehicle or at a school-sponsored activity or event. For the purposes of this policy, the term "bullying" shall have the meaning ascribed to it in Kansas law.

Doc. 1-4; Doc. 1-18, p. 3; Doc. 11-3. K.S.A. 72-6147(1) defines bullying to include

Any intentional … verbal … act by any … staff member … towards a student … that is sufficiently severe, persistent or pervasive that such … act … creates an intimidating, threatening or abusive educational environment that a reasonable person, under the circumstances, knows or should know will have the effect of: (i) Harming a student or staff member, whether physically or mentally ….

4.      Board Policy GAF-Staff-Student Relations provides, in relevant part, "Staff members shall maintain professional relationships with students which are conducive to an effective educational environment." Doc. 1-4; Doc. 1-18, p. 4; Doc. 11-4.

5.      On March 8, 2021, President Biden issued Executive Order 14021. That Order sets forth a policy "all students should be guaranteed an educational environment free from discrimination on the basis of sex, including discrimination in the form of sexual harassment, which encompasses sexual violence, and including discrimination on the basis of sexual orientation or gender identity" Doc. 11-5, Exec. Order No. 14021, 86 FR 13803. This includes "discrimination on the basis of sexual orientation or gender identity. For students attending schools and other educational institutions that receive Federal financial assistance, this guarantee is codified, in part, in Title IX of the Education Amendments of 1972, 20 U.S.C. 1681 *et seq*., which prohibits discrimination on the basis of sex in education programs or activities receiving Federal financial assistance." *Id*.

6.      Plaintiff Ricard is a middle school math teacher at Fort Riley Middle School, a publicly funded school. *Doc.* 1, ¶ 1.

7.      During the 2020-2021 school year, Ricard taught all levels of middle school students—grates six, seven and eight. Doc. 1, ¶ 95.

8.      During the 2020-2021 school year, Plaintiff Ricard received training on diversity awareness, harassment prevention, and youth suicide awareness, prevention, and postvention. Doc. 11-12, Ricard Training History.

9.      Ricard participated in the similar training for both the 2020-2021 and 2021-2022 school years. *Id.*; Doc. 11-6, Board Packet pp. 101-03; Doc. 11-7.

10.     In the spring of 2021, three known transgender students attended Fort Riley Middle School. Doc. 11-8, Lubbers Declaration.

11.     In early March 2021, a Student E.S. and Student J.K. confided in Kelly "Paige" Miller, a science teacher, that they preferred to be called a different name. Doc. 11-9 *Miller Declaration*.

12.     Miller let the student know that their request would be respected, and she would alert the other teachers. *Id.*

13.     On March 9, 2021, J.K. attended a teacher Team Meeting and shared that he preferred to be called an alternate name. *Id.* Plaintiff Ricard was not at that teacher Team Meeting, but she was made aware of the request. *Doc. 11-6, Board Packet, p. 000010.*

**14.**     Ricard was informally made aware that a student in her classroom preferred a different name by a fellow teacher during a hallway conversation in March of 2021. Doc. 1, p. 15, ¶ 103.

15.     Ricard averes and alleges that, "[t]hroughout her teaching career, including in her Math Strategies class, [] has regularly used students' last names instead of first names as a more

formal way of addressing students or getting students' attention, as circumstances may require." *Doc. 1*, ¶ 112. By her own affirmation, Ricard uses last names for formal address or to get a student's attention--not as a usual form of address. *Id.*

16.     Ricard avers that she "addressed Student 1 [E.S.] as "Miss [E.S.'s Legal/Enrolled Last Name]" when Ms. Ricard needed to get Student E.S.'s attention at the end of class. *Doc. 1*, ¶ 114.

17.     Ricard disclosed, however, that she had been made aware of Student E.S.'s preferred name and that she intentionally did not use Student E.S.'s preferred name and, instead used [Last Name] or Miss [Last Name] instead of [Legal First Name]. *Doc. 11-6, Board Packet, p. 000010*. It was her sole form of address to the student. Also, it was done in such a manner as to cause Student J.K. to call Plaintiff Ricard out on the deliberate disparate treatment. *Id.*, p. 000085.

18.     USD 475 and the Junction City Education Association entered into a formal agreement for the 2020-2021 SY. This agreement included Article V to address a grievance process and Article X to address a teacher discipline process. These Articles of the Agreement are set forth in Doc 1.8 and Doc. 11-6, *Board Packet*, pp. 000087-91.

19.     On March 29, 2021, Plaintiff Ricard signed the Faculty Meeting "Equity Info" acknowledgment. Doc. 11-6, *Board Packet*, p. 103.

20.     On March 30, 2021 [Note: The Complaint alleges this conversation occurred on March 12, 2021] the verified Complaint alleges:

> 100. Ricard approached fellow teacher Paige Miller ("Miller") after school to ask if "[Student J.K.'s Legal First Name]" was still at the school because Ms. Ricard had sought to give Student [J.K.] an extra pair of jeans and some extra shirts after Spring Break.
>
> 101. During this conversation with Ms. Ricard, Miller repeatedly asked Ms. Ricard if Ms. Ricard meant "[Student J.K. Preferred Alternative First Name]."
>
> 102. Ms. Ricard continued to state to Miller she was looking for "[Student J.K. Legal First Name]."

103. Miller eventually told Ms. Ricard that "[Student J.K. Legal First Name]" now "goes by" "[Student J.K. Preferred Alternative First Name]."

104. Ms. Ricard stated, "don't go there" and then moved on from the conversation to look for Student [J.K.].

Doc. 1.

21.     The District Investigation Report reflects the conversation occurred on May 30, 2021 as follows:

Pamela Ricard spoke with Kelly "Paige" Miller looking for [Student J.K., (Student 2 in the Complaint]. Ricard asked, "Has [Legal First Name] left yet?" Miller replied, "No [Preferred First Name] has not." Ricard then said: "I'm not getting into that. I want to know has [Legal First Name] left yet?" Miller: "He goes by [Preferred First Name]." Miller reported correcting Ricard three times when she used the name Elizabeth instead of [Preferred First Name]. Ricard stated, "Don't get me started on this."

*Doc. 11-6, Board Packet*, p. 8; Doc. 11-9, *Miller Declaration*. Ricard herself described the interaction as follows: "I went upstairs to the 8th grade hallway to ask if [J.K.'s Legal First Name] left early. Paige Miller said do you mean [J.K.'s Preferred First Name] and I said no [J.K.'s Legal First Name]. She then said again do you mean [J.K.'s Preferred First Name]and I said No [J.K.'s Legal First Name]and she said it again and I said don't go there. I didn't know who [J.K. Preferred First Name] was." *Doc. 11-6, Board Packet*, p. 000020; Doc. 1, ¶¶ 100-104.

22.     On March 30, 2021, Paige Miller told Pamela Ricard that Student J.K. to go by [Preferred First Name]. *Doc. 11-6, Board Packet*, pp. 5, pp. 000008, 000020; Doc. 11-9, *Miller Declaration*.

23.     On March 30, 2021, Paige Miller told then-Principal Shannon Molt and then Assistant Principal Kathleen Brennan about the interaction with Ricard. *Doc. 11-10, Molt Declaration*; Doc. 11-9, *Miller Declaration*.

24.     On March 31, 2021, at about 9:56 a.m., Principal Shannon Molt sent an email to FRMS staff that said:

Subject: Preferred Names

Good Morning,

When we have a student that requests to go by a preferred name that is different than their given name, our district honors the request. Once you are aware of a preferred name, use that name for the student.

Please let me know what question you have.

*Doc. 1-1, Molt 3-31-21 Email; Doc. 11-6, Board Packet, pp. 000081-82; Doc. 11-10, Molt Declaration.*

25.     On or about April 4, 2021, Principal Molt included the following instruction to staff in the Weekly Newsletter: "Preferred Names: When we have a student that requests to go by a preferred name that is different than their given name. our district honors the request. Once you are aware of a preferred name, use that name for the student." Doc. 11-6, *Board Packet*, pp. 000083, 000099; *Doc. 11-10, Molt Declaration*.

