## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

PAMELA RICARD,

*Plaintiff*,

*v.*

USD 475 GEARY COUNTY SCHOOLS SCHOOL BOARD MEMBERS—Ron Johnson, Kristy Haden, Anwar Khoury, Jim Schmidt—in their official and individual capacities; Beth Hudson, Mark Hatcher, Jason Butler—in their official capacities; REGINALD EGGLESTON, Superintendent, USD 475 Geary County Schools, in his official and individual capacities; KATHLEEN BRENNAN, Principal, Fort Riley Middle School, in her official capacity.

*Defendants.*

Case No: 5:22-cv-04015

## PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ...................................................................................................................... 2

I.      The traditional preliminary injunction standard applies. .................................... 2

II.     Ms. Ricard treats all students equally in her speech and religious exercise. ..................... 4

III.    Defendants' application of their Policies is violating Ms. Ricard's rights. ....................... 6

        A.      Defendants' Policies unconstitutionally compel and restrict Ms. Ricard's speech. 6

                1.      Defendants' Policies implicate Ms. Ricard's interests as a citizen. ............ 6

                        a.      Ms. Ricard has no valid "official duty" to mislead parents or
                                address students using pronouns inconsistent with their sex. ......... 6

                        b.      Ms. Ricard's speech is not school sponsored speech. .................... 8

                        c.      Ms. Ricard has interests as a citizen in her ability to serve as a
                                teacher without being compelled to speak in ways that violate her
                                conscience. ...................................................................... 9

                2.      Ms. Ricard's speech addresses a matter of public concern. ..................... 10

                3.      Ms. Ricard's interests outweigh Defendants'. .......................................... 11

        B.      Defendants' Policies violate Ms. Ricard's right to free exercise of religion. ....... 14

                1.      The Policies are subject to strict scrutiny. ................................................ 14

                2.      The Policies fail strict scrutiny. ............................................................... 15

                        a.      Ms. Ricard's speech does not implicate any compelling state
                                interest. ........................................................................... 15

                        b.      Defendants' Policies are not narrowly tailored to achieve any
                                compelling state interest. ............................................................ 16

        C.      Defendants' Policies are unconstitutionally vague. ............................................ 17

IV.     All remaining preliminary injunction factors favor Ms. Ricard. ..................................... 17

CONCLUSION .................................................................................................................. 18

i

# TABLE OF AUTHORITIES

<u>**Cases**</u>

*American Civil Liberties Union v. Johnson,*
    194 F.3d 1149 (10th Cir. 1999) .......................................................................................... 18

*Boy Scouts of America v. Dale,*
    530 U.S. 640 (2000) .......................................................................................................... 11

*Bostoc v. Clayton County, Georgia,*
    140 S. Ct. 1731 (2020) ...................................................................................................... 13

*Butler v. Board of County Commissioners for San Miguel County.,*
    920 F.3d 651 (10th Cir. 2019) .......................................................................................... 10

*Fleming v. Jefferson County School District, R-1,*
    298 F.3d 918 (10th Cir. 2002) ........................................................................................ 7, 8

*Free the Nipple-Fort Collins v. City of Fort Collins,*
    916 F.3d 792 (10th Cir. 2019 .............................................................................................. 3

*Fulton v. City of Philadelphia,*
    141 S. Ct. 1868 (2021) ................................................................................................ 14, 15

*Garcetti v. Ceballos*
    547 U.S. 410 ............................................................................................................... 6, 7, 9

*Grayned v. City of Rockford,*
    408 U.S. 14 (1972) ............................................................................................................ 17

*Heglet v. City of Hays,*
    844 F.3d 1216 (10th Cir. 2017) ...................................................................................... 6, 11

*Hurley v. Irish-American Gay, Lesbian, and Bisexual Group of Boston, Inc.*
    515 U.S. 557 (1997) .......................................................................................................... 16

*Janus v. Am. Federation of State, County. & Municipal Employees., Council 31,*
    138 S. Ct. 2448 (2018) .............................................................................................. 9, 10, 11

*Johnson v. Unified School District 507, Haskell County,*
    No. 20-CV-001162-GEB, 2022 WL 184325 (D. Kan. Jan. 20, 2022) .............................. 8, 9

*Kluge v. Bownsburg Community School Corporation,*
    432 F. Supp. 3d 823 (S.D. Ind. 2020) ................................................................................ 17

*Little v. Jones,*
    607 F.3d 1245 (10th Cir. 2010) ............................................................................ 3

*Matal v. Tam,*
    137 S. Ct. 1744 (2017) ...................................................................................... 16

*Meriwether v. Hartop,*
    992 F.3d 492 (6th Cir. 2021) ...................................................................... 11, 15

*Pickering v. Board of Education of Township High School District 205, Will County, Illinois,*
    391 U.S. 563 (1968) ............................................................................................ 6

*Shelton v. Tucker,*
    363 U.S. 497 (1960) .......................................................................................... 10

*Sherbert v. Verner,*
    374 U.S. 398 (1963) .......................................................................................... 15