26.     On April 7, 2021, Student E.S. went to Counselor Jason Lubbers and told Lubbers that Plaintiff Ricard was not using his preferred name and had called him "Miss [Last Name]." Student J.K. told Lubbers that Ricard did not call any other student by last name. *Doc. 11-6, Board Packet, p. 00093; Doc. 11-8, Lubbers Declaration*.

*27.*     Also on April 7, 2021, at about 11:38 a.m., Counselor Lubbers emailed Pamela Ricard, stating: "Mrs. Ricard, [Student E.S. Legal Name] asked me to tell you that she would like to be called [Student E.S. Preferred Name]' Thank you." *Doc. 11-6, Board Packet, p. 000084.*

28.     After receiving the April 7 email from Lubbers, Ricard attempted to address the issue of preferred names with Ass't Principal Terry Heina. Ricard says she wanted to "ask for advice on how to address Student [E.S.] as a result of the email when Student [E.S.]'s enrolled name had not been changed in the Skyward system." Doc. 1, ¶ 111. Heina reported that he told Ricard to speak with Principal Shannon Molt about her questions. Doc. 1-2, Doc. 11-6, *Board*

*Packet*, pp. 000086, 96.

29.     On April 7, 2021 at about 1:33 p.m. Student J.K. emailed Ricard (during class):

"I don't know if Mr.lubbers has emailed you about [Student E.S.] ([Legal first name]) preferred name and pronouns and im [*sic*] assuming since you said "miss [legal last name]" to him in class he has yet to do so, unless he has and you are purposely misgendering/deadnaming him on purpose, which I don't think you would do that purposely but there's always a possibility. Anyways, His preferred name is [E.S.] and his pronouns are He/ Him.

Doc. 11-6, *Board Packet*, p. 000085

30.     On April 8, 2021, around noon, when Principal Molt was speaking to Student J.K. about another matter, Student J.K. told Molt about Ricard calling Student E.S. "Miss [Last Name]." Doc. 11-6, *Board Packet*, p. 000094; *Doc. 11-10, Molt Declaration*.

31.     On April 8 2021, around 1:15 p.m., while Ricard was writing the Level 2 discipline referral for Student J.K., Ricard wrote [Legal First Name] [Legal Last Name] on the form – despite knowing Student J.K.'s preferred name. Student J.K. wrote a note to Ricard: "[E.S.'s Legal Last Name]s name is [E.S.'s Preferred Name] BTW, his pronouns are He/Him and if you can't act like an adult and respect him and his pronouns then prepare yourself to deal with his mother since you can't be a decent human being and respect him. All you're doing right now is showing that you're transphobic and don't care that your' being visibly transphobic." Doc. 11-6, *Board Packet*, pp. 000094, 000104.

32.     On April 8, 2021, at about 1:41 p.m., Ricard forwarded the April 7 email from Student J.K. to Ass't Principal Terry Heina, Principal Shannon Molt, and Ass't Principal Kathleen Brennan. Ricard advised she gave Student J.K. a Level 2 discipline referral for emailing during class, scribbling over the discipline referral and throwing it in the trash, and calling Ricard a homophobe [Note: Student J.K.'s note says transphobic, not homophobic]. Ricard asked to meet with the student in her room. Doc. 11-6, *Board Packet*, p. 000085.

33.     On April 8, around 2:30 p.m., Principal Molt spoke with Student J.K., who was

"very upset with Mrs. Ricard and said she walked out of the room because she was very upset and didn't want to say something that she would regret." Doc. 11-6, *Board Packet*, pp. 000094-95; *Doc. 11-10, Molt Declaration*.

34.    On April 8, 2021, around 3:42 p.m., Counselor Jason Lubbers forwarded his April 7 email to Principal Molt. Doc. 11-6, *Board Packet*, p. 000084; Doc. 11-8, Lubbers Declaration.

35.    On April 8, 2021, from about 8:14 p.m. to about 9:42 p.m. Principal Molt exchanged multiple emails with District Executive Director of Personnel Services Dawn Toomey and Assoc. Supt. Lacee Sell. Toomey advised Molt that Pamela Ricard's conduct violated district policies and federal law. Doc. 11-6, *Board Packet*, 000092-95; *Doc. 11-10, Molt Declaration*.

36.    On April 9, 2021, Assoc. Supt. Lacee Sell issued a Notice of Suspension to Pamela Ricard, suspending Ricard with pay, for three days effective April 12, 2021. Doc. 1-3.

37.    On April 15, 2021, Principal Molt gave Ricard a Reprimand Documentation Form, Doc. 1-4, that states:

> Mrs. Ricard has engaged in discriminatory practices. The behavior demonstrated by Mrs. Ricard is against the guidance provided by building leadership via email on March 31, 2021 and the building's weekly newsletter on April 4, 2021.
>
> The email and newsletter shared, "when we have a student that requests to go by a preferred name that is different than their given name, our district honors the request. Once you are aware of a preferred name, use that name for the student." Mrs. Ricard was made aware of one student's request via an email sent by Mr. Lubbers. Mrs. Ricard called the student by their last name instead of their preferred name. Mrs. Ricard was made aware of a second student who wanted to use a preferred name and pronouns by a colleague. Mrs. Ricard refused to use that students's preferred names and pronouns. She stated in her interview that she would not call them by their preferred names and pronouns without getting approval from the parents. At the end of the interview Mrs. Ricard stated she would follow the policy even though she did not agree with it.
>
> As an employee of the district, Mrs. Ricard participated in the building diversity and inclusion policy training. Even though it was self-directed for her because she was absent when building leadership conducted it, the policy is clear on the board's expectations of staff and students of the district.

The form specifically notes the following:

Board Policy GAACB-Diversity and Inclusion …
o The student preferred name was not used by Mrs. Ricard.

Board Policy GAAE- Bullying by Staff …
o Students felt discriminated against based on the teacher not using the preferred names.

Board Policy GAF-Staff-Student Relations …
o Student ( ) was not called by his preferred name after Mrs. Ricard received notification emails from a student and the counselor. Prior to the notification, Mrs. Ricard called the student by their legal name. After notification, Mrs. Ricard called the student by their last name.

Ricard initialed the form and wrote: "I do not agree with this!" Doc. 1-4; Doc. 11-6, *Board Packet*, pp. 000016-18 [Note: The signature page is not included in the board packet, nor does it have Ricard's initials or statement that she did not agree with the action.]

38.     On April 20, 2021, Ricard sent a written rebuttal to the 4-15-21 Reprimand Documentation Form, Doc. 1-4 to Assoc. Supt. Lacee Sell. Throughout the rebuttal, Ricard continually referred to Student J.K. as his legal first name rather than his preferred name. Doc. 1, ¶ 138; Doc. 11-6, *Board Packet*, p. 000020; Doc. 11-13, 8.4.21 Ney ltr to USD 475, pp. 8-10.

39.     On April 21, 2021, at 3:41 p.m. Principal Molt emailed the following two diversity training documents to FRMS staff: 1. Training on Gender Identity and Gender Expression; and 2. Use of Preferred Names and Pronouns - District Guidance. Doc. 1-5, Doc. 1-6, Doc. 1-7.

40.     On April 28, 2021, Ricard submitted her Level 1 and Level 2 Grievance (document says only Level 1), that stated:

"Statement of Grievant

Statement of facts: I was given a written reprimand on April 15, 2021. The first two steps of Article X - Teacher Discipline were not done prior to the written reprimand.

Counseling shall be the first step to a minor infraction such as lateness to work, professionalism or professional responsibilities. Documentation may occur for record, but no written record will be placed in the professional employee's personnel file.

Oral reprimand transmitted directly to the teacher, acknowledged by the teacher, and recorded in the building personnel file only as the existence of the reprimand, without extensive detail.