*Schrier v. University of Colorado,,*
    427 F.3d 1253 (10th Cir. 2005) ............................................................................ 3

*Tandon v. Newsom,*
    141 S. Ct. 1294 (2021) ...................................................................................... 16

*Utah Licensed Bererage Association v. Leavitt,*
    256 F.3d 1061 (10th Cir. 2001) .......................................................................... 18

*Weiman v. Updegraff,*
    344 U.S. 183 (1952) .......................................................................................... 10

*Wells v. City & County of Denver,*
    257 F.3d 1132 (10th Cir. 2001) ............................................................................ 7

## **Statutes**

20 U.S.C. § 1232g(a)(1)(A) ...................................................................................... 13

20 U.S.C. § 1232g(a)(4)(A) ...................................................................................... 13

## **Other Authorities**

*Special Issues in Treating Adolescents with Gender Dysphoria,*

36    Psychiatric    Times    12,    Dec.    30,    2019,
https://www.psychiatrictimes.com/view/special-issues-treating-adolescents-gender-
dysphria..................................................................................................................... 12

*Standards of Care for the Health of Transsexual, Transgender, and Gender
Nonconforming People, 1*
    (7th ed. 2012)...................................................................................................... 12

## INTRODUCTION

Ms. Ricard requires a preliminary injunction because the school is socially transitioning children, making Ms. Ricard participate in this, and compelling her to deceive parents about it. Defendants are openly discriminating against Ms. Ricard because of her religion by allowing teachers to address students by last name for secular reasons while punishing Ms. Ricard for doing the same thing for religious reasons. And Defendants' Policies are vague and riddled with exceptions that lack a rational, much less compelling, basis.

Defendants' Response completely ignores one of the most urgent reasons Ms. Ricard has requested preliminary relief—their order to mislead parents about their child's social transition. Defendants' demand that teachers use one set of names and pronouns to address students at school while using legal names and corresponding pronouns in communications with parents to keep them in the dark goes completely unmentioned in their Response. Instead, Defendants claim this case is all about discrimination (while again ignoring Ms. Ricard's explanation of how her practice is nondiscriminatory) and misconstrue Ms. Ricard's requested injunction as asking for a right to "misgender" or "deadname" students, when all Ms. Ricard asks is to not be *compelled* to *use* terms Ms. Ricard's conscience prohibits.

Nor can Defendants claim that Ms. Ricard's use of names but not pronouns will cause harm to any student. In fact, Defendants admit that gender dysphoria is a "serious medical condition" and claim to have adopted their Policies "consistent with" standards of care for gender dysphoric youth. Doc. 11, Def.'s Resp. to Mot. for TRO and Prelim. Inj. (hereinafter, "Resp.") at 22–23. But their Policies are both irrational and unlawful. The Policies require no medical diagnosis or treatment before embarking on a student's social transition. Yet, if a student does have a "serious medical condition," Defendants hide this from parents, jeopardizing the student's wellbeing and violating federal law. At the same time, Defendants keep students' legal names and biological sex

listed in their Skyward system (which students see), use those terms in internal communications, and publish those terms in their yearbook next to the student's picture. All the while, Defendants punish teachers like Ms. Ricard that only wish to refrain from using certain pronouns, without any showing that one teacher's silence causes any harm.

Ultimately, the facts show that Ms. Ricard treats her students equally, but Defendants are forcing her to violate her conscience with the words she *must* use to address students and the words she may *not* use to inform parents. And the facts show that Ms. Ricard is likely to prevail on her claims that Defendants are violating her rights to free speech, free exercise of religion, and due process of law. These ongoing violations are doing her irreparable injury. The injunction Ms. Ricard actually requests—prohibiting further retaliatory adverse action against her—would not harm the government. Enjoining unlawful acts also always serves the public interest. Therefore, this Court should grant Ms. Ricard's motion for preliminary injunction.

## ARGUMENT

Defendants invoke an inapplicable standard for preliminary injunctive relief and base their entire response on the false premise that Ms. Ricard treats transgender-identifying students differently from the way she treats other students. Because Ms. Ricard seeks a routine, prohibitory injunction, the traditional standard applies. Under that standard, all four factors favor Ms. Ricard.

**I.    The traditional preliminary injunction standard applies.**

Defendants agree that, to receive a preliminary injunction, the moving party must show (1) a likelihood of success on the merits, (2) irreparable injury, (3) balance of equities favoring the moving party, and (4) the injunction serves the public interest. Resp. at 16. They insist, however, that Ms. Ricard must also "make a heightened showing of the above four factors" because she seeks a "[m]andatory preliminary injunction" and because her injunction asks the Court to "grant

all the relief that the moving party could expect to win in trial." *Id.* at 16–17. Both arguments are wrong.