Relief Desired: I would like to have the Suspension and Written reprimand taken out of my file and have the discussion with the Administrator and student that was originally supposed to take place."

Doc. 11-6, *Board Packet*, pp. 000027-28.

41.     Principal Molt, Ass't Principal Kathleen Brennan, Dana Wiegand (JCEA President), and Ricard met at 8:15 a.m. on May 3, 2021, to address Ricard's grievance. Molt advised she would continue with the written reprimand.

"Statement of Facts: I was given a written reprimand on April I5, 2021. The first two steps of Article X - Teacher Discipline were not done prior to the written reprimand.

D. Discipline of a teacher will be progressive and/or sequential, and appropriate to the severity of the infraction, except in those situations that constitute a breach of board policy that could impair the effective operation of the school, or a potential criminal violation. The sequence of discipline shall be as follows:

I. Counseling shall be the first step to a minor infraction such as; lateness to work, professionalism or professional responsibilities. Documentation may occur for record, but no written record will be placed in the professional employee's personnel file.

Mrs. Molt stated that the emails sent out to all school employees was considered my counseling. There was never a conversation between Mrs. Molt and me for counseling. I requested a meeting with Mrs. Molt and the student to resolve this issue and it did not take place.

Mrs. Toomey was brought into the meeting on April 9 and an investigation was started. I was placed on Suspension with pay for alleged violations of Board of Education Policies. Upon return to work, I was issued a written reprimand for alleged violations of Board of Education Policies.

The written reprimand statement that "guidance" was provided to staff in an email and through a newsletter. The email and newsletter should be considered information for staff and not a counseling.

2. Oral reprimand transmitted directly to the teacher, acknowledged by the teacher, and recorded in the building personnel file only as the existence of the reprimand, without extensive detail.

There was never a conversation with Mrs. Molt about an oral reprimand. As stated

previously, I had requested a meeting with Mrs. Molt and the student to resolve the issue. I have never been asked by the student in question to call her a different name. Every correspondence that I have received is from another student, nothing has ever come from the student in question. I was told that Mrs. Molt would not be able to facilitate a meeting that day and the students were not in session the following day due to parent teacher conference day.

3. Once the administrator determines that a written reprimand is necessary, a face-to-face meeting with the teacher shall occur within 3 business days unless there are extenuating circumstances. It shall contain sufficient details of the incident to allow understanding by the teacher who shall submit a written response to the allegations within 3 business days unless there are extenuating circumstances. The response shall be attached to the reprimand, and both will remain in the teacher's building personnel file. There shall be no further appeal of the reprimand. A series of oral reprimands can be grouped together under unprofessional behavior.

4. In the event of the failure of a teacher to correct the behavior identified in the written reprimand, the teacher may be placed on a written behavior plan and a timeline for meeting those expectations. The written behavior plan shall provide an opportunity for the teacher to object in writing to elements of the plan within 3 business days unless there are extenuating circumstances. Any objections shall be resolved by the Superintendent, or Associate Superintendent within 5 business days unless there are extenuating circumstances.

I had not been provided with counseling that identified any behavior in need of change or correction. Had I been provided a counseling, I would have had the opportunity to correct or change as requested.

Relief Desired: I would like to have the Suspension and Written reprimand taken out of my file and have the discussion with the Administrator and student that was originally supposed to take place. (The meeting with the student and Mrs. Molt was done yesterday 5/11/2 1. If this would have been done at the beginning of all of this, the written reprimand would not have been necessary.)

Doc. 11-6, *Board Packet*, p. 000030.

42.    On May 4, 2021, Principal Molt documented the May 3 meeting in an email stating the written reprimand would go forward. Doc. 11-6, *Board Packet*, pp. 000030, 000034; *Doc. 11-10, Molt Declaration*.

43.    On May 12, 2021, Ricard submitted a Level 3 Grievance. Doc. 11-6, *Board Packet*, pp. 000031-33.

44.    On May 19, 2021, Supt. Reginald Eggleston responded to the Level 3 Grievance

relaying that Ricard's conduct was not a minor infraction (which would require counseling and an

oral reprimand before issuing a written reprimand).

> "[T]he events leading up to the date of the cause of action on April 15, 2021, are
> not of a minor nature. The building leadership provided communication on multiple
> days via email and the building newsletter advising staff to utilize the preferred
> names of students. The communication came from the district office and was
> presented to staff by the building administration. Several staff members advised
> you of the preferred names of students and students provided notification of the
> preferred names they wished to go by.

> "[T]he incident was not of a minor nature. The district has an obligation as
> educators to ensure that our students are provided with a safe and secure
> environment. When someone engages in conduct that is deemed to be in a
> discriminatory nature, action must be taken and cannot be limited to a counseling
> or an oral reprimand. The counseling in this incident had already occurred when
> the building leadership provided the email notification to staff on March 31, 2021
> and through the Trooper Newsletter on April 4, 2021.

> "During the investigation, the district received statements that Mrs. Ricard had been
> notified by fellow staff members of the preferred names of students in her Math
> Strategies class. Mrs. Ricard did not make any attempts to utilize the preferred
> names when notified by staff."

Doc. 11-6, *Board Packet*, pp. 000036-37; Doc. 1-9.

45.     On May 19, 2021, Molt forwarded her March 31 email to FRMS Staff to Supt.

Eggleston and the excerpt from the April 5 Newsletter. Doc. 11-6, *Board Packet*, pp. 000081-82,

000083; *Doc. 11-10, Molt Declaration*.

46.     On May 21, 2021, Ricard, via Dana Wiegand (JCEA President) requested a Level

4 Grievance. Doc. 11-6, *Board Packet*, pp. 000038-39

47.     On May 24, 2021, Supt. Eggleston and Dana Wiegand signed a notice for a Level

4 Grievance to occur June 9, 2021 via Zoom. Doc. 11-6, Board Packet, p. 000040.

48.     On July 8, 2021, Attorney Joshua A. Ney sent a letter to USD 475, c/o Supt.

Reginald Eggleston, that included a "request for a religious accommodation regarding any school

policy that requires a teacher or school employee to actively state or otherwise use a student's or

any other person's preferred pronouns or other gendered language when different from the student's

or person's biological sex." Doc. 11-6, *Board Packet*, pp. 000046-48; Doc. 1-10.

49.     On July 14, 2021, Attorney Ney emailed Supt. Eggleston and Mark Edwards, Legal Counsel for the District, requesting a Level 5 Grievance. Doc. 11-6, *Board Packet*, pp. 000043-45.

50.     On August 4, 2021, Attorney Ney sent a letter to the Board of Education outlining Pamela Ricard's arguments to the Board of Education; the letter enclosed a "proposed neutrally applicable gendered policy procedure and accommodation language" Doc. 1-11, Doc. 1-12; Doc. 11-13.

51.     On August 11, 2021, the Board of Education issued its written decision on Ricard's grievance. The decision notes:

> 1. The persons pertinent to the grievance went into executive session,
> 2. Grievant Ricard addressed the Board,
> 3. Grievant's attorney, Joshua Ney, presented oral and written arguments to the Board,
> 4. The JCEA Chair, Catherin Coughlin, presented comments to the Board,
> 5. USD 475 presented comments from Kathleen Brennan, Reginald Eggleston and Mark Edwards.
> The Board denied the grievance and adopted the reason in Supt. Eggleston's letter dated May 19, 2021.

Doc. 1-14.

52.     On August 12, 2021, Attorney Ney emailed USD 475 Counsel Mark Edwards and Supt. Reginald Eggleston asking when a written decision would be issued and inquiring of the status of Ricard's accommodation request. Doc. 1-13.

53.     At its regular meeting on September 7, 2021, the Board of Education, by public motion and vote, denied the Level 5 Grievance by Pamela Ricard and "[i]n denying the grievance of Pam Ricard, the Board of Education adopts and approves the reasoning of Superintendent Dr. Reginald Eggleston set out in his letter to the grievant dated May 19, 2021." The Board of Education also voted by deny "the request by Pamela Ricard for a religious accommodation set

forth in her July 8, 2021, letter to USD 475. Doc. 11-14, *September 07 2021 BOE Minutes*, p. 8.