First, Ms. Ricard seeks a prohibitory injunction, not a mandatory one. A mandatory injunction is "one which requires the nonmoving party to take affirmative action." *Little v. Jones*, 607 F.3d 1245, 1251 (10th Cir. 2010). In constitutional cases, mandatory injunctions are commonly sought in prisoner cases, like *Little*, where the plaintiff sought "an injunction directing prison officials . . . to provide him with a vegan diet." *Id.* On the other hand, where a plaintiff claims that a government policy is unconstitutional and seeks an order *prohibiting* the government from enforcing the policy, the injunction is prohibitory. Defendants cite *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792 (10th Cir. 2019), Resp. at 17, but that case actually favors Ms. Ricard. There, the plaintiffs sought an injunction prohibiting enforcement of a public nudity ordinance. *Id.* at 794–95. The 10th Circuit stated, "the district court's decision to apply the heightened standard . . . was likely in error" because the requested injunction would preserve the status quo, which the Court defined as "the last peaceable uncontested status existing between the parties before the dispute developed." *Id.* at 798 n.3 (quotation omitted). *See also Schrier v. University of Colorado*, 427 F.3d 1253, 1260 (10th Cir. 2005). In this case, the "last peaceable uncontested status" between Ms. Ricard and Defendants was before Defendants enacted their Policies and applied them to Ms. Ricard in April 2021. Ms. Ricard seeks only an "injunction *prohibiting* Defendants from taking adverse action against" her for exercising her constitutional rights; she is not asking the Court to direct Defendants to affirmatively *do* anything. Doc. 4, Pl.'s Mot. for TRO, Prelim. Inj. and Expedited Hr'g, at 1 (emphasis added).

Second, Ms. Ricard's requested injunction would not "grant all the relief that the moving party could expect to win in trial." Resp. at 17. Ms. Ricard has only requested an order prohibiting

Defendants from taking additional adverse actions against her. The relief she would win at trial would include compensatory damages, nominal damages, declaratory relief, attorneys' fees, and permanent injunctive relief (1) prohibiting future adverse action, and (2) requiring expungement of any records relating to Defendants' past adverse actions against her. *See* Doc. 1, V. Compl. (hereinafter "Compl."), at 46–47. Because Ms. Ricard is requesting a prohibitory injunction offering limited prospective relief that would preserve the status quo, she is not required to make any heightened showing on the traditional four-factor preliminary injunction test.

## II.    Ms. Ricard treats all students equally in her speech and religious exercise.

Defendants incorrectly claim that "Plaintiff was disciplined for intentionally treating a transgender student differently than cisgender students" and that her Motion requests a "court order permitting her to discriminate against transgender students . . . ." Resp. at 2. Defendants' argument on every issue depends on the allegation that Ms. Ricard discriminates on the basis of transgender identity. *See* Resp. at 2, 16, 18, 21–23, 26, 28, 31–33 (basing merits arguments on allegations of discrimination); 34–36 (basing arguments on remaining preliminary injunction factors on allegations of discrimination). Yet, despite mentioning "discriminate" or "discrimination" seventy-eight times in their brief, Defendants did not once address the *nondiscriminatory* account of her actions that Ms. Ricard detailed in her Declaration.

Ms. Ricard explained that she addresses every student the same way: by their name as reported in the Skyward system and with pronouns consistent with their sex. *See* Doc. 6, Decl. of Pamela Ricard in Supp. of Pl.'s Mot. for TRO and Prelim. Inj. (hereinafter "Ricard Decl.") at ¶ 3. Ms. Ricard does not use "preferred pronouns" for anyone, including so-called "cisgendered" students. *Id.* If a *student requests* to be treated differently, Ms. Ricard will accommodate those requests—whether they are made by a transgender-identifying or a so-called "cisgendered" student—consistent with her conscience. *Id.* at ¶ 4. Ms. Ricard will do her best to accommodate

any official request that she *not* use certain names or terms to address a student. *Id.* But Ms. Ricard cannot use *any* terms to address a student, including pronouns that are inconsistent with sex. *Id.* at ¶¶ 4–5.

Defendants' own Policies help show that Ms. Ricard does not treat transgender-identifying students differently. The Policies state, "Students will be called by their preferred name and pronouns." Compl. at ¶ 186. Thus, a transgender-identifying or "cisgendered" student could state a different "preferred name and pronouns" and the Policies would compel Ms. Ricard to use those terms. If a "cisgendered" female student asked Ms. Ricard to address her with "he/him" pronouns out of solidarity for her transgender-identifying classmates, the Policy would apply. Nevertheless, Ms. Ricard would decline that request (in violation of the Policy), just as she would for any student. That's because Ms. Ricard's reason has nothing to do with the student's identity or any reason the student might request different names or pronouns. *See* Ricard Decl. at ¶¶ 3–4.

It is patently false, then, that Ms. Ricard "[r]efus[es] a transgendered student the same treatment afforded a cisgender student, because the student is transgender." Resp. at 18. The record (which Defendants' Response completely ignores) and Defendants' own Policies demonstrate that the opposite is true: Ms. Ricard *affords* each student the *same* treatment, regardless of gender identity. Any request for different treatment that Ms. Ricard would grant to one student, she would grant to any student; any request for different treatment that Ms. Ricard would deny to one student, she would deny to any student. *See* Ricard Decl. at ¶¶ 2–5. A student's gender identity never changes the way Ms. Ricard treats a student. Therefore, Ms. Ricard does not "intentionally discriminate against transgender students," Resp. at 23, or any students. Ricard Decl. at ¶¶ 2–3. All of Defendants' arguments are predicated on this false accusation. Thus, all are meritless.