54.     Also on September 7, 2021, the Board of Education also amended Policy GAACB (Diversity and Inclusion) and Policy JGECB (Student Diversity and Inclusion), to add one sentence to each of the policies: "Students will be called by their preferred name and pronouns." Doc. 1-16; Doc. 1-18, pp. 2, 5; and *Agenda from the Sept. 7, 2021 Meeting of the Board of Education*, pp. 94-95.

55.     The Board adopted the amendments to GAACB and JGECB on the recommendation of Donna Whiteman, General Counsel for the Kansas Association of School Boards, to include a formal policy regarding the use of preferred names. Doc. 11-17, *8-17-21 Eggleston Email to BOE re Preferred Name Policy*.

56.     On October 8, 2021, at about 10:57 a.m., Principal Brennan emailed FRMS staff, advising of the revision to policy that explicitly address preferred names, and advising that Supt. Eggleston had emailed parents and guardians the afternoon of October 7 the following:

> On September 7, 2021, the USD 475 Board of Education adopted an addition to the district Diversity and Inclusion Policy. USD 475 is committed to creating an educational environment that embraces diversity, equity, empathy, and inclusion for all students. This policy includes, "Respectful communication, inclusion, and cooperation between and among all students and staff."
>
> The addition to this policy is the statement: Students will be called by their preferred name and pronoun. This means if a student makes a request of a staff member to call them by a name other than their legal name as noted in the student information system- Skyward, the staff member(s) will respect the student's wishes and refer to them with the indicated preferred name. USD 475 will not communicate this information to parents unless the student requests the administration or counselor to do so, per Federal FERPA Guidance. The entire Diversity and Inclusion policy, JGECB may be found on page 523 of USD 475 Board Policy- 09-2021-KASB-June-updates-BOE- approved-9.7.21pdf (usd475.org) Thank you for your support of our students and staff.

Doc. 1-16, p. 2.

57.     There is no evidence that any FRMS teacher or staff-member, other than Plaintiff Ricard, intentionally misgendered or deadnamed a transgender student.

58.     There is no evidence that any FRMS teacher or staff-member, other than Plaintiff Ricard, intentionally changed the manner of address to transgender students by calling only transgender students by their last name.

### Argument and Authorities

Plaintiff Ricard is not entitled to a preliminary injunction or restraining order against the District's anti-discrimination, anti-bullying, and anti-harassment policies. The District's policies violated by Plaintiff in April of 2021 were promulgated in compliance with federal and state prohibitions against discrimination on the basis of sex. USD 475 acts *in loco parentis* for the students in their care during the school day. Teachers in USD 475 are expected to treat all students equally, and with respect, to affect a conducive learning environment. Plaintiff Ricard is, quite simply, not entitled to court-sanctioned discrimination against transgendered students.

## I.     Standards of review.

Rule 65 governs both injunctions and restraining orders. Fed. R. Civ. P. 65. A preliminary injunction is an extraordinary remedy and the Tenth Circuit cautions "against granting injunctions that alter the status quo or that require the 'nonmoving party to take affirmative action—a mandatory preliminary injunction—before a trial on the merits occurs.'" *Att'y Gen. of Oklahoma v. Tyson Foods, Inc.*, 565 F.3d 769, 776 (10th Cir. 2009) (quoting *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009)). The moving party must demonstrate, to obtain a preliminary injunction: (1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that the injunction is in the public interest. *Tyson Foods, Inc.*, 565 F.3d at 776. Mandatory preliminary injunctions are disfavored and require the moving party make a heightened showing of the above four factors. *RoDa*, 552 F.3d at 1208-09. This is aimed "to minimize any injury that would not have occurred but for the court's intervention." *Id*. at 1209.

The status quo here encompasses the array of constitutional, statutory, and policy provisions that (separately and collectively) forbid intentional discrimination, harassment, and bullying by state actors such Plaintiff Ricard. Ricard has worked for a year since her April 2021 conduct that resulted in discipline. We are within a month of the conclusion of the 2021-2022 school year. A preliminary injunction serves only to disrupt the status quo, not to preserve it. The injunction sought would require the District to disregard its constitutional and statutory obligations against intentional discrimination on the basis of sex/gender and to dispense with mandatory policies that implement those constitutional and statutory obligations.

The United States Supreme Court recently reemphasized that the moving party must satisfy all four separate elements to succeed on a request for a temporary injunction. *Ramirez v. Collier*, 142 S. Ct. 1264 (2022). The party seeking relief "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.*

The Tenth Circuit couches these elements as requirements and makes a moving party to satisfy all four elements to succeed. *Free the Nipple-Fort Collins v. City of Fort Collins, Colorado*, 916 F.3d 792, 797 (10th Cir. 2019). Mandatory injunctions (those that require a mandated action, changing the status quo) or that grant all the relief that the moving party could expect to win in trial are disfavored. *Id*. Here, Plaintiff is requesting all three disfavored actions. She cannot establish that a temporary injunction is warranted in this case – especially since she intends to leave employment with the district and only a few weeks of school remain. Therefore, her motion should be denied.

## II.    School districts have constitutional and statutory obligations to prevent unlawful discrimination on the basis of, *inter alia*, sex/gender.

Plaintiff Ricard's claims must be viewed, first, with an eye towards the constitutional and statutory obligations imposed on state actors, generally; and those duties placed upon federally

funded schools, specifically. Transgender students are entitled to equal treatment under the Equal Protection Clause and Title IX for their identified gender and not their biological gender at birth. Refusing a transgendered student the same treatment afforded a cisgender student, because the student is transgender, violates both Title IX and the Equal Protection Clause. The Free Speech and Free Exercise Clauses do not afford a middle school teacher a right to discriminate against a student on the basis of sex—transgender or otherwise. The accommodation(s) and policies Plaintiff Ricard seeks to impose upon USD 475 run afoul of the Equal Protection Clause and Title IX.

**A.      K-12 Education is compulsory and the Board of Education is required to promulgate rules governing the conduct of employees and students.**

The Kansas Constitution requires that the Kansas Legislature establish and maintain public school. Kan. Const., Art. 6, Sec. 1. "Local public schools under the general supervision of the state board of education shall be maintained, developed and operated by locally elected boards. Kan. Const., Art. 6, Sec. 5. K-12 school attendance for minors is compulsory. K.S.A. 72-3120.

Kansas Boards of Education are required to adopt policies or rules governing the conduct of employees and students of the district. K.A.R. 91-15-1.

**B.      The Equal Protection Clause**

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall … deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). The Equal Protection Clause protects person from state-imposed classifications and from "intentional and arbitrary discrimination." *See Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam). Stated differently, state action is unconstitutional when it creates "arbitrary or irrational" distinctions between classes of people out of "a bare … desire to harm a politically unpopular group." *Cleburne*, 473 U.S. at 446–47 (quoting *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534

(1973)); *see also United States v. Virginia*, 518 U.S. 515, 534 (1996) (sex-based classifications "may not be used, as they once were, to create or perpetuate the legal, social, and economic inferiority of women" (citation omitted)); *Obergefell v. Hodges*, 576 U.S. 644, 672-75 (2015) (sex-based classifications based on sexual orientation are prohibited by the Equal Protection Clause).

Discrimination against transgender persons constitutes sex-based discrimination for purposes of the Equal Protection Clause. *Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 608 (4th Cir. 2020), *as amended* (Aug. 28, 2020), *cert. denied*, 141 S. Ct. 2878 (2021); *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1051 (7th Cir. 2017) (discrimination based on being transgendered violates equal protection); *Glenn v. Brumby*, 663 F.3d 1312, 1318 (11th Cir. 2011) ("All persons, whether transgender or not, are protected from discrimination on the basis of gender stereotype."); *Smith v. City of Salem*, 378 F.3d 566, 573–75; 578 (6th Cir. 2004) (holding that the transgender plaintiff stated a sex discrimination claim in violation of equal protection); *Glenn v. Brumby*, 663 F.3d 1312, 1317-19 (11th Cir. 2011) (discrimination against transgendered is sex discrimination in violation of equal protection).