**III.    Defendants' application of their Policies is violating Ms. Ricard's rights.**

Defendants apply their Policies to compel Ms. Ricard to address students using pronouns inconsistent with the students' sex and to be dishonest with parents about the terms school staff are using to address their children. This is violating Ms. Ricard's rights to free speech, free exercise of religion, and due process of law.

**A.  Defendants' Policies unconstitutionally compel and restrict Ms. Ricard's speech.**

All parties agree that employee speech is governed by the five-part test set forth in *Heglet v. City of Hays*, 844 F.3d 1216, 1221 (10th Cir. 2017). *See* Resp. at 30; Doc. 5, Pl.'s Mem. in Supp. of Mot. for TRO and Prelim. Inj. (hereinafter "Pl.'s Mem.") at 12. Defendants only dispute three elements of this test: (1) whether Ms. Ricard spoke as a citizen, (2) whether Ms. Ricard's speech addresses a matter of public concern, and (3) whether Ms. Ricard's interests outweigh Defendants'. *See* Resp. at 31–32. Ms. Ricard is likely to prevail on all three.

**1.  Defendants' Policies implicate Ms. Ricard's interests as a citizen.**

The First Amendment protects the interests of "the teacher, as a citizen, in commenting upon matters of public concern." *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568 (1968). Defendants' Policies implicate Ms. Ricard's interests as a citizen because they impose no valid official duty (lying to students and their parents), they exceed the bounds of school sponsored speech, and they force Ms. Ricard to choose between following her conscience and being eligible for public employment.

**a.  Ms. Ricard has no valid "official duty" to mislead parents or address students using pronouns inconsistent with their sex.**

Typically, "when public employees make statements pursuant to their official duties," they "are not speaking as citizens for First Amendment purposes." *Garcetti v. Ceballos*, 547 U.S. 410,

421 (2006). Defendants contend that Ms. Ricard's claim is barred by *Garcetti*. *See* Resp. at 31.[1]
But Defendants completely ignore the two reasons Ms. Ricard has already identified that
*Garcetti*'s "official duties" rule does not save their Policies: (1) the government cannot create an
official duty requiring Ms. Ricard to be dishonest, and (2) Defendants' Policies transgress the
constitutional limits on what the government has authority to require employees to say. *See* Pl.'s
Mem. at 12–17.

Perhaps most surprisingly, Defendants never address the feature of their Policies that drives
Ms. Ricard to seek preliminary relief with the urgency that she has: the requirement that she
participate in a child's "social transition" by using names and pronouns based on gender identity
while keeping parents in the dark about that process. Ms. Ricard now has to communicate with
parents in a way that violates her conscience by using a student's legal name in emails to the
parents when that student is going by a different name at school. *See* Ricard Decl. at ¶ 12; Second
Decl. of Pamela Ricard in Supp. of Pl'.s Mot. for TRO and Prelim. Inj. (hereinafter "2d Ricard
Decl.") at ¶ 10. Now, Ms. Ricard believes that she is the only teacher who is willing to give parents
notice about how the school is treating their children before the school year ends and the children
move on.

Not only does this harm both Ms. Ricard and the parents of the students in Ms. Ricard's
class that are being addressed by different names in pronouns, it contradicts Defendants' own
policies. Defendants have a "District-wide Parental Involvement Policy" that acknowledges that

---

[1] Defendants separately argue that Ms. Ricard's speech is "government speech," Resp. at 25–26,
but these arguments are actually the same: an employee's speech pursuant to official duties is
really the government's speech. *See*, *e.g.*, *Fleming v. Jefferson Cnty. Sch. Dist. R-1*, 298 F.3d 918,
923 (10th Cir. 2002) (giving "the principal speaking at a school assembly" as an example of
"government speech"). The test from *Wells v. City & Cty. of Denver*, 257 F.3d 1132, 1141 (10th
Cir. 2001), is designed to determine when private contributions to or sponsorship of a government
display may qualify as "government speech," and is inapplicable to the public employee context.

"parent involvement is integral to student success." *See* Exhibit A, USD 475 Geary Cnty. Schs. Family Handbook, at 30. This policy defines "parental involvement" as "the participation of parents in regular, two-way, and meaningful communication involving student academic learning and other school activities . . . ." *Id.* at 31. The policy tasks the district with "ensuring" that (A) "parents play an integral role in assisting their child's learning;" (B) "parents are encouraged to be actively involved in their child's education at school," (C) that parents are *full partners* in their child's education and are included, as appropriate, in decision making . . . to assist in the education of their child." *Id.* Utterly disregarding this policy, Defendants effectively keep two sets of books on students: one for the parents, and one for everyone else. *See* Ricard Decl. at ¶ 13. Defendants have no authority to make dishonesty with parents a part of Ms. Ricard's official duties. *See* Pl.'s Mem. at 13–14.