C.    **Title IX and Title VII**

Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688, prohibits discrimination on the basis of sex in any education program or activity offered by a recipient of federal financial assistance. Title IX directs that "[n]o person … shall, on the basis of sex, … be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). "Title IX thus prohibits gender discrimination against students enrolled in federally supported educational programs …." *Gossett v. Oklahoma ex rel. Bd. of Regents for Langston Univ.*, 245 F.3d 1172, 1176 (10th Cir. 2001).

Courts rely on interpretations of Title VII to inform interpretations of Title IX. *Id.* at 32638 (citing *Franklin v. Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60, 75 (1992); *Jennings v. Univ. of N.C.*,

482 F.3d 686, 695 (4th Cir. 2007); *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 66 (1st Cir. 2002); *Gossett v. Oklahoma ex rel. Bd. of Regents for Langston Univ.*, 245 F.3d 1172, 1176 (10th Cir. 2001) ("Courts have generally assessed Title IX discrimination claims under the same legal analysis as Title VII claims."). Thus, violations of Title IX may also be violations under Title VII. In *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), the United States Supreme Court held discrimination against individual for being homosexual or a transgender person is discrimination "because of" the individual's sex and, thus, violates Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, which prohibits sex discrimination in employment. Discrimination means treating an individual worse or differently than others who are similarly situated. *Bostock*, 140 S. Ct. at 1740. An executive order directs federal agencies to implement *Bostock* and to enforce federal prohibitions on sex discrimination against individuals based on sexual orientation and gender identity. Exec. Order 13,988, 86 Fed. Reg. 7023 (January 20, 2021).

The Department of Education, through its Office for Civil Rights (OCR) is responsible for the Department's enforcement of Title IX. Following the *Bostock* decision and, in keeping with Executive Order 13,988, the OCR issued an interpretation regarding its enforcement of Title IX. *Enforcement of Title IX of the Education Amendments of 1972 With Respect to Discrimination Based on Sexual Orientation and Gender Identity in Light of Bostock v. Clayton County*, 86 Fed. Reg. 32,637 (June 22, 2021). "Consistent with the Supreme Court's ruling and analysis in *Bostock*, the Department interprets Title IX's prohibition on discrimination 'on the basis of sex' to encompass discrimination on the basis of sexual orientation and gender identity." *Id.*

*Bostock* explained that discrimination on the basis of sexual orientation or gender identity is intentionally treating an individual differently "because of their sex." 140 S. Ct. at 1742. When one discriminates against a person for being gay or transgender, the one necessarily discriminates against that person for "traits or actions it would not have questioned in members of a different

sex." *Id*. at 1737.

D.      **42 U.S.C. § 1983 and *Monell* liability.**

Under federal law, persons, can be held liable for damages to persons for the deprivation

of rights under the Constitution or the laws of the United States. provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or
> usage … subjects, or causes to be subjected, any citizen of the United States or
> other person within the jurisdiction thereof to the deprivation of any rights,
> privileges, or immunities secured by the Constitution and laws, shall be liable to
> the party injured in an action at law ….

42 U.S.C. § 1983. A school district can be liable under § 1983 if an official custom or policy caused

a violation of the constitutional rights of the plaintiff. *Monell v. Dep't of Social Servs.*, 436 U.S.

658, 694 (1978). "A municipal wrong is one resulting from the enforcement of a municipal policy

or custom; a 'municipal custom or policy' may be established through an officially promulgated

policy, a custom or persistent practice, deliberately indifferent training that results in the violation

of a plaintiff's federally protected rights, or a single decision by an official with final policymaking

authority." *Id*.

The requisite deliberate indifference standard may be satisfied when the municipality has

actual or constructive notice that its action or failure to act is substantially certain to result in a

constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm.

*Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998). Thus, a school district that knowingly

allows a staff person, such as an 8th grade math teacher, to intentionally discriminate against a

student becomes, itself, liable under § 1983.

> What's in a name? William Shakespeare suggested maybe not much, for "that
> which we call a rose, by any other name would smell as sweet."  But a transgender
> individual may answer that question very differently, as being referred to by a name
> matching one's identity can provide a great deal of support and affirmation. This
> case involves the legal ramifications of a public-school corporation's practical
> response to that philosophical question.

*Kluge v. Brownsburg Community School Corporation*, 548 F.Supp.3d 814, 818-19 (2021) (quoting

William Shakespeare, *Romeo and Juliet,* act 2, sc. 2).

### III.    Plaintiff's Claims Fail on the Merits.

Plaintiff's allegations can be distilled into three broad categories: (1) First Amendment violations (to include retaliation and discrimination of free speech as well as religious discrimination); (2) Fourteenth Amendment violations of both due process and equal protection; and (3) a breach of contract claim. Though Plaintiff's motion is based on the First Amendment claims, no claim pled shows a substantial likelihood of success on the merits.

### A.    The District suspended Plaintiff for speech that is unprotected under the First Amendment.

The District's enforcement of its anti-discrimination policies (as they existed in April 2021 or as amended in September 2021) does not constitute a violation of Plaintiff's First Amendment rights. The District suspended Plaintiff Ricard for three days because she violated multiple policies that prohibit discrimination on the basis of sex.

The question to determine if an employer's interest outweighs that of an employee's First Amendment speech whether the employer "has an efficiency interest which would justify it in restricting the particular speech at issue." *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1207 (10th Cir. 2007). There is no doubt that the District's interest in providing a learning environment free from discrimination justifies enforcement of their policies. Adolescents suffering from gender identity concerns are at a higher risk for mental health problems compared with cisgender peers. *See* van der Miesen, MD, Arnoldussen, MD, de Vries, MD, PhD, *Special Issues in Treating Adolescents with Gender Dysphoria*, 36 Psychiatric Times 12, Dec. 30, 2019, https://www.psychiatrictimes.com/view/special-issues-treating-adolescents-gender-dysphoria (last accessed April 18, 2021). They remain targets of cyber bullying, harassment, and violence. *Id*. They also present a high number of suicidal ideations. *Id*.

Courts recognize gender dysphoria as a serious medical condition. *See Kosilek v. Spencer*,

774 F.3d 63, 86 (1st Cir. 2014) ("[Gender dysphoria] is a serious medical need, and one which mandates treatment[.]"); *Edmo v. Corizon, Inc.*, 935 F.3d 757, 769 (9th Cir. 2019) ("Gender dysphoria is a serious but treatable medical condition."). A leading health organization on transsexual, transgender, and gender-nonconforming people is the World Professional Association for Transgender Health ("WPATH"). WPATH is an "international, multidisciplinary, professional association whose mission is to promote evidence-based care, education, research, advocacy, public policy, and respect in transsexual and transgender health." WPATH, *Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People*, 1 (7th ed. 2012). In the most recent publication of WPATH standards, school boards, teachers and courts are encouraged to educate and advocate on behalf of gender dysphoric children and adolescents in their community (e.g., day care centers, schools, camps, other organizations). *Id*. This is "particularly important in light of evidence that children and adolescents who do not conform to socially prescribed gender norms may experience harassment in school, putting them at risk for social isolation, depression, and other negative sequelae." *Id*. (internal citations omitted).

USD 475 advances policies consistent with these recommendations for the students who are compelled to attend its schools. Allowing Plaintiff Ricard to intentionally discriminate against transgender students, subjects the District legal liability and consequences under Title IX. The District has a responsibility to protect the interests its students. Allowing a teacher to intentionally discriminate against a subset of protected students is unlawful and harms the District's goals to facilitate an environment conducive for learning for all students, including transgender students. The interests of the District to provide for the safety, health, and welfare of those who work in and attend its schools far outweigh any purported interest by a single teacher.