### b.   Ms. Ricard's speech is not school sponsored speech.

Defendants next argue that Ms. Ricard's speech to students and parents is "school-sponsored" speech. *See* Resp. at 23–26. Defendants understate the scope of the Policy in order to shoe-horn its mandate into the concept of "school-sponsored" speech. As Defendants acknowledge, "[s]chool-sponsored speech is . . . speech that a school affirmatively . . . promote[s], as opposed to speech that it tolerate[s]." Resp. at 25 (quoting *Fleming*, 298 F.3d at 923). They then cast the Policies as controlling speech in a "middle school math classroom." Resp. at 26. But the Policies simply state, "Students will be called by their preferred name and pronouns." Compl. at ¶ 186. The Policies apply in class, but also in the hall, in the cafeteria, on the track, in the parking lot, and on field trips. Defendants can point to no authority for the proposition that every word a teacher says anywhere is "school-sponsored." And this Court has recently held that at least some teacher activities on school grounds during school hours retain First Amendment protection. *See Johnson v. Unified Sch. Dist. 507, Haskell Cty.*, No. 20-CV-01162-TC-GEB, 2022 WL 184325, at

*7 (D. Kan. Jan. 20, 2022) (denying motion to dismiss free speech retaliation claim where teacher reported student's sexual assault and personally escorted victim to class).

### c.  Ms. Ricard has interests as a citizen in her ability to serve as a teacher without being compelled to speak in ways that violate her conscience.

Ms. Ricard's interests as a citizen are especially threatened by Defendants' Policies because of the distinction between restricted speech and compelled speech in the context of public employment. Defendants claim, that "[c]ensorship of speech is no different than compelled or forced speech" and that, therefore, "Plaintiff Ricard's claims of compelled speech are subject to the same analysis." Resp. at 24. The Supreme Court says otherwise.

> When speech is compelled, however, additional damage is done. In that situation, individuals are coerced into betraying their convictions. Forcing free and independent individuals to endorse ideas they find objectionable is always demeaning, and for this reason, one of our landmark free speech cases said that a law commanding 'involuntary affirmation' of objected-to beliefs would require 'even more immediate and urgent grounds' than a law demanding silence.

*Janus v. Am. Fed'n of State, Cnty. & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2464 (2018). With respect to employee speech in particular, the Supreme Court acknowledged that the traditional framework "fits much less well where the government compels speech" and "would certainly require adjustment in that context." *Id.* at 2473.

One reason for the distinction is the way an employer's restriction impacts an employee's rights "as a citizen." Where the government *restricts* an employee's ability to speak her preferred message at work, she is still able to speak her preferred message on her own time, as with the letter to the editor in *Pickering*. *See* 391 U.S. at 566. While executing her official duties, an employee is doing what she was "paid to perform," and so being unable to speak her own message at the same time does not generally impinge on her interests as a citizen. *Garcetti*, 547 U.S. at 422. Such a restriction only affects the employee *as* an employee—it does not reach into her private life.

But employer-compelled speech does not simply make an employee speak her own message on her own time, it *forces* the employee to say something she would *never* say on her own time. The ability to speak her preferred message during other hours does not cure that harm. *See Janus*, 138 S. Ct. at 2464. And employer-compelled speech affects the employee *as a citizen* by reaching into her private life in two ways. First, the violation of conscience that occurs in the workplace is not limited to the workplace: "[w]hen speech is compelled, however, additional damage is done." *Janus*, 138 S. Ct. at 2464. Second, the rule reaches into the employee's private life by making her choose between her conscience and her *ability* to procure public employment at all. In this way, a compulsory speech requirement is like the other conditions to public employment the Supreme Court invalidated in *Shelton v. Tucker*, 364 U.S. 497, 489–90 (1960) (disclosing private associations) and *Weiman v. Updegraff*, 344 U.S. 183, 190–91 (1952) (swearing loyalty oaths). When the government tries to "forc[e] free and independent individuals to endorse ideas they find objectionable" as a condition of securing or keeping a job, it implicates the employee's interests as a citizen. *Janus*, 138 S. Ct. at 2464. Because Defendants' Policies compel Ms. Ricard to address students and mislead parents in ways that violate her conscience, they implicate her interests as a citizen.