### 1.    Speech in the public school setting.

Courts are to "apply the First Amendment 'in light of the special characteristics of the

school environment.'" *Mahanoy Area Sch. Dist. v. B. L. by & through Levy*, 141 S. Ct. 2038, 2044 (2021) (quoting *Hazelwood School Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988) (internal quotation mark omitted)). Among these special characteristics "is the fact that schools at times stand *in loco parentis, i.e.*, in the place of parents. *Id.*, at 2044-45. Schools also have a special interest in regulating speech that "materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech. *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 513 (1969).

The analysis begins first by recognizing that there are three main categories of speech that occur within the school setting, (1) student speech, (2) government speech, and (3) school-sponsored speech. *Fleming v. Jefferson Cty. Sch. Dist. R-1*, 298 F.3d 918, 923-24 (10th Cir. 2002). Before exploring the contours of First Amendment protections, it necessary to recognize that the right to speak, the right to refrain from speaking, and the right to be free from compelled speech are necessarily different in a school setting. *Corder v. Lewis Palmer Sch. Dist. No. 38*, 566 F.3d 1219, 1231 (10th Cir. 2009) (citing *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 178, 186 (3d Cir. 2005). Censorship of speech is no different than compelled or forced speech under the First Amendment. *Corder*, 566 F.3d at 1232 (citing *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 256 (1974); *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796–97 (1988). Accordingly, Plaintiff Ricard's claims of compelled speech are subject to the same analysis.

Student speech that "happens to occur on the school premises" is governed by *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969). *Hazelwood*, 484 U.S. at 271. The black armbands worn by the students in *Tinker* are representative of the pure student expression that a school must tolerate unless it can reasonably forecast that the expression will lead to "substantial disruption of or material interference with school activities." *Tinker*, 393 U.S. at 514. As a teacher, Plaintiff Ricard's conduct is not student speech.

Government speech is "[a]t the opposite end of the spectrum" and, "[w]hen the government speaks, it may choose what to say and what not to say." *Id*. The Tenth Circuit articulated a four-factor test to discern whether expression is government speech: (1) whether the "central purpose" of the project is to promote the views of the government or of the private speaker; (2) whether the government exercised "editorial control" over the content of the speech; (3) whether the government was the "literal speaker"; and (4) whether "ultimate responsibility" for the project rested with the government. *Wells v. City & Cty. of Denver*, 257 F.3d 1132, 1141 (10th Cir. 2001).

Cases from the United States Supreme Court and the Tenth Circuit make clear that state actors (such as public school teachers) cannot discriminate against persons (and particularly against public school students) on the basis of sex/gender.

> Between pure student speech and government speech is "school-sponsored" speech, which is governed by *Hazelwood*. School-sponsored speech is student speech that a school "affirmatively … promote[s]," as opposed to speech that it "tolerate[s]." *Hazelwood*, 484 U.S. at 270-71 "[E]xpressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school" constitute school-sponsored speech, over which the school may exercise editorial control, "so long as [its] actions are reasonably related to legitimate pedagogical concerns." *Id*. at 271, 273.

*Fleming*, 298 F.3d at 923-24. "The imprimatur concept covers speech that is so closely connected to the school that it appears the school is somehow sponsoring the speech." *Id*., at 925. Pedagogical concerns include activities that affect learning but are not confined to purely academic exercises because pedagogical concerns include discipline, courtesy, and respect for authority. *Id*. It further includes a "school district's desire to avoid controversy within a school environment." *Id.*, at 925-26. "Indeed, the pedagogical concern in *Hazelwood* itself was to avoid the controversial subjects of pregnancy and divorce in a school setting because of the potentially disruptive nature of such subjects upon young students." *Id*. at 926;

       **2.**     **Ricard's "speech" (addressing 8th-grade math students by name during the regular class-time) is government speech over which the**

**District may exercise editorial control.**

"[T]he Government's own speech … is exempt from First Amendment scrutiny." *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 553 (2005). "The Free Speech Clause restricts government regulation of *private* speech; it does not regulate government speech." *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467 (2009) (emphasis added). "It is the very business of government to favor and disfavor points of view on (in modern times, at least) innumerable subjects …." *National Endowment for Arts v. Finley*, 524 U.S. 569, 598 (1998) (Scalia, J., concurring in judgment). The District, here, can disfavor Plaintiff Ricard's manner of addressing students (her claimed speech) in a manner that discriminates on the basis of sex. Government speech is not restricted by the Free Speech Clause. *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 469 (2009).

> 3.   **Even if viewed as school-sponsored speech, the manner in which Plaintiff Ricard addresses students bears the imprimatur of the school over which the school may exercise editorial control reasonably related to legitimate pedagogical concerns.**

A middle school math classroom cannot be characterized as a public forum for public expression. School facilities may be deemed a public forum only if school authorities, by policy or by practice, open the facilities for indiscriminate use by the general public or by a segment of the public. Where school facilities are reserved for other intended purposes, no public forum has been created. School officials may impose reasonable restrictions on the speech of students, teachers, and other members of the school community. *Hazelwood,* 484 U.S. at 267-69.

A public school is permitted to compel school-sponsored speech, or to punish for the misuse of school-sponsored speech, provided its decision is reasonably related to legitimate pedagogical concerns. *Corder*, 566 F.3d at 1231; *Axson–Flynn*, 356 F.3d at 1290; *Fleming*, 298 F.3d 926. Courts give substantial deference to a school district's stated pedagogical concerns. *Corder*, 566 F.3d at 1231; *Axson–Flynn*, 356 F.3d at 1290; *Fleming*, 298 F.3d at 925. A federal court should play no role in judging the reasonableness of the sanctions which a school levies

against its employees. *Vanderhurst v. Colorado Mountain Coll. Dist.*, 208 F.3d 908, 917 n.5 (10th Cir. 2000); *Miles*, 944 F.2d at 779 ("[W]e will not interfere with the authority of the school officials to select among alternate forms of discipline."). "Rather, an adverse employment action reasonably relates to a school's legitimate pedagogical interests if the employee's conduct prompting the sanction, as perceived in good faith by the school, in some way violated or vitiated those legitimate pedagogical concerns." *Vanderhurst*, 208 F.3d at 917 n.5. The question is whether the speech that USD 475 in good faith believed was uttered by Plaintiff Ricard violated the District's policies which embodied legitimate pedagogical concerns. *Id*. The answer is, "most assuredly so."

**B.     USD 475's anti-discrimination policies, and the discipline of Plaintiff Ricard for violating them does not violate Ricard's right to free exercise of religion.**

Plaintiff contends USD 475's policies are subject to strict scrutiny. Not so. The speech by a government employee, a middle school math teacher, occurring in school and during class was government speech or, alternatively, was school-sponsored speech over which the District may impose restrictions reasonably related to its legitimate pedagogical concerns.

**1.     The District's policies are content and viewpoint neutral, do not impermissibly compel Plaintiff's speech, and are not vague or overbroad.**

The Free Exercise Clause, as other provisions of the First Amendment, is "applied to the states under the Fourteenth Amendment." *Green v. Haskell Cnty. Bd. of Comm'rs*, 568 F.3d 784, 796 (10th Cir.2009). "Depending on the nature of the challenged … government action, a free exercise claim can prompt either strict scrutiny or rational basis review." *Axson–Flynn v. Johnson*, 356 F.3d 1277, 1294 (10th Cir.2004) (quotation omitted). Government action based upon neutral, generally applicable rules are subject to rational basis review, even if the application of the neutral rule "has the incidental effect of burdening a particular religious practice." *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 531 (1993).