**2. Ms. Ricard's speech addresses a matter of public concern.**

Matters of public concern include "any matter of political, social, or other concern to the community." *Butler v. Bd. of Cnty. Comm'rs for San Miguel Cnty.*, 920 F.3d 651, 656 (10th Cir. 2019). Defendants offer no legal argument on this point, instead repeating their false charge that Ms. Ricard's speech is "intentional misgendering and deadnaming a transgender student." Resp. at 31. Ms. Ricard has already explained that she will *not* use pronouns a student asks her not to use (so-called "misgendering") and that she will *not* use a name a student asks her not to use (so-called "deadnaming"). *See* Ricard Decl. at ¶¶ 4–5. So Defendants' charges of "misgendering" and

"deadnaming" have no support whatsoever. On the other hand, Ms. Ricard's interest in *not* being compelled to *use* pronouns inconsistent with a student's sex does address a matter of public concern. *See Meriwether v. Hartop*, 992 F.3d 492, 508 (6th Cir. 2021) ("Pronouns can and do convey a message implicating a sensitive topic of public concern."); *see also* Janus, 138 S. Ct. at 2476 ("controversial subjects such as climate change, the Confederacy, sexual orientation and gender identity . . . are sensitive political topics, and they are undoubtedly matters of profound 'value and concern to the public.'").

### 3.   Ms. Ricard's interests outweigh Defendants'.

Because Defendants' Policies implicate Ms. Ricard's interests as a citizen addressing a matter of public concern, Defendants have the "burden to justify [their] restriction on speech" by showing that their "interests outweigh" Ms. Ricard's interests. *Helget*, 844 F.3d at 1219, 1222. Defendants cannot carry this burden.

Ms. Ricard has a profound interest in not being "coerced into betraying [her] convictions." *Janus*, 138 S. Ct. at 2464. The fact that Ms. Ricard's view about sex and human identity contradicts a view that is growing in popularity weighs in favor of her interest all the more: "the premise that gender identity [rather than sex makes a person male or female] is an idea 'embraced and advocated by increasing numbers of people is all the more reason to protect the First Amendment rights of those who wish to voice a different view.'" *Meriwether*, 992 F.3d at 510 (quoting *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 660 (2000)).

Defendants identify three interests, none of which outweigh Ms. Ricard's. First, Defendants claim an interest in avoiding discrimination, again accusing Ms. Ricard of "misgendering" and "deadnaming." *See* Resp. at 31–32. Any such interests are not implicated here, because Ms. Ricard doesn't discriminate against, "misgender," or "deadname" her students. *See supra* Parts II, III.A.2.

Next, Defendants claim their Policies protect the "safety, health, and welfare" of students. *See* Resp. at 22–23. Defendants cite a study entitled *Special Issues in Treating Adolescents with Gender Dysphoria* and a set of *Standards of Care for the Health of Transexual, Transgender, and Gender Nonconforming People* to support their claim. *See id.* Neither the study nor the Standards support Defendants' assertion. *See* Exhibit B, Decl. of James Cantor (hereinafter "Cantor Decl.") at ¶¶ 17–20.

While Defendants' sources offer no support to their Policies, other sources undermine them. Over the last forty years, "every study without exception has come to the identical conclusion" that the majority of children with gender dysphoria will "desist," or stop experiencing gender dysphoria if allowed to finish going through natural puberty. *Id.* at ¶ 31. For gender dysphoric youth, "psychosocial support" is correlated with better outcomes, while medical treatment is not. *Id.* at ¶ 52. Clinical outcomes show that there is a "greater need to resolve potential mental health obstacles" rather than "endorsing transition." *Id.* at ¶ 61. But Defendants Policies do the opposite: they endorse transition and *hide* it from parents, who are an important source of psychosocial support *and* must be involved in order to ensure that the child ultimately receives the care they need to resolve other physical or mental health issues.

Defendants' claims about harm to students arising from Ms. Ricard's use of names but not pronouns are also irrational when compared with what Defendants do and authorize. Defendants themselves *refuse* to change the name or sex of a student in the Skyward system based on a student's request to use different names or pronouns. 2d Ricard Decl. at ¶¶ 3–5. Yet students must log on to the system using their legal name. *Id.* at ¶ 4. And when they log on they see their legal name and biological sex. *Id.* at ¶¶ 3–5. Defendants produce a yearbook that lists a student's legal name, not preferred name, underneath the student's photograph. *See id.* at 11–12. And Defendants

allow teachers to use last names to address students, so long as the school doesn't know that the teacher's reason for doing so is religious. All this undermines any possible claim that Defendants' interest in their students' wellbeing justifies punishing Ms. Ricard simply for staying silent when it comes to using pronouns inconsistent with a student's sex.

Finally, Defendants claim they must compel Ms. Ricard's speech in order to avoid violating various federal statutes. *See* Resp. at 18–21. This is wrong for three reasons. First, avoiding federal statutory violations is not a reason to limit *constitutional* rights—otherwise the federal government could simply legislate away constitutional rights. Second, all of Defendants' claims about statutory violations are predicated on the false charge that Ms. Ricard's *refusal* to use pronouns inconsistent with sex is discriminatory.[2] *See supra* Part II. Third, Defendants are the ones violating federal statutes through their Policies. Defendants maintain a record of students who request use of different names and pronouns. *See* Ricard Decl. at ¶ 13. The Family Educational and Privacy Rights Act (FERPA) prohibits schools from denying to any parent "the right to inspect and review the education records of their children." 20 U.S.C. § 1232g(a)(1)(A). FERPA defines an "education record" as any "documents" that "contain information directly related to a student" and "are maintained by" the school. 20 U.S.C. § 1232g(a)(4)(A).