The actions by the defendants were based upon neutral rules of general applicability and

were rationally related to the District's reasonable and legitimate pedagogical concerns, including

1.  The creation and maintenance of an educational environment that embraces diversity, equity, empathy, and inclusion for all students,
2.  The creation of an engaging and welcoming feel valued, respected, and included, and
3.  Providing equal and equitable educational opportunities to all students without regard to age, color, national origin, disability, ethnicity, socio-economic status, sex, gender identity and sexual orientation.

*See Doc. 11-2, Geary County Schools USD 475 Diversity and Inclusion Policy.*

Plaintiff Ricard contends the District policies are not generally applicable, asserting other teachers routinely refer to students with last names without being punished. *Doc. 5*, p. 27, *citing Doc. 6*, ¶ 16. First, Plaintiff Ricard's declaration speaks to other teachers "routinely" addressing students by their last name. This bit of misdirection obfuscates the point—that is, the District disciplined Plaintiff for intentionally treating a student differently on the base of gender identity, or being transgendered. She did so in a manner that resulted in actual class and school disruption.

While there is a "fundamental rule of protection under the First Amendment, that a speaker has the autonomy to choose the content of [speaker's] *own message*," *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557, 573 (1995*); Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 61 (2006), the speech here is government speech or school-sponsored speech.

Nonetheless, the District has a compelling interest in protecting both the dignity interests of all students in receipt of a public education. *See, e.g., Roberts v. U.S. Jaycees*, 468 U.S. 609, 624 (1984) (Minnesota public accommodation law's goals of "eliminating discrimination and assuring its citizens equal access to publicly available goods and services … plainly serves compelling state interests of the highest order").

### 2.   The District's anti-discrimination policies are content-neutral.

Government regulation of speech is content-neutral if it is "justified without reference to

the content of the regulated speech." *PeTA, People for the Ethical Treatment of Animals v. Rasmussen*, 298 F.3d 1198, 1204 (10th Cir. 2002) (internal citations omitted). Laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based. *Turner Broadcasting System, Inc. v. FCC,* 512 U.S. 622, 642–643 (1994). In determining whether a regulation is content based or content neutral, the court looks to the purpose behind the regulation; typically, Government regulation of expressive activity is content neutral if it is justified without reference to the content of the regulated speech. *Ward v. Rock Against Racism,* 491 U.S. 781, 791 (1989) (quotes and citation omitted). USD 475's anti-discrimination policies are content neutral—they prohibit intentional discrimination on the basis of on the basis of age, color, national origin, disability, ethnicity, socio-economic status, sex, gender identity and sexual orientation.

### 3.   Content-neutral regulations are permitted in a non-public forum such as a school.

The scrutiny applied to content-neutral restrictions depends on whether the restrictions affect a public forum. Content-neutral speech restrictions in a public forum are subject to strict scrutiny, while content-neutral restrictions in a nonpublic forum are subject to a reasonableness test. *PeTA, People for the Ethical Treatment of Animals v. Rasmussen*, 298 F.3d 1198, 1204 (10th Cir. 2002). "[P]ublic schools do not possess all of the attributes of streets, parks, and other traditional public forums" *Hazelwood*, 484 U.S. at 267. Unless the school facility was reserved for other purposes, "no public forum has been created, and school officials may impose reasonable restrictions on the speech of students, teachers, and other members of the school community." *Id*. at 268.

Plaintiff's speech involves government restrictions in a non-public forum. Viewpoint neutrality is not required in a public school. *Downs v. Los Angeles Unified Sch. Dist.*, 228 F.3d 1003, 1013 (9th Cir. 2000) (high school not required to permit a teacher to post anti-gay and anti-

lesbian messages on board). The school could elect to promote tolerance and preclude contrarian messages. *Id.* at 1012.

### 4. The focus is on Plaintiff's speech in her role as a teacher.

"[A] public employee does not relinquish First Amendment rights to comment on matters of public interest by virtue of government employment." *Connick v. Myers*, 461 U.S. at 140. "Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). However, the interests of public employees in commenting on matters of public concern must be balanced with the employer's interests "in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968); *see also Garcetti*, 547 U.S. at 420 ("The Court's decisions, then, have sought both to promote the individual and societal interests that are served when employees speak as citizens on matters of public concern and to respect the needs of government employers attempting to perform their important public functions."). To balance the competing interests, courts developed the five-step *Garcetti/Pickering* test:

(1) Was the speech was made pursuant to an employee's official duties?
(2) Was the speech was on a matter of public concern?
(3) Do the interests of the government/employer in promoting efficiency of public service outweigh the plaintiff's free speech interests?
(4) Was the protected speech a motivating factor in the adverse employment action? and
(5) Would the defendant have reached the same employment decision in the absence of the protected conduct?

*Helget v. City of Hays,* Kansas, 844 F.3d 1216, 1221-22 (10th Cir. 2017). "The first three steps concern questions of law for the courts, and the last two concern questions of fact." *Id.* at 1222. Speech is made pursuant to official duties if it is generally consistent with "the type of activities [the employee] was paid to do." *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1203 (10th Cir. 2007).

    **a.**  ***Ricard's speech was made pursuant to her official duties.***

   *Garcetti* requires courts to "shift [the] focus from the content of the speech to the role the speaker occupied when he said it." *Williams v. Dallas Indep. Sch. Dist.*, 480 F.3d 689, 692 (5th Cir. 2007). "Even if the speech is of great social importance, it is not protected by the First Amendment so long as it was made pursuant to the worker's official duties." *Id.*

   Speech is made pursuant to official duties if it is generally consistent with "the type of activities [the employee] was paid to do." *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1203 (10th Cir. 2007). Teaching and addressing students during the school day is what Plaintiff Ricard is paid to do, and *Garcetti* forecloses her claim. *See e.g., Brown v. Chicago Bd. of Educ.*, 824 F.3d 713 (7th Cir. 2016). In *Brown*, the Seventh Circuit held a public-school teacher did not have a First Amendment claim when disciplined for using the N-word in a well-intentional lecture instructing students about not using racial slurs. *Id.* at 715. The teacher's First Amendment claim "fail[ed] right out of the gate" because of *Garcetti*. *Id.*

    **b.**  ***Ricard's speech was not on a matter of public concern.***

   Plaintiff Ricard's speech was the intentional misgendering and deadnaming a transgender student. Addressing an 8th grade math student (properly or otherwise) is not a matter of public concern.

    **c.**  ***The District's interest as employer, in fostering an appropriate educational setting and prohibiting discrimination on the basis of sex, outweigh the Plaintiff's free speech interests.***

   School attendance is compulsory. *See, § II.A, supra*, p. 18. Discrimination against individual for being homosexual or a transgender person is unlawful discrimination. *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020). Intentional discrimination on the basis of sex violates both the Equal Protection Clause and Title IX. The District has a compelling interest in providing an educational environ free of unlawful discrimination for students who have no choice but to

attend school.

Plaintiff Ricard's interest in misgendering and deadnaming students because of her religious believes and beliefs about biology (however sincerely held) are very much outweighed.

### 5.    The District's policies are not vague or overbroad.

A policy is so vague as to violate due process when it either (1) fails to inform ordinary people what conduct is prohibited, or (2) allows for arbitrary and discriminatory enforcement. *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). The standards depend on the legal context: There is "substantially more room for imprecision in regulations bearing only civil, or employment, consequences, than would be tolerated in a criminal code." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 498–99 (1982). Even where First Amendment values are at stake, "employment standards 'are not void for vagueness as long as ordinary persons using ordinary common sense would be notified that certain conduct will put them at risk'" of discipline. *See Arnett v. Kennedy*, 416 U.S. 134, 159–60 (1974) (plurality opinion).

A similar claim of vague and overbroad policies was made by a schoolteacher in *Kluge v. Brownsburg Cmty. Sch. Corp.*, 432 F. Supp. 3d 823, 842 (S.D. Ind. 2020).