Contrary to FERPA, Defendants maintain two sets of books; one for school officials and students and a separate one for parents. Parents have access to Skyward which maintains the legal

---

[2] Defendants' claims that *not* forcing Ms. Ricard to speak would render the district liable under Title IX fail for this reason. *See* Resp. at 21–22. Defendants also assert that courts' use of similar legal analysis in Title VII cases means that "violations of Title IX may also be violations of Title VII." Resp. at 20. Not true. Title VII protects *employees*, not *students*, and the use of similar analysis by courts does not change the conduct a statute prohibits or the classes of people it protects. *Bostock v. Clayton Cnty.* is therefore doubly inapplicable: it only addresses employment and it only addresses "discriminat[ion] against employees *for being homosexual or transgender*." 140 S. Ct. 1731, 1743 (2020) (emphasis added). Students aren't employees, and Ms. Ricard doesn't treat any student differently because they identify as transgender. *See supra* Part II.

name and sex of students. But Defendants maintain a separate "notebook" for students who have requested a different name and/or pronoun at school. *See* Ricard Decl. at ¶ 13. Defendants conceal that information from parents unless a student affirmatively consents to revealing that information to their parents. In FERPA's terms, Defendants "maintain" a notebook of "information directly related to a student" that they will *not* provide parents with "the right to inspect and review." None of Ms. Ricard's practices cause Defendants to violate federal law, but Defendants' application of their own Policies violates FERPA.

Ms. Ricard's strong interest in avoiding compulsion to violate her conscience outweighs any interests of the Defendants in forcing her to use pronouns inconsistent with a student's sex or to mislead parents about how their children are being addressed at school.

**B.  Defendants' Policies violate Ms. Ricard's right to free exercise of religion.**

Ms. Ricard is substantially likely to prevail on her free exercise claims because Defendants' Policies are subject to strict scrutiny but are not narrowly tailored to achieve any compelling state interest.

**1.  The Policies are subject to strict scrutiny.**

Under the Free Exercise Clause, a government policy that is not "generally applicable" is unconstitutional unless it can "survive strict scrutiny." *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1881 (2021). If a policy allows the government to "grant exemptions based on the circumstances underlying each" request for an exemption, it is not generally applicable. *Id.* at 1877. If the government exempts conduct undertaken for a secular motive but punishes the same conduct when undertaken for a religious motive, the government's policy fails general applicability and must face strict scrutiny.

Defendants' Policies work this way. Defendants acknowledge that teachers "routinely" address students—including transgender-identifying students—by last name. *See* Resp. at 28.

Defendants claim the fact that some teachers do this "routinely" distinguishes Ms. Ricard, who they claim chooses her words in a discriminatory fashion. *See id.* But since the unrebutted evidence shows that Ms. Ricard does *not* discriminate, *see supra* Part II, Defendants' decision to excuse staff who address students by last name for secular reasons while punishing Ms. Ricard for doing the same thing for religious reasons triggers strict scrutiny. *See Sherbert v. Verner*, 374 U.S. 398, 401 (1963).

### 2. The Policies fail strict scrutiny.

Defendants' Policies fail strict scrutiny because they are not narrowly tailored to achieve any compelling state interest.

### a. Ms. Ricard's speech does not implicate any compelling state interest.

Defendants must not only identify compelling interests, they must show why they have "such an interest in denying an exception to" Ms. Ricard. *Fulton*, 141 S. Ct. at 1881. To the extent Defendants rely on the same interests they assert for restricting Ms. Ricard's speech, none of those interests are compelling for the reasons set forth in Part III.A.3. In addition, Defendants claim interests in (1) an "educational environment that embraces diversity, equity, empathy, and inclusion," (2) making sure students "feel valued, respected, and included," and (3) "[p]roviding equal and equitable educational opportunities for all students without regard to" various protected characteristics. *See* Resp. at 28.

The first two interests are not a compelling reason to deny an exemption to Ms. Ricard and compelling her to speak in violation of her conscience. Any interest in "diversity" or "inclusion" would necessarily *include* Ms. Ricard's point of view, in which case the "students' interest in hearing even contrarian views is also at stake." *Meriwether*, 992 F.3d at 510. And, while schools may control *conduct* to protect students' feelings, such interests are not compelling reasons to restrict *speech* for purposes of strict scrutiny under the First Amendment. *See Matal v. Tam*, 137

S. Ct. 1744, 1764 (2017) (the "Government has [no] interest in preventing speech expressing ideas that offend"); *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 579 (1997) (restricting speech to "produce speakers free of . . . biases" is "a decidedly fatal objective").

The third interest is not implicated by Ms. Ricard's speech or her requested accommodation, since her speech is nondiscriminatory. *See supra* Part II. And Defendants further undermine their own claims that avoiding discrimination is their compelling interest by *requiring* what they define as "discrimination." Defendants claim that using a legal name or sex-based pronoun to address a transgender-identifying person (neither of which Ms. Ricard continues to do after a student asks her to use different terms) constitutes "discrimination." *See* Doc.1-6, Compl. Ex. F, at 5. Yet Defendants require teachers and administrators to use legal names and corresponding pronouns when communicating with a student's parent. *See* Doc.1-16, Compl. Ex. P.