> Specifically, he asserts that the "transgender policies and related practices" are unconstitutionally vague because they grant [school] officials "unbridled discretion in deciding what constitutes 'gender dysphoria' and 'gender discrimination,' because they utilize terms that are inherently subjective and elude any precise or objective definition that would be consistent from one official, teacher, or student to another, and because they are incapable of providing meaningful guidance …the policies lack objective criteria, factors, or standards, rendering them unconstitutionally vague. … [The school's] policies were informal, sometimes unwritten, and when written, suggested they were subject to change, and, as a result, were unconstitutionally vague. … [S]uch vagueness is illustrated by the fact that the requirement that teachers use students' names listed in PowerSchool suggests that a teacher could use students' last names, which appear in PowerSchool, but [the school] changed its policy without warning to prohibit that practice. … Finally, he asserts that similarly-situated teachers must guess which "gender dysphoria policies" are in effect at any given time, and supervisors will differ as to their enforcement of these policies.

432 F.Supp.3d at 842–43.

The United State District Court for the Southern District of Indiana dismissed this claim. *Id*. at 844. The District notified Plaintiff Ricard of its non-discrimination policies. Plaintiff acknowledges that the District's policy requires her to address each student by their preferred pronoun. She intentionally discriminated against the transgender students in her class when she called them by a different name and in a different way than she addressed other students. There was no confusion caused due to a vagueness of the policy. Plaintiff Ricard simply "didn't want to go there" but was on notice that the policy applied to her conduct. *See Parker v. Levy*, 417 U.S. 733, 755–56 (1974); *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18–19 (2010) (holding that a plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.)

### 6.    Enforcing anti-discrimination policies is not an infringement upon religion.

Claims that a law or government policy violates the right to free exercise of religion do not mandate that the Court apply strict scrutiny. The strict scrutiny standard requires the government to justify a regulation or law with a compelling government interest and show that the law is narrowly tailored to advance that interest. *See Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993). Scrutiny does not apply to free-exercise claims where the challenged law is neutral and generally applicable. "even if the law has the incidental effect of burdening a particular religious practice." *Id*. at 531. A neutral, generally applicable law "need only be rationally related to a legitimate governmental interest to survive a constitutional challenge." *Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 649 (10th Cir. 2006).

Where individualized exemptions from a general requirement are available, the government may not refuse to extend that system to cases of religious hardship without compelling reason. *Lukumi*, 508 U.S. at 537 (citing *Emp. Div., Dep't of Hum. Res. of Oregon v. Smith*, 494

U.S. 872, 884 (1990)) (internal quotation marks omitted). *Accord Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1877 (2021). Nobody is, however, exempted from USD 475's anti-discrimination and anti-bullying policies. They are both neutral and generally applicable. Policy JGECB prohibits discrimination on the basis of age, color, national origin, disability, ethnicity, socio-economic status, sex, gender identity and sexual orientation. The District's policies do no impose burdens only on conduct motivated by religious belief.

When there is no conflict between an employee's religious belief and their actual job duties, the employer had no duty to accommodate those beliefs. *See Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 76 (1986) (Stevens, J., concurring in part and dissenting in part) (internal quotations omitted); *see also Summers v. Whitis*, 2016 WL 7242483, *1 (S.D. Ind. Dec. 15, 2016) (county clerk need not accommodate employee who refused to process marriage licenses for same-sex couples). Addressing a student is a simple, administerial task which does not conflict with a te'cher's religious beliefs.

## IV.     Plaintiff cannot show an irreparable injury.

The District suspended Plaintiff in April of 2021 for her violations of multiple policies. She has continued to work for District since that time. In nearly a full year, she has not suffered harm from the same policies being kept in place. She suffers from no irreparable future injury. The discipline administered will be removed from her file in a few short weeks.

Plaintiff Ricard has not suffered a violation of her constitutional rights. Should she choose to again violate the District's anti-discrimination policies, she may incur future discipline, up to and including termination. But that conjectural future consequence "loss of earnings or damage to reputation" does not "afford a basis for a finding of irreparable injury and provide a basis for temporary injunctive relief." *Sampson v. Murray*, 415 U.S. 61, 89 (1974); *see also We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 294 (2d Cir.), *opinion clarified*, 17 F.4th 368 (2d Cir. 2021)

("It is well settled, however, that adverse employment consequences are not the type of harm that usually warrants injunctive relief because economic harm resulting from employment actions is typically compensable with money damages.").

Irreparable injury requires that the movant prove a "significant risk of harm that couldn't "be compensated after the fact."" *Trial Laws. Coll. v. Gerry Spence Trial Laws. Coll. at Thunderhead Ranch*, 23 F.4th 1262, 1270–71 (10th Cir. 2022) (internal citation omitted). That harm "must be both certain and great," not "merely serious or substantial." *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001). A speculative or theoretical injury will not suffice. *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009). The injury must also be "of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *State v. U.S. Env't Prot. Agency*, 989 F.3d 874, 884 (10th Cir. 2021).

## V.     The damage caused to the District and students under its care is significantly outweighed by any threat of future injury Plaintiff claims.

The primary function of a preliminary injunction is "to preserve the status quo pending a final determination of the rights of the parties." *Harmon v. City of Norman, Oklahoma*, 981 F.3d 1141, 1151 (10th Cir. 2020). Courts are cautioned against "granting injunctions that alter the status quo or that require the "nonmoving party to take affirmative action—a mandatory preliminary injunction—before a trial on the merits occurs."" *Att'y Gen. of Oklahoma v. Tyson Foods, Inc.*, 565 F.3d 769, 776 (10th Cir. 2009).

Here, the policies Plaintiff desires to thwart have long been in place. An injunction permitting intentional discrimination on the basis of sex/gender would harm the school environment. Courts show deference to school officials in disciplining teachers for speech deemed inappropriate or likely to cause problems at school. *See e.g., Miles v. Denver Pub. Sch.*, 944 F.2d 773, 776 (10th Cir. 1991) ("A podium before a captive audience of public school children is decisively different from a street corner soapbox."). School is a "reserved forum" for teaching. *Id.*

Plaintiff Ricard is not entitled to an injunction enabling (*i.e.*, causing) the violation of the constitution and federal law.

Plaintiff Ricard's intentional disparate treatment on the basis of sex/gender caused school disruption, and not just to the disrespected student. An injunction prohibiting the District from enforcing the policies violated by Plaintiff on April 7 and 8, 2021, would significantly hinder the District's obligations to protect young persons entrusted to its care.

## VI. An injunction is adverse to the public interest and violates significant protections afforded to our society.

The public interest at issue here includes the Equal Protection Clause Title IX, and the Kansas Acts Against Discrimination –all of which prohibit intentional discrimination. Allowing Plaintiff Ricard to disregard these protections hurt not only transgender students, but society as a whole. Further, it is in the public interest that federal courts of equity should exercise their discretionary power with proper regard for the rightful independence of state governments in carrying out their domestic policy. *Commonwealth of Pennsylvania v. Williams*, 294 U.S. 176, 185 (1935).

### Conclusion

Plaintiff Ricard's Motion for Preliminary Injunction should be denied.

**Fisher, Patterson, Sayler & Smith, LLP**
3550 S.W. 5th Street | Topeka, Kansas 66606
Tel: (785) 232-7761 | Fax: (785) 232-6604
dcooper@fpsslaw.com | cmoe@fpsslaw.com

**s/David R. Cooper**
David R. Cooper                                    #16690
**s/Crystal B. Moe**
Crystal B. Moe                                      #29168
**Attorney for Defendants**

**Certificate of Service**

I hereby certify that I electronically filed the foregoing on the 29th day of April, 2022, with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to:

Tyson C. Langhofer, KS Bar No. 19241
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(480) 444-0020
tlanghofer@adflegal.org

Joshua A. Ney, KS #24077
Ryan A. Kriegshauser, KS #23942
Alan M. Vester, KS #27892
Kriegshauser Ney Law Group
15050 W. 138th Street, Unit 4493
Olathe, Kansas 66063
T: (913) 303-0639 | firm@knlawgroup.com

**s/David R. Cooper**