### b. Defendants' Policies are not narrowly tailored to achieve any compelling state interest.

Narrow-tailoring requires the government to restrict only that which is necessary to actually achieve a compelling interest. *See Tandon v. Newsom*, 141 S. Ct. 1294, 1296–97 (2021). When "the government permits other activities" that generate some risk but keep restricting similar religious activities, the restriction is not narrowly tailored. *Id.* at 1297. Here, Defendants use students' legal names and authorize other teachers to use legal names in several contexts. *See supra* Part III.A.3. Defendants offer no facts to show that these denials are harmless, nor do they offer any facts to show that allowing Ms. Ricard to use last names would *cause* harm. *See* Cantor Decl. at ¶¶ 17–20 (discussing Defendants' sources). In fact, Defendants' Policies of socially transitioning

any student that requests to be addressed with different names and pronouns while keeping parents in the dark likely harms children. *See id.* at ¶¶ 61, 77.

Because Defendants' Policies, as applied to Ms. Ricard, do not further any compelling interest and are not narrowly tailored to achieving any such interest, Ms. Ricard is likely to succeed on her claims that the Policies violate her right to free exercise of religion.

### C.  Defendants' Policies are unconstitutionally vague.

Defendants' Policy of compelling teachers to grant *every* students' request to be called by their "preferred name and pronouns" is unconstitutionally vague. Compl. at ¶ 186. Policies that restrict or compel speech must give teachers a "reasonable opportunity to know what is prohibited," otherwise they violate the Due Process Clause. *Grayned v. City of Rockford*, 408 U.S. 14, 108 (1972). Defendants point to *Kluge v. Brownsburg Cmty. Sch. Corp.*, 432 F. Supp. 3d 823, 842 (S.D. Ind. 2020), to claim that their Policies satisfy due process requirements. But *Kluge* addressed a policy with far more guidance for teachers than Defendants'. For example, the policy in *Kluge* authorized narrower requests for names by a narrower class of students. *See id.* at 835 ("the policy instructs faculty to use names that 'the students choose as a *part of their gender dysphoria* '") (emphasis added). Defendants' Policies, on the other hand, appear to compel teachers to use *any* name *any* student requests at *any* time. But no reasonable teacher would believe that she is obligated to address a student as "Cumsock." *See* Compl. at ¶ 159. Therefore, the Policies mean something less than what they say they mean, but teachers have to guess at which request they can safely ignore and which names or terms they must use on pain of punishment. This violates Ms. Ricard's right to due process.

### IV.   All remaining preliminary injunction factors favor Ms. Ricard.

All of Defendants' arguments on the remaining factors assume (1) that Ms. Ricard is unlikely to succeed on the merits and (2) that Ms. Ricard is engaged in discrimination. *See* Resp.

at 34 ("Plaintiff Ricard has not suffered a violation of her constitutional rights"); 35 ("An injunction permitting intentional discrimination" would "harm the school environment"); 36 ("Ms. Ricard is not entitled to an injunction enabling . . . the violate of the constitution and federal law."). But Ms. Ricard is not engaged in discrimination. *See supra* Part II. And she is likely to prevail on the merits. *See supra* Part III. Therefore, she is suffering ongoing irreparable injury. *See Utah Licensed Beverage Ass'n v. Leavitt*, 256 F.3d 1061, 1076 (10th Cir. 2001) ("it is proper for us to assume irreparable injury" where there is a violation of constitutionally protected speech). And enjoining unconstitutional activity does not harm the government and serves the public interest. *See Am. Civ. Liberties Union v. Johnson*, 194 F.3d 1149, 1163 (10th Cir. 1999). Therefore, all four factors for preliminary relief favor Ms. Ricard.

## CONCLUSION

This Court should enjoin Defendants from taking any additional adverse actions against Ms. Ricard for exercising her constitutional rights.

Respectfully submitted this 3rd day of May, 2022.

By: *s/ Tyson C. Langhofer*
Tyson C. Langhofer, KS Bar No. 19241
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(480) 444-0020
tlanghofer@adflegal.org

Joshua A. Ney, KS Bar No. 24077
Ryan A. Kriegshauser, KS Bar No. 23942
Alan M. Vester, KS Bar No. 27892
15050 W. 138th St., Unit 4493
Olathe, KS 66063
Telephone: 913 303-0639
firm@knlawgroup.com

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that on the 3rd day of May, 2022, I electronically filed the foregoing with

the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to:

David R. Cooper
Fisher, Patterson, Sayler & Smith, LLP
3550 S.W. 5th Street
Topeka, KS 66606
(785) 232-7761
dcooper@fpsslaw.com

Attorney for Defendants

*s/ Tyson C. Langhofer*
Tyson C. Langhofer
*Attorney for Plaintiff*
