IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

PAMELA RICARD,

Plaintiff,

vs.                                                        Case No. 5:22-cv-04015-HLT-GEB

USD 475 GEARY COUNTY SCHOOLS SCHOOL
BOARD MEMBERS—Ron Johnson, Kristy Haden,
Anwar Khoury, Jim Schmidt—in their official and
individual capacities; Beth Hudson, Mark Hatcher,
Jason Butler—in their official capacities; REGINALD
EGGLESTON, Superintendent, USD 475 Geary
County Schools, in his official and individual
capacities; and KATHLEEN BRENNAN, Principal,
Fort Riley Middle School, in her official capacity,

Defendants.

## Motion to Dismiss and Memorandum in Support

Defendants Ron Johnson, Kristy Haden, Anwar Khoury, Jim Schmidt, Beth Hudson, Mark

Hatcher, Jason Butler, Reginald Eggleston, and Kathleen Brennan move, pursuant to Fed. R. Civ.

P. 12(b)(6), to dismiss plaintiff's complaint for failure to state a claim upon which relief may be

granted.

## Nature of the Case

Plaintiff Ricard is a middle school math teacher. Ricard was disciplined for intentionally

discriminating against transgender students in her classroom. Following her return to work from

suspension, Ricard proceeded through the five levels of grievance hearings afforded by the

Negotiated Agreement between the District and its teachers—three at various levels of

Administration, one with the Federal Mediation and Conciliation Service, and one with the Board

of Education. The discipline was upheld at each stage, with the Board of Education upheld Ricard's

suspension for the same reasons the suspension was first imposed. The Board also denied Ricard's request for a religious accommodation to the District's anti-discrimination, anti-harassment, and anti-bulling policies.

Ricard's Complaint asserts the following claims:

Count I, Violation of Ricard's First Amendment Right to Free Speech, Retaliation (under § 1983),

Count II, Violation of Plaintiff's First Amendment Right to Freedom of Speech Content & Viewpoint Discrimination (§ 1983),

Count III, Violation of Plaintiff's First Amendment Right to Freedom of Speech Compelled Speech, (§ 1983),

Count IV, Violation of Plaintiff's First Amendment Right to Free Exercise of Religion (§ 1983),

Count V, Violation of Plaintiff's Right to be Free from Unconstitutional Conditions (§ 1983),

Count VI, Violation of Plaintiff's Fourteenth Amendment Right to Due Process of Law (§ 1983)

Count VII, Violation of Plaintiff's Fourteenth Amendment Right to Equal Protection of the Law (§ 1983),

Count VIII, Breach of Contract (state law)

This Court addressed the free exercise claim and the "Communication with Parents" policy in its Memorandum and Order on Ricard's motion for a preliminary injunction. *Doc. 21*. The USD 475 Board of Education voted to rescind that policy on May 19, 2022. The minutes from that meeting will be approved at its meeting June 1, 2022 which will then be submitted to the Court. Likewise, Ricard retired and left the employment of USD 475 (also reflected in the agenda and will be reflected in the minutes of the May 19 meeting). Accordingly, Ricard's free exercise claim is moot.

Plaintiff's remaining claims for money damages and other relief fail because:

1.      Ricard's speech in the classroom was not protected by the First Amendment,

2.      The District's anti-discrimination policies do not violate the Free Exercise Clause,

3.      The District is not required to permit Ricard, as a religious accommodation, to discriminate on against transgender students the basis of sex/gender,

4.      Ricard was not deprived of due process,

5.      The Complaint does not state an equal protection claim,

6.      The Complaint does not state a claim for breach of contract, and

7.      The individual defendants are entitled to qualified immunity.

### Statement of Facts

Plaintiff Ricard's Complaint refer to Student 1 and Student 2. This memorandum refers to these students as Student E.S. and Student J.K. The initials should better enable the reader to discern between the students when reviewing the exhibits.

On a motion to dismiss under Fed.R.Civ.P. 12(b), courts consider the "documents attached to or referenced in the complaint if they 'are central to the plaintiff's claim and the parties do not dispute the documents' authenticity.'" *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1103 (10th Cir. 2017) (quoting J*acobsen v. Deseret Book Co.*, 287 F.3d 936, 941 n.2 (10th Cir. 2002)). Likewise, A court may take judicial notice of facts that are a matter of public record and of state court documents. *Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006);[1] *Pace v. Swerdlow*, 519 F.3d 1067, 1072 (10th Cir. 2008) (federal court properly considered state court files without converting a motion to dismiss to a motion for summary judgment). "[F]ederal courts, in appropriate circumstances, may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue." *St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir.

---

[1] The Tenth Circuit noted, in *Tal v. Hogan*,

> However, facts subject to judicial notice may be considered in a Rule 12(b)(6) motion without converting the motion to dismiss into a motion for summary judgment. *See Grynberg v. Koch Gateway Pipeline Co.,* 390 F.3d 1276, 1278 n. 1 (10th Cir. 2004) (citing 27A Fed. Proc., L.Ed. § 62:520 (2003)). This allows the court to "take judicial notice of its own files and records, as well as facts which are a matter of public record." *Van Woudenberg ex rel. Foor v. Gibson,* 211 F.3d 560, 568 (10th Cir. 2000), *abrogated on other grounds by McGregor v. Gibson,* 248 F.3d 946, 955 (10th Cir. 2001).

453 F.3d 1244, 1264 n.24

1979) (citations omitted). The court does so without converting a motion to dismiss into a motion for summary judgment. *Grynberg v. Koch Gateway Pipeline Co.*, 390 F.3d 1276, 1278 n.1 (10th Cir. 2004) (citations omitted). The facts below are from the Complaint, *Doc. 1*, and the documents attached and expressly incorporated therein. *Id.* ¶ 92. Defendants reserve the right to dispute these allegations should this case survive the motion to dismiss.

1.      The signature line of outgoing emails details USD 475's policy of nondiscrimination:

Notice of Nondiscrimination

Geary County USD #475 does not discriminate on the basis of race, color, national origin, sex, disability, or age in its programs and/or activities and provides equal access to the Boy Scouts and other designated youth groups. For questions or complaints based on race, color, national origin, sex or age, please contact the USD 475 Executive Director of Personnel, 123 N. Eisenhower, Junction City, KS 66441. Telephone: 785.717.4000. For questions or complaints based on disability, please contact the USD 475 Executive Director of Special Education, 123 N. Eisenhower, Junction City, KS 66441. Telephone: 785.717.4000.

*Doc. 1-1*, *1-2*, *1-3*, *1-5*, *1-16*, *1-17*.

2.      District Policy GAACB provides, in part, that "All employees, students and the Board of Education are expected to exhibit conduct that reflects dignity, respect and inclusion at all times during the instructional day and at all other district-sponsored programs and events." *Doc. 1-4.*, p. 4

3.      District Policy GAAE-Bullying by Staff, provides:

The board of education prohibits bullying in any form by any student staff member, or parent towards a student or a staff member on or while using school property, in a school vehicle or at a school-sponsored activity or event. For the purposes of this policy, the term "bullying" shall have the meaning ascribed to it in Kansas law.

*Doc. 1-4*, p. 4; *Doc. 1-18*, p. 3. K.S.A. 72-6147(1) defines bullying to include

Any intentional … verbal … act by any … staff member … towards a student … that is sufficiently severe, persistent, or pervasive that such … act … creates an intimidating, threatening or abusive educational environment that a reasonable person, under the circumstances, knows or should know will have the effect of: (i) Harming a student or staff

member, whether physically or mentally ….

4.      Board Policy GAF-Staff-Student Relations provides, in relevant part, "Staff members shall maintain professional relationships with students which are conducive to an effective educational environment." *Doc. 1-4*, p. 4; *Doc. 1-18*, p. 4.

5.      On March 8, 2021, President Biden issued Executive Order 14021. That Order set forth a policy that "all students should be guaranteed an educational environment free from discrimination on the basis of sex, including discrimination in the form of sexual harassment, which encompasses sexual violence, and including discrimination on the basis of sexual orientation or gender identity" Exec. Order No. 14021, 86 FR 13803. This includes "discrimination on the basis of sexual orientation or gender identity. For students attending schools and other educational institutions that receive Federal financial assistance, this guarantee is codified, in part, in Title IX of the Education Amendments of 1972, 20 U.S.C. 1681 *et seq.*, which prohibits discrimination on the basis of sex in education programs or activities receiving Federal financial assistance." *Id*.

6.      Plaintiff Ricard is a middle school math teacher at Fort Riley Middle School, a publicly funded school. *Doc. 1*, ¶ 1.

7.      During the 2020-2021 school year, Ricard taught all levels of middle school students—sixth, seventh and eighth grades. *Doc. 1*, ¶ 95.

8.      Ricard was informally made aware that a student in her classroom preferred a different name by a fellow teacher during a hallway conversation in March of 2021. *Doc. 1*, p. 15, ¶ 103.

9.      Ricard avers and alleges that, "[t]hroughout her teaching career, including in her Math Strategies class, [] has regularly used students' last names instead of first names as a more formal way of addressing students or getting students' attention, as circumstances may require."

*Doc. 1*, ¶ 112.

10.     Ricard uses last names for formal address or to get a student's attention--not as a usual form of address. *Id.*

11.     Ricard avers that she "addressed Student 1 [E.S.] as "Miss [E.S.'s Legal/Enrolled Last Name]" when Ms. Ricard needed to get Student E.S.'s attention at the end of class. *Doc. 1*, ¶ 114.

12.     USD 475 and the Junction City Education Association entered into a formal agreement for the 2020-2021 SY. This agreement included Article IV to address a grievance process and Article X to address a teacher discipline process.  *Doc. 1-8*, p. 10-12, 33-35.

13.     In March 2021, Ricard discussed Student J.K.' preferred name with teacher Paige Miller. The Complaint details the conversation as follows:

> 100. Ricard approached fellow teacher Paige Miller ("Miller") after school to ask if "[Student J.K.'s Legal First Name]" was still at the school because Ms. Ricard had sought to give Student [J.K.] an extra pair of jeans and some extra shirts after Spring Break.
>
> 101. During this conversation with Ms. Ricard, Miller repeatedly asked Ms. Ricard if Ms. Ricard meant "[Student J.K. Preferred Alternative First Name]."
>
> 102. Ms. Ricard continued to state to Miller she was looking for "[Student J.K. Legal First Name]."
>
> 103. Miller eventually told Ms. Ricard that "[Student J.K. Legal First Name]" now "goes by" "[Student J.K. Preferred Alternative First Name]."
>
> 104. Ms. Ricard stated, "don't go there" and then moved on from the conversation to look for Student [J.K.].

*Doc. 1*, ¶¶ 100-104.

14.     On March 31, 2021, at about 9:56 a.m., Principal Shannon Molt sent an email to FRMS staff that said:

> Subject: Preferred Names
>
> Good Morning,

When we have a student that requests to go by a preferred name that is different than their given name, our district honors the request. Once you are aware of a preferred name, use that name for the student.

Please let me know what question you have.

*Doc. 1-1.*

15.     On or about April 4, 2021, Principal Molt included the following instruction to staff in the Weekly Newsletter: "Preferred Names: When we have a student that requests to go by a preferred name that is different than their given name. our district honors the request. Once you are aware of a preferred name, use that name for the student." *Doc. 1-1*, p. 23 ¶ 147.

16.     After receiving the April 7 email from Lubbers, Ricard attempted to address the issue of preferred names with Assistant Principal Terry Heina. Ricard says she wanted to "ask for advice on how to address Student [E.S.] as a result of the email when Student [E.S.]'s enrolled name had not been changed in the Skyward system." *Doc. 1*, ¶ 111. Heina reported that he told Ricard to speak with Principal Shannon Molt about her questions. *Doc. 1-2.*

17.     On April 7, 2021, at about 1:33 p.m. Student J.K. emailed Ricard (after class):

"I don't know if Mr.lubbers has emailed you about [Student E.S.] ([Legal first name]) preferred name and pronouns and im [*sic*] assuming since you said "miss [legal last name]" to him in class he has yet to do so, unless he has and you are purposely misgendering/deadnaming him on purpose, which I don't think you would do that purposely but there's always a possibility. Anyways, His preferred name is [E.S.] and his pronouns are He/ Him.

*Doc. 1-1*, p. 17, ¶ 115.

18.     On April 8, 2021, around 1:15 p.m., while Ricard was writing the Level 2 discipline referral for Student J.K., Ricard wrote [Legal First Name] [Legal Last Name] on the form – despite knowing Student J.K.'s preferred name. Student J.K. wrote a note to Ricard: "[E.S.'s Legal Last Name] name is [E.S.'s Preferred Name] BTW, his pronouns are He/Him and if you can't act like an adult and respect him and his pronouns then prepare yourself to deal with his mother since you can't be a decent human being and respect him. All you're doing right now is showing that you're

transphobic and don't care that your' being visibly transphobic." *Doc. 1-1*, p. 18, ¶ 123.

19.     On April 8, 2021, at about 1:41 p.m., Ricard forwarded the April 7 email from Student J.K. to Ass't Principal Terry Heina, Principal Shannon Molt, and Ass't Principal Kathleen Brennan. Ricard advised she gave Student J.K. a Level 2 discipline referral for emailing during class, scribbling over the discipline referral and throwing it in the trash, and calling Ricard a homophobe [Note: Student J.K.'s note says transphobic, not homophobic]. Ricard asked to meet with the student in her room. *Doc. 1-1*, p. 18, ¶ 124.

20.     On April 8, 2021, around 3:42 p.m., Counselor Jason Lubbers forwarded his April 7 email to Principal Molt. *Doc. 1-1*, pp. 18-19, ¶ 126.

21.     On April 9, 2021, Assoc. Supt. Lacee Sell issued a Notice of Suspension to Pamela Ricard, suspending Ricard with pay, for three days effective April 12, 2021. *Doc. 1-3*.

22.     On April 15, 2021, Principal Molt gave Ricard a Reprimand Documentation Form, *Doc. 1-4*, that states:

> Mrs. Ricard has engaged in discriminatory practices. The behavior demonstrated by Mrs. Ricard is against the guidance provided by building leadership via email on March 31, 2021 and the building's weekly newsletter on April 4, 2021.
>
> The email and newsletter shared, "when we have a student that requests to go by a preferred name that is different than their given name, our district honors the request. Once you are aware of a preferred name, use that name for the student." Mrs. Ricard was made aware of one student's request via an email sent by Mr. Lubbers. Mrs. Ricard called the student by their last name instead of their preferred name. Mrs. Ricard was made aware of a second student who wanted to use a preferred name and pronouns by a colleague. Mrs. Ricard refused to use that student's preferred names and pronouns. She stated in her interview that she would not call them by their preferred names and pronouns without getting approval from the parents. At the end of the interview Mrs. Ricard stated she would follow the policy even though she did not agree with it.
>
> As an employee of the district, Mrs. Ricard participated in the building diversity and inclusion policy training. Even though it was self-directed for her because she was absent when building leadership conducted it, the policy is clear on the board's expectations of staff and students of the district.

The form specifically notes the following:

Board Policy GAACB-Diversity and Inclusion …
o The student preferred name was not used by Mrs. Ricard.

Board Policy GAAE- Bullying by Staff …
o Students felt discriminated against based on the teacher not using the preferred names.

Board Policy GAF-Staff-Student Relations …
o Student (E.S.) was not called by his preferred name after Mrs. Ricard received notification emails from a student and the counselor. Prior to the notification, Mrs. Ricard called the student by their legal name. After notification, Mrs. Ricard called the student by their last name.

Ricard initialed the form and wrote: "I do not agree with this!" *Doc. 1-4.*

23.    On April 20, 2021, Ricard sent a written rebuttal to the 4-15-21 Reprimand Documentation Form to Assoc. Supt. Lacee Sell. Throughout the rebuttal, Ricard continually referred to Student J.K. as his legal first name rather than his preferred name. *Doc. 1*, p. 21, ¶ 138; *Doc.* 11-15, pp. 49-53.[2] Ricard's rebuttal (1) confirms she intentionally refrained from using the preferred name of transgender students and (2) does not deny treating the transgender students differently from cisgender students in terms of means of address (first names versus last names).

24.    On April 28, 2021, Ricard file a Legal 1 and 2 Grievance. Doc. 1, p. 22, ¶ 141.

25.    After discussion on May 3, 2021, Principal Molt documented the meeting in an email stating the written reprimand would go forward on May 4, 2021. Doc. 1, p. 22, ¶¶ 142-43.

26.    On May 12, 2021, Ricard submitted a Level 3 Grievance. Doc. 1, p. 22, ¶ 144.

27.    On May 19, 2021, Supt. Reginald Eggleston responded to the Level 3 Grievance relaying that Ricard's conduct was not a minor infraction (which would require counseling and an

---

[2] When plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss. *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997). Ricard's Rebuttal document is explicitly referenced in the complaint at ¶ 138. That rebuttal was (1) attached to Ricard's Level 5 Grievance submission, and filed with the court on April 29, 2022. *Doc. 11-14.*

oral reprimand before issuing a written reprimand).

> "[T]he events leading up to the date of the cause of action on April 15, 2021, are not of a minor nature. The building leadership provided communication on multiple days via email and the building newsletter advising staff to utilize the preferred names of students. The communication came from the district office and was presented to staff by the building administration. Several staff members advised you of the preferred names of students and students provided notification of the preferred names they wished to go by.

> "[T]he incident was not of a minor nature. The district has an obligation as educators to ensure that our students are provided with a safe and secure environment. When someone engages in conduct that is deemed to be in a discriminatory nature, action must be taken and cannot be limited to a counseling or an oral reprimand. The counseling in this incident had already occurred when the building leadership provided the email notification to staff on March 31, 2021 and through the Trooper Newsletter on April 4, 2021.

> "During the investigation, the district received statements that Mrs. Ricard had been notified by fellow staff members of the preferred names of students in her Math Strategies class. Mrs. Ricard did not make any attempts to utilize the preferred names when notified by staff."

*Doc. 1-9*.

28.     On May 21, 2021, Ricard, via Dana Wiegand (JCEA President) requested a Level 4 Grievance. *Doc. 1*, p. 23, ¶ 149.

29.     On July 8, 2021, Attorney Joshua A. Ney sent a letter to USD 475, c/o Supt. Reginald Eggleston, that included a "request for a religious accommodation regarding any school policy that requires a teacher or school employee to actively state or otherwise use a student's or any other person's preferred pronouns or other gendered language when different from the student's or person's biological sex." *Doc. 1-10*.

30.     On August 4, 2021, Attorney Ney sent a letter to the Board of Education outlining Pamela Ricard's arguments to the Board of Education; the letter enclosed a "proposed neutrally applicable gendered policy procedure and accommodation language" *Doc. 1-11*, *Doc. 1-12*.

31.     On August 11, 2021, the Board of Education issued its written decision on Ricard's grievance. The decision notes:

1.      The persons pertinent to the grievance went into executive session,

2.      Grievant Ricard addressed the Board,

3.      Grievant's attorney, Joshua Ney, presented oral and written arguments to the Board,

4.      The JCEA Chair, Catherin Coughlin, presented comments to the Board,

5.      USD 475 presented comments from Kathleen Brennan, Reginald Eggleston and Mark Edwards.

The Board denied the grievance and adopted the reason in Supt. Eggleston's letter dated May 19, 2021. *Doc. 1-14*.

32.     On August 12, 2021, Attorney Ney emailed USD 475 Counsel Mark Edwards and Supt. Reginald Eggleston asking when a written decision would be issued and inquiring of the status of Ricard's accommodation request. *Doc. 1-13*.

33.     At its regular meeting on September 7, 2021, the Board of Education, by public motion and vote, denied the Level 5 Grievance by Pamela Ricard and "[i]n denying the grievance of Pam Ricard, the Board of Education adopts and approves the reasoning of Superintendent Dr. Reginald Eggleston set out in his letter to the grievant dated May 19, 2021." The Board of Education also voted by deny "the request by Pamela Ricard for a religious accommodation set forth in her July 8, 2021, letter to USD 475." *Doc. 1*, p. 30, ¶¶ 183-84.

34.     Also on September 7, 2021, the Board of Education also amended Policy GAACB (Diversity and Inclusion) and Policy JGECB (Student Diversity and Inclusion), to add one sentence to each of the policies: "Students will be called by their preferred name and pronouns." *Doc. 1*, p. 31, ¶ 187,

35.     On October 8, 2021, at about 10:57 a.m., Principal Brennan emailed FRMS staff, advising of the revision to policy that explicitly address preferred names, and advising that Supt. Eggleston had emailed parents and guardians the afternoon of October 7 the following:

On September 7, 2021, the USD 475 Board of Education adopted an addition to the district Diversity and Inclusion Policy. USD 475 is committed to creating an educational environment that embraces diversity, equity, empathy, and inclusion for all students. This policy includes, "Respectful communication, inclusion, and cooperation between and among all students and staff."

The addition to this policy is the statement: Students will be called by their preferred name and pronoun. This means if a student makes a request of a staff member to call them by a name other than their legal name as noted in the student information system- Skyward, the staff member(s) will respect the student's wishes and refer to them with the indicated preferred name. USD 475 will not communicate this information to parents unless the student requests the administration or counselor to do so, per Federal FERPA Guidance. The entire Diversity and Inclusion policy, JGECB may be found on page 523 of USD 475 Board Policy- 09-2021-KASB-June-updates-BOE- approved-9.7.21pdf (usd475.org) Thank you for your support of our students and staff.

*Doc. 1-16*, p. 2.

36.     The USD 475 Board of Education voted to rescind the Communication with Parents Policy on May 19, 2022. The minutes from that meeting will be approved at its meeting June 1, 2021 which will then be submitted to the Court.

37.     Ricard retired and left the employment of USD 475. *Doc. 27-1, Agenda* Special Board of Education Meeting Thursday, May 19, 2022, p. 6 (Schedule of Certified Personnel Retiring Certified Personnel Retiring at the End of the 2021 – 2022 School Year).

**Issues Presented**

1.     Whether Ricard's "speech" regarding mode of addressing middle school students, in school during a math class is government speech unprotected by the First Amendment? It is.

2.     Whether Ricard's rights under the Free Speech and Free Exercise Clauses of the First Amendment require that a school permit her to discriminate against transgender students on the basis of sex/gender? They do not.

3.     Whether Ricard's free exercise claim is moot? It is.

4.     Whether Ricard was deprived of due process? She was not.

5.     Whether the Complaint states an equal protection claim? It does not.

6.     Whether the Complaint states a claim for breach of contract. It does not.

7.     Whether the individual defendants are entitled to qualified immunity? They are.

## Argument and Authorities

**I.      Standard for a Motion to Dismiss**

When ruling on a motion to dismiss under Rule 12(b)(6), the Court assumes as true all well-pleaded factual allegations and views them in the light most favorable to the nonmoving party to determine whether they plausibly give rise to an entitlement of relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). The pleading standard arising from the decisions in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, require that a complaint plead facts sufficient to show that the claims have substantive plausibility. This standard emphasizes the tenet that a court must accept as true all of the allegations contained in a complaint; but this tenant is inapplicable to legal conclusions, which instead must be supported by facts. *Iqbal*. at 679–80.

A facially plausible claim exists where the complaint pleads factual content from which the court can reasonably infer the defendants are liable for the misconduct alleged. *Iqbal*, 556 U.S. at 678. Plaintiffs must show more than a sheer possibility that defendants have acted unlawfully— it is not enough to plead facts that are "merely consistent with" defendants' liability. *Id*. (quoting *Twombly*, 550 U.S. at 557). Labels, conclusions, formulaic recitation of the elements of a cause of action, and/or naked assertions devoid of further factual enhancement will not stand. *Iqbal*, 556 U.S. at 678.

A complaint must contain sufficient factual matter to state a claim which is plausible—not merely conceivable—on its face. *Iqbal*. at 679–80. The court draws on its judicial experience and common sense. *Iqbal*, 556 U.S. at 679. The Court need not accept as true those allegations which state only legal conclusions. *See id.*; *Hall v. Bellmon*, 935 F.3d 1106, 1110 (10th Cir. 1991). Plaintiffs must frame the complaint with enough factual matter to suggest that they are entitled to relief. *Twombly*, 550 U.S. at 556. Threadbare recitals of a cause of action accompanied by conclusory statements are not enough. *Twombly*, 550 U.S. at 556.

## II.     Plaintiff Ricard's speech was not protected by the First Amendment.

Plaintiff is employed at a public school as a teacher. A government entity has broad discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations. *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). Here, the policies at issue are directed to how students are addressed and treated while in school or during school-sponsored activities.

### A.     Plaintiff Ricard's speech was:
**(1) Government speech over which the District may exercise editorial control or, alternatively,**
**(2) School-sponsored speech over which the school may exercise editorial control reasonably related to legitimate pedagogical concerns.**

"[A] public employees do not surrender all their First Amendment rights by reason of their employment. Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti*, 547 U.S. at 417. However, the interests of public employees in commenting on matters of public concern must be balanced with the employer's interests "in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968); *see also Garcetti*, 547 U.S. at 420 ("The Court's decisions, then, have sought both to promote the individual and societal interests that are served when employees speak as citizens on matters of public concern and to respect the needs of government employers attempting to perform their important public functions."). To balance the competing interests, courts developed the five-step *Garcetti*/*Pickering* test:

(1)     Was the speech was made pursuant to an employee's official duties?
(2)     Was the speech was on a matter of public concern?
(3)     Do the interests of the government/employer in promoting efficiency of public service outweigh the plaintiff's free speech interests?
(4)     Was the protected speech a motivating factor in the adverse employment action? and
(5)     Would the defendant have reached the same employment decision in the absence of the protected conduct?

*Helget v. City of Hays,* Kansas, 844 F.3d 1216, 1221-22 (10th Cir. 2017). "The first three steps concern questions of law for the courts, and the last two concern questions of fact." *Id*. at 1222. Each of the first three steps weigh in favor of defendants and against Ricard.

"[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421 (2006). Speech is made pursuant to official duties if it is generally consistent with "the type of activities [the employee] was paid to do." *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1203 (10th Cir. 2007).

### 1.      Speech in the public school setting.

Courts are to "apply the First Amendment 'in light of the special characteristics of the school environment.'" *Mahanoy Area Sch. Dist. v. B. L. by & through Levy*, 141 S. Ct. 2038, 2044 (2021) (quoting *Hazelwood School Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988) (internal quotation mark omitted)). Among these special characteristics "is the fact that schools at times stand *in loco parentis, i.e.*, in the place of parents. *Id.*, at 2044-45. Schools also have a special interest in regulating speech that "materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech. *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 513 (1969).

The analysis begins first by recognizing that there are three main categories of speech that occur within the school setting, (1) student speech,[3] (2) government speech, and (3) school-sponsored speech. *Fleming v. Jefferson Cty. Sch. Dist. R-1*, 298 F.3d 918, 923-24 (10th Cir. 2002). Before exploring the contours of First Amendment protections, it necessary to recognize that the

---

[3] Student speech that "happens to occur on the school premises" is governed by *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969). *Hazelwood*, 484 U.S. at 271. As a teacher, Plaintiff Ricard's conduct is not student speech.

right to speak, the right to refrain from speaking, and the right to be free from compelled speech are necessarily different in a school setting. *Corder v. Lewis Palmer Sch. Dist. No. 38*, 566 F.3d 1219, 1231 (10th Cir. 2009). Censorship of speech is no different than compelled or forced speech under the First Amendment. *Corder*, 566 F.3d at 1232. Accordingly, Ricard's claims of compelled speech are subject to the same analysis.

Government speech is "[a]t the opposite end of the spectrum" and, "[w]hen the government speaks, it may choose what to say and what not to say." *Id*. The Tenth Circuit articulated a four-factor test to discern whether expression is government speech: (1) whether the "central purpose" of the project is to promote the views of the government or of the private speaker; (2) whether the government exercised "editorial control" over the content of the speech; (3) whether the government was the "literal speaker"; and (4) whether "ultimate responsibility" for the project rested with the government. *Wells v. City & Cty. of Denver*, 257 F.3d 1132, 1141 (10th Cir. 2001).

Cases from the United States Supreme Court and the Tenth Circuit make clear that state actors (*i.e.*, public school teachers) cannot discriminate against persons (and particularly against public school students) on the basis of sex/gender.

> Between pure student speech and government speech is "school-sponsored" speech, which is governed by *Hazelwood*. School-sponsored speech is student speech that a school "affirmatively … promote[s]," as opposed to speech that it "tolerate[s]." *Hazelwood*, 484 U.S. at 270-71 "[E]xpressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school" constitute school-sponsored speech, over which the school may exercise editorial control, "so long as [its] actions are reasonably related to legitimate pedagogical concerns." *Id*. at 271, 273.

*Fleming*, 298 F.3d at 923-24. "The imprimatur concept covers speech that is so closely connected to the school that it appears the school is somehow sponsoring the speech." *Id*., at 925. Pedagogical concerns include activities that affect learning but are not confined to purely academic exercises because pedagogical concerns include discipline, courtesy, and respect for authority. *Id*. It further includes a "school district's desire to avoid controversy within a school environment." *Id*., at 925-

26. "Indeed, the pedagogical concern in *Hazelwood* itself was to avoid the controversial subjects of pregnancy and divorce in a school setting because of the potentially disruptive nature of such subjects upon young students." *Id*. at 926;

> **2.** **Ricard's "speech" (addressing 8th-grade math students by name during the regular class-time) is government speech over which the District may exercise editorial control.**

"[T]he Government's own speech … is exempt from First Amendment scrutiny." *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 553 (2005). "The Free Speech Clause restricts government regulation of *private* speech; it does not regulate government speech." *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467 (2009) (emphasis added). "It is the very business of government to favor and disfavor points of view on (in modern times, at least) innumerable subjects …." *National Endowment for Arts v. Finley*, 524 U.S. 569, 598 (1998) (Scalia, J., concurring in judgment). The District, here, can disfavor Plaintiff Ricard's manner of addressing students (her claimed speech) in a manner that discriminates on the basis of sex. Government speech is not restricted by the Free Speech Clause. *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 469 (2009).

Ricard's classroom speech was "speech relating to tasks within an employee's uncontested employment responsibilities" and "is not protected from regulation." *Brammer-Hoelter*, 492 F.3d at 1203. The "The ultimate question" is whether Ricard spoke "as a citizen or instead as a government employee," and where Ricard "engages in speech during the course of performing an official duty and the speech reasonably contributes to or facilitates [Ricard's] performance of the official duty, the speech is made pursuant to [Ricard's] official duties." *Id*.

The way Ricard addresses students in class is speech pursuant to Ricard's official duties. Under *Garcetti* and *Brammer-Hoelter* Ricard's classroom speech was government speech unprotected by the First Amendment.

**3.      Even if viewed as school-sponsored speech, the manner in which Plaintiff Ricard addresses students bears the imprimatur of the school over which the school may exercise editorial control reasonably related to legitimate pedagogical concerns.**

A middle school math classroom cannot be characterized as a public forum for public expression. School facilities may be deemed a public forum only if school authorities, by policy or by practice, open the facilities for indiscriminate use by the general public or by a segment of the public. Where school facilities are reserved for other intended purposes, no public forum has been created. School officials may impose reasonable restrictions on the speech of students, teachers, and other members of the school community. *Hazelwood,* 484 U.S. at 267-69.

A public school is permitted to compel school-sponsored speech, or to punish for the misuse of school-sponsored speech, provided its decision is reasonably related to legitimate pedagogical concerns. *Corder*, 566 F.3d at 1231; *Axson–Flynn*, 356 F.3d at 1290; *Fleming*, 298 F.3d at 926. Courts give substantial deference to a school district's stated pedagogical concerns. *Corder*, 566 F.3d at 1231; *Axson–Flynn*, 356 F.3d at 1290; *Fleming*, 298 F.3d at 925. A federal court should play no role in judging the reasonableness of the sanctions which a school levies against its employees. *Vanderhurst v. Colorado Mountain Coll. Dist.*, 208 F.3d 908, 917 n.5 (10th Cir. 2000); *Miles*, 944 F.2d at 779 ("[W]e will not interfere with the authority of the school officials to select among alternate forms of discipline."). "Rather, an adverse employment action reasonably relates to a school's legitimate pedagogical interests if the employee's conduct prompting the sanction, as perceived in good faith by the school, in some way violated or vitiated those legitimate pedagogical concerns." *Vanderhurst*, 208 F.3d at 917 n.5. The question is whether the speech that USD 475 in good faith believed was uttered by Plaintiff Ricard violated the District's policies which embodied legitimate pedagogical concerns. *Id*. The answer is, "most assuredly so."

**B.      Enforcing anti-discrimination policies is not an infringement upon religion.**

Claims that a law or government policy violates the right to free exercise of religion do not

mandate that the Court apply strict scrutiny. The strict scrutiny standard requires the government to justify a regulation or law with a compelling government interest and show that the law is narrowly tailored to advance that interest. *See Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993). Scrutiny does not apply to free-exercise claims where the challenged law is neutral and generally applicable. "even if the law has the incidental effect of burdening a particular religious practice." *Id*. at 531. A neutral, generally applicable law "need only be rationally related to a legitimate governmental interest to survive a constitutional challenge." *Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 649 (10th Cir. 2006).

Where individualized exemptions from a general requirement are available, the government may not refuse to extend that system to cases of religious hardship without compelling reason. *Lukumi*, 508 U.S. at 537 (citing *Emp. Div., Dep't of Hum. Res. of Oregon v. Smith*, 494 U.S. 872, 884 (1990)) (internal quotation marks omitted). *Accord Fulton v. City of Philadelphia,* 141 S. Ct. 1868, 1877 (2021). Nobody is, however, exempted from USD 475's anti-discrimination and anti-bullying policies. They are both neutral and generally applicable. Policy JGECB prohibits discrimination on the basis of age, color, national origin, disability, ethnicity, socio-economic status, sex, gender identity and sexual orientation. The District's policies do no impose burdens only on conduct motivated by religious belief.

Plaintiff's alleges that others have failed to use preferred names and pronouns without being disciplined as she was. Plaintiff does not alleged, however, that the comparator (specifically Jason Lubbers) (1) intentionally refrained from using preferred names and pronouns (2) to intentionally treat transgender students differently on the basis of sex/gender.

When there is no conflict between an employee's religious belief and their actual job duties, the employer had no duty to accommodate those beliefs. *See Ansonia Bd. of Educ. v. Philbrook*,

479 U.S. 60, 76 (1986) (Stevens, J., concurring in part and dissenting in part) (internal quotations omitted); *see also Summers v. Whitis*, 2016 WL 7242483, *1 (S.D. Ind. Dec. 15, 2016) (county clerk need not accommodate employee who refused to process marriage licenses for same-sex couples). Addressing a student is a simple, ministerial task which does not conflict with a teacher's religious beliefs.

The Free Exercise Clause, as other provisions of the First Amendment, is "applied to the states under the Fourteenth Amendment." *Green v. Haskell Cnty. Bd. of Comm'rs*, 568 F.3d 784, 796 (10th Cir. 2009). "Depending on the nature of the challenged … government action, a free exercise claim can prompt either strict scrutiny or rational basis review." *Axson–Flynn v. Johnson*, 356 F.3d 1277, 1294 (10th Cir. 2004) (quotation omitted). Government action based upon neutral, generally applicable rules are subject to rational basis review, even if the application of the neutral rule "has the incidental effect of burdening a particular religious practice." *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 531 (1993).

USD 475's anti-discrimination policies are neutral and generally applicable. The Complaint does not allege the policies were adopted to burden religious belief or religious conduct. *See, e.g.*, *303 Creative LLC v. Elenis*, 6 F.4th 1160, 1186 (10th Cir. 2021), *cert. granted in part*, 142 S. Ct. 1106, 212 L. Ed. 2d 6 (2022). *303 Creative* held Colorado's anti-discrimination in public accommodations law was a neutral law of general applicability not subject to strict scrutiny for a free exercise challenge. The partial grant of certiorari was limited to the question: "Whether applying a public-accommodation law to compel an artist to speak or stay silent violates the Free Speech Clause of the First Amendment." 142 S. Ct. 1106. The free exercise holding in *303 Creative* is not being reviewed and is final. Likewise, USD 475's anti-discrimination policies are neutral and of general applicability and are not subject to strict scrutiny for Ricard's free exercise challenge. The actions by the defendants were based upon neutral rules of general applicability

and were rationally related to the District's reasonable and legitimate pedagogical concerns

Even if Ricard's speech were not government speech and we proceed to the next steps in the *Garcetti/Pickering* analysis. *Brammer-Hoelter* 492 F.3d at 1202. The manner in which Ricard (a middle school math teacher) addresses middle school students while in school is not a matter of public concern.. Step two reviews if the matter is of public concern. *Id*. If the speech is not a matter of public concern, then the speech is unprotected, and the inquiry ends. *Id*. at 1203. But if the employee speaks as a citizen on a matter of public concern, the court must then determine "whether the employee's interest in commenting on the issue outweighs the interest of the state as employer." *Id*.

**C.   Ricard's mode of addressing middle school students id not a matter of public concern.**

Ricard's "speech" directed at students who request to be identified by a preferred name and pronoun are not a matter of public concern. The mode of address—the name used to address of these students is in the context of Ricard's role as a teacher, not expression as a citizen on a matter of public concern. The District's policies do not prevent Plaintiff from sharing her personal beliefs on the issues of transgenderism or gender identity outside of her duties as a middle school math teacher.

Because Plaintiff does not show that her speech is protected, her claims unrelated to the now-rescinded "communication with parents policy" fail to state a claim upon which relief may be granted.

**III.   Ricard is not entitled to a religious "accommodation" that allows her to discriminate against transgender students.**

Plaintiff complains that the District discriminated against her by rejecting her request for a religious accommodation and declined her version of the policy. The law does not require the District to grant an accommodation to ignore a neutral and generally applicable policy. An

"accommodation" for Plaintiff to address transgender students differently from cisgender students is discrimination.

Nor does the law require the District to change its neutral, generally applicable policy. "[T]he mere failure of a government employer to accommodate the religious needs of an employee, where the need for accommodation arises from a conflict with a neutral and generally applicable employment requirement, does not violate the Free Exercise Clause …." *Shrum v. City of Coweta, Okla.*, 449 F.3d 1132, 1143 (10th Cir. 2006).

Where nondiscrimination is at issue, a school does not violate the First or Fourteenth Amendments of others by requiring that everyone comply with the nondiscrimination policy. *Christian Legal Soc. Chapter of the University of California, Hastings College of the Law v. Martinez*, 561 U.S. 661, 698 (2010). (A law school's policies of requiring officially recognized student groups to comply with the school's nondiscrimination policy, enforced by requiring the admission of "all comers" to such student groups, did not violate the organization's First and Fourteenth Amendment rights to free speech, expressive association, and free exercise of religion because the "all comers" policy was viewpoint neutral.) The enforcement of the District's anti-discrimination policies and denial of Ricard's request to do otherwise does not impinge the free exercise of religion.

The Complaint does not plausible allege Ricard's religious beliefs were a motivating factor in the District's decision to suspend her. The District suspended Plaintiff for three days when she intentionally discriminated against a transgender student in her classroom on April 7 and 8, 2021 in violation of multiple District policies. It is the plaintiff's burden to show religious beliefs were a motivating factor in the adverse employment action. *See Brammer-Hoelter*, 492 F.3d at 1207.

Plaintiff advances the premise that she was somehow targeted by the District for her religious beliefs. Doc. 1, ¶ 247. That conclusory allegation does not follow from the facts alleged

and the incorporated documentation in the record. Ricard was invited to share concerns with Principal Mott regarding the preferred name directive,[4] Ricard did not do so. *See Doc. 1-1*. Ricard first raised religious concerns when preparing for the Level Four grievance hearing on July 8, 2021. *Doc. 1-10*, p. 2. It is not plausible to suggest Ricard was suspended in April 2021 for religious convictions she first expressed in July 2021. It is notable that Ricard never denied the factual basis for her suspension—that she discriminated by treating transgender students differently than cisgender students. Plaintiff cannot meet her burden to show that the adverse action taken against her was in retaliation of her religious beliefs.

## IV.    Ricard's free exercise claim is moot.

Ricard's free exercise claim for money damages fails because she was not subjected to any adverse action or injury because of the Communication with Parents Policy. Ricard was not disciplined for violating the Communication with Parents Policy. The claim for injunctive and declaratory relief are moot and must be dismissed.

The claims for declaratory and injunctive relief become moot if circumstances change such that the defendants are not "actually situated to have their future conduct toward the plaintiff altered by the court's declaration of rights." *Jordan v. Sosa*, 654 F.3d 1012, 1025–26 (10th Cir. 2011). Mootness is a threshold issue because the existence of a live case or controversy is a constitutional prerequisite to federal court jurisdiction. Rio *Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1109 (10th Cir. 2010). "Article III's requirement that federal courts adjudicate only cases and controversies necessitates that courts decline to exercise jurisdiction where the award of any requested relief would be moot—*i.e.* where the controversy is no longer live and ongoing." *Cox v. Phelps Dodge Corp.*, 43 F.3d 1345, 1348 (10th Cir. 1994), *superseded*

---

[4] "When we have a student that requests to go by a preferred name that is different than their given name, our district honors the request. Once you are aware of a preferred name, use that name for the student. Please let me know what question you have." *Doc. 1-1*.

*by statute on other grounds.* "A claim is moot when no reasonable expectation exists that the alleged violation will recur and interim relief of events have eliminated the effects of the alleged violation." *Committee for the First Amendment v. Campbell*, 962 F.2d 1517, 1524 (10th Cir. 1992).

The Communications with Parents Policy has been rescinded and Ricard is no longer employed by the District. The claims are moot.

**V.    Ricard was not deprived of due process. Ricard was not deprived of any protected interest and Ricard was afforded extensive due process protections that far exceeded the minimum necessary to satisfy constitutional requirements.**

Ricard's claim that the District denied her due process under the Fourteenth Amendment fails on the merits. The District provided Ricard notice of the basis for the suspension and reprimand before it was imposed. Ricard was then afforded a five-level grievance procedure which afforded her due process at every level.

The Tenth Circuit has a two-step inquiry to determine if an individual was denied procedural due process. *See e.g., Brammer-Hoelter*, 492 F.3d 1192, 1209 (10th Cir. 2007). First, did the individual possess a protected interest such that the due process protections were applicable; and, if so, then was the individual afforded an appropriate level of process. *Id.*

**A.    Plaintiff was not deprived of any protected interest.**

The complaint bases the due process claim on assertions she was disciplined for violating policies that did not require the use of students' preferred names or pronouns. The complaint allege:

> By punishing and threatening to punish Ms. Ricard under vague, overbroad, retroactive, and/or constantly changing policies for her expression in and out of the classroom, Defendants have violated and are violating Ms. Ricard's right to due process of law under the Fourteenth Amendment.

*Complaint, Doc. 1, ¶ 256.*

Under the Fourteenth Amendment, a state may not "depriv[e] a party of 'property without due process of law.'" *Hyde Park Co. v. Santa Fe City Council*, 226 F.3d 1207, 1210 (10th Cir.

2000) (quoting U.S. Const. amend. XIV, § 1). "[T]o prevail on either a procedural or substantive due process claim, a plaintiff must first establish that a defendant's actions deprived plaintiff of a protectible property interest." *Id*. For the purposes of substantive due process, the plaintiff's property interest must be "fundamental." *Hennigh v. City of Shawnee*, 155 F.3d 1249, 1257 (10th Cir. 1998). The Tenth Circuit has not held an employee's property interest in government employment implicates the substantive due process clause. *Potts v. Davis Cnty.*, 551 F.3d 1188, 1196 n.1 (10th Cir. 2009).

The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (internal quotations marks omitted). Thus, a hearing is generally required before a person may be deprived of a protected interest. *Smith v. Org. of Foster Families for Equal. & Reform*, 431 U.S. 816, 848 (1977). Courts look to state law to determine whether a property interest exists. *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1209 (10th Cir. 2007). Such an interest can arise from "state statutes, regulations, municipal ordinances, university rules, and even express or implied contracts." *Anglemyer v. Hamilton County Hosp.*, 58 F.3d 533, 536 (10th Cir. 1995).

The Negotiated Agreement clearly affords teachers a property interest in continued employment and imposes procedures for the termination of employment. *See Doc. 1-8,* Article XIII – Reduction in Force; Article XV – Due Process Rights ("all contracts continue for the next succeeding school year absent notice of termination or non-renewal"). The claim here, however, does not involve a deprivation of a property interest in continued employment. Ricard was, instead, suspended for three days *with* pay. That suspension did not, in turn, cause or lead to a deprivation of Ricard's property interest in continued employment.

In *Gilbert v. Homar*, the Supreme Court noted it had "not had occasion to decide whether the protections of the Due Process Clause extend to discipline of tenured public employees short

of termination." 520 U.S. 924, 929 (1997). *Gilbert* assumed, without deciding, that suspension without pay of a government employee (who had a protected property interest in his continued employment), amounts to a property deprivation sufficient to implicate due process protections. *Id*. The Tenth Circuit has done likewise—assuming a property interest without deciding the issue. *Kirkland v. St. Vrain Valley Sch. Dist. No. Re-1J*, 464 F.3d 1182, 1191 (10th Cir. 2006). The Tenth Circuit held, however, that an at-will employee does not have a property interest in a government employer's written discipline procedure. *Williams v. McKee*, 655 Fed.Appx. 677, 687 (10th Cir. 2016).

Ricard had no property interest to be free of discipline that did not result in the deprivation of a property interest in continued employment which is, itself dispositive of Ricard's due process claim.

### B.       Plaintiff was afforded adequate process.

Even if Ricard had a protected property interest, she was afforded adequate process at every step in the process of her suspension—she was afforded written notice, a meeting with the Principal, and a five-level grievance process. The fundamental requirement of due process is the opportunity to be heard "at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (internal citations omitted). The essence of due process is the requirement that "a person in jeopardy of serious loss [be given] notice of the case against him and opportunity to meet it." *Id*. at 348.

The requirements for constitutionally adequate due process encompass notice of the charges, an explanation of the employer's evidence, and an opportunity to present the employee's side of the story. *Cleveland Board of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985). The notice must be reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. *Aacen v. San*

*Juan County Sheriff's Dept.*, 944 F.2d 691, 697 (10th Cir. 1991). It must permit adequate preparation for the impending hearing. *Id*.

Ricard's rights are defined in the Formal Agreement For School Year 2020-2021. *Doc*. 1-8. Article X – Teacher Discipline of the Agreement between USD 475 and JCEA, Section C states:

> Discipline of a teacher will be progressive and/or sequential, and appropriate to the severity of the infraction, **except** in those situations that constitute a breach of board policy that ***could* impair the effective operation of the school**, or a potential criminal violation.

*Doc*. 1-8, pp. 34-35 (emphasis added). The Agreement also states that informal disciplinary actions are only taken as a first step "in situations of a minor nature." *Id*. at 34.[5] The disciplinary steps detailed in Art. X § C state that counseling shall be the first step "to a minor infraction such as: lateness to work, professionalism, or professional responsibilities."

Ricard was notified on April 9, 2021, of the school's decision to suspend her, with pay, for three days. *Doc. 1-3*. Ricard was given a list of the policies she violated and an explanation as why she was being suspended. *Id*. Ricard was given both pre-suspension and post-suspension notice of the charges alleged against her. She was advised of the following specifics:

> • Board Policy GAACB-Diversity and Inclusion
> • All **employees**, students and the Board of Education of Geary County USD 475 ***have a responsibility to treat others with dignity and respect***. All employees, students and the Board of Education are ***expected to exhibit conduct that reflects dignity, respect and inclusion at all times during the instructional day*** and at all other district-sponsored programs and events.
> > o The student preferred name was not used by Mrs. Ricard.
> • Board Policy GAAE- Bullying by Staff
> • Section 1. K.S.A. 2007 Supp. 72-8256 is hereby amended to read as follows: 72-8256. (a) As used in this section: (1) "Bullying" means: (A) Any intentional gesture or any intentional written, verbal, electronic or physical act or threat that is sufficiently severe, persistent or pervasive that creates an intimidating, threatening

---

[5] Article X, § C.1 states:

> Counseling shall be the first step to a minor infraction such as; lateness to work, professionalism or professional responsibilities. Documentation may occur for record, but no written record will be placed in the professional employee's personnel file.

or abusive educational environment for a student or staff member that a reasonable person, under the circumstances, knows or should know will have the effect of:

    i. Harming a student or staff member, whether physically or mentally;

    ii. Damaging a student's or staff member's property;

    iii. Placing a student or staff member in reasonable fear of harm to the student or staff member; or

    iv. Placing a student or staff member in reasonable fear of damage to the student's or staff member's property;

    o Students felt discriminated against based on the teacher not using the preferred names.

• Board Policy GAF-Staff-Student Relations

• Staff members shall maintain professional relationships with students which are conducive to an effective educational environment. Staff members shall not submit students to bullying, ***harassment, or discrimination prohibited by board policy***. Staff members shall not have any interaction of an inappropriate and/or sexual nature with any student at any time regardless of the student's age or consent.

    o Student ( ) was not called by his preferred name after Mrs. Ricard received notification emails from a student and the counselor. Prior to the notification, Mrs. Ricard called the student by their legal name. After notification, Mrs. Ricard called the student by their last name.

*Doc.* 1-4 (emphasis added).

Ricard was afforded due process—she was afforded five steps of a grievance policy and exercised her contractual right to be heard at every step of the process. Ricard's claims suggest she is claiming she was improperly disciplined for violating the District's preferred name policy. While the use of preferred names is certainly involved, it was Ricard's intentional discriminatory treatment on the basis of sex/gender that resulted in discipline, not the mere failure to use a student's preferred name or pronouns. District policy (regardless of any directives about preferred names and pronouns) required respectful treatment of the transgender students while also prohibiting harassment in discrimination. Ricard never disputed she treated the students differently because of sex/gender (a refusal to acknowledge them as transgender).

While defendants contend Ricard had no property interest requiring due process, the process afforded to her far surpassed the process constitutionally required. *Gilbert v. Homar* held a public employee was not entitled notice and a hearing before suspending a tenured public employee for several weeks <u>without</u> pay pending an investigation. 520 U.S. at 932. Even if it were

arguable that Ricard's suspension and reprimand were excessive or improper under the Negotiated Agreement (which they are not), the grievance process provided in the collective bargaining agreement satisfies due process. *Montgomery v. City of Ardmore*, 365 F.3d 926, 938 (10th Cir. 2004), and *Hennigh v. City of Shawnee*, 155 F.3d 1249, 1256 (10th Cir. 1998).

## VI.   The Complaint fails to state an equal protection claim.

The complaint bases the equal protection claim on alleged disparities in disciplining Ricard for failing to use a student's preferred name when not disciplining other staff who had failed to do so.

To prevail on a claim under § 1983, a plaintiff must prove (1) the deprivation of a federal right by (2) a person acting under color of state law. *Watson v. City of Kansas City, Kan.*, 857 F.2d 690, 694 (10th Cir. 1988). Under the Equal Protection Clause, there is a critical difference in the analysis when the government acts as the employer managing its internal operation versus between the government use of power to regulate, license, or make laws. *Engquist v. Oregon Dep't of Agr.*, 553 U.S. 591, 598 (2008). This distinction is especially significant when reviewing of state action in the context of public employment where "the government as employer indeed has far broader powers than does the government as sovereign." *Waters v. Churchill*, 511 U.S. 661, 671 (1994) (plurality opinion). "[T]he extra power the government has in this area comes from the nature of the government's mission as employer. Government agencies are charged by law with doing particular tasks. Agencies hire employees to help do those tasks as effectively and efficiently as possible." *Id.*, at 674-675.

The Equal Protection Clause is concerned with governmental classifications that "affect some groups of citizens differently than others," especially those in "an identifiable group." *Engquist*, 553 U.S. at 601 (quotations omitted). "To treat employees differently is not to classify them in a way that raises equal protection concerns. Rather, it is simply to exercise the broad

discretion that typically characterizes the employer-employee relationship." *Id*. at 605. "[T]he Equal Protection Clause is implicated when the government makes class-based decisions in the employment context, treating distinct groups of individuals categorically differently" but not in the employment context "where, as here, government employers are alleged to have made an individualized, subjective personnel decision in a seemingly arbitrary or irrational manner." *Id*.

The Complaint does not allege Ricard was treated differently on the basis of any suspect class. The comparator in the Complaint does not allege any other District staff intentionally discriminated against transgender students without consequence.

The note sent out by school administrators stated that "every effort will be made to remember their preferred name and pronoun; however, patience and understanding will be required." Ricard was not disciplined for *accidentally* failing to use a student's preferred name. Rather, Ricard intentionally addressed the transgender student differently than the cisgender students—because she didn't want to acknowledge them as transgender. The complaint does not identify any other person doing the same without consequence (indeed, Ricard agreed to refrain doing so thereafter). Teachers who unintentionally misname a student are not similarly situated to Plaintiff. Thus, the Complaint does not identify an employee is similarly situated to the plaintiff that was treated differently for the same conduct.

The equal protection claim should be dismissed.

## VII. The District did not breach any contract with Ricard.

The Complaint alleges the District violated the contract between the District and the Junction City Education Association (the Agreement). Ricard argues the investigation and subsequent disciplinary action of her conduct was a breach under the terms of the Agreement. *Doc. 1*, pp. 45-46, ¶¶ 281-82. Local school boards have broad discretion in the management of school affairs. *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 863 (1982).

The Board's denial of Plaintiff's grievance action falls within that discretion. Article X – Teacher Discipline of the Agreement between USD 475 and JCEA, Section C states:

> Discipline of a teacher will be progressive and/or sequential, and appropriate to the severity of the infraction, **except** in those situations that constitute a breach of board policy that could **impair the effective operation of the school**, or a potential criminal violation.

*Doc. 1-8*, pp. 34-35 (emphasis added). The Agreement also states that informal disciplinary actions are only taken as a first step "in situations of a minor nature." *Id* at 34. The disciplinary steps detailed in Art. X § C state that counseling shall be the first step "to a minor infraction such as: lateness to work, professionalism, or professional responsibilities."

Here, the building Principal, Superintendent Eggleston, and the School Board all reviewed the incident and concluded that Ricard's actions (which are not disputed by Ricard in the Complaint) were not of a "minor nature" and the elevated discipline of suspension and reprimand was warranted. Ricard does not dispute her conduct, she merely contends it a "minor" infraction. The distruption caused by Ricard's conduct is clearly set forth in the records attached to the Complaint—student's complained during class to Ricard, to other staff. Students complained after class to other staff. Ricard was repeatedly notified that she was to call students by their preferred name and pronouns and yet choose to ignore the directives. Such conduct "could impair the effective operation of the school" which doe not require that the District start with just an oral reprimad. "[T]he Government, as an employer, must have wide discretion and control over the management of its personnel and internal affairs. This includes the prerogative to remove employees whose conduct hinders efficient operation and to do so with dispatch." *Arnett v. Kennedy*, 416 U.S. 134, 168 (1974) (Powell, J., concurring).

Nothing within the Negotiated Agreement precludes the conclusion reached by the District Administration—that Ricard's conduct was <u>not</u> minor. The District was within its discretion to issue the suspension. There is no question that the District followed the proscribed procedures for

imposing the discipline and the grievance process that ensued. There was no breach of contract. *See Doc. 1-8*, Art. IV – Grievance Procedure, pp. 10-12.

## VIII. The individual defendants are entitled to qualified immunity.

Defendants Ron Johnson, Kristy Haden, Anwar Khoury, Jim Schmidt, Beth Hudson, Mark Hatcher, Jason Butler, and Reginal Eggleston are entitled to qualified immunity.[6] They were each acting in their official capacity as board members during the events at issue in this case.

"Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). Under the doctrine of qualified immunity, government officials who perform discretionary functions are shielded from individual liability unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The doctrine gives government officials immunity from lawsuits themselves rather than a mere defense to liability. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments," and "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

A suit against a government official in his or her personal capacity cannot lead to imposition of fee liability upon the governmental entity. *Graham*, 473 U.S. at 167. Congress rejected making § 1983 a "mutual insurance" scheme and a relief fund for lawyers. *Id.* at 168.

Qualified immunity from personal damage liability "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). "Qualified immunity attaches when an official's conduct does not

---

[6] The Complaint names Kathleen Brennan only in her official capacity and seeks only injunctive relief against her. To the extent Plaintiff seeks monetary damages, Brennan is also entitled to qualified immunity.

violate clearly established ... constitutional rights of which a reasonable person would have known." *White v. Pauly*, 580 U.S. 73, 137 S. Ct. 548, 551 (2017).

Because qualified immunity is the "norm" in private actions against public officials, there is a presumption of immunity when the defense is raised. *Pahls v. Thomas*, 718 F.3d 1210, 1227 (10th Cir. 2013) (citation omitted). When a defendant claims qualified immunity, the plaintiff bears the "heavy two-part burden" of showing (1) the defendant's violation of a constitutional right; and (2) that the "infringed right at issue was clearly established at the time of the allegedly unlawful activity such that a reasonable [official] would have known that his or her challenged conduct was illegal." *Martinez v. Carr*, 479 F.3d 1292, 1294–95 (10th Cir. 2007) (citations omitted).

"'[C]learly established law' should not be defined 'at a high level of generality.'" *White v. Pauly*, 137 S. Ct. at 552 (quoting *al–Kidd*, 563 U.S. at 742). "[T]he clearly established law must be 'particularized' to the facts of the case." *Id*. (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "To be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate.'" *Id*. at 551 (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)). Here, the law was not "clearly established" that the individual defendants' conduct would violate the First Amendment. *See, e.g., Reichle*, 566 U.S. at 664-65.

The individual defendants are entitled to judgment because (1) Ricard's speech was not protected by the First Amendment and (2) the law on that legal issue was not sufficiently clear that every reasonable official in defendants' position(s) would have understood that they were violating Ricard's First Amendment rights. *See Reichle v. Howards*, 566 U.S. 658, 664 (2012). There is a fundamental inquiry whether the plaintiff speaks as an employee or as a citizen. *David v. City and Cty. of Denver*, 101 F.3d 1344, 1355 (10th Cir. 1996) (citing *Connick*, 461 U.S. at 147). When distinguishing between employee or citizen speech, "courts must consider the 'content, form, and

context of a given statement, as revealed by the whole record.'" *Id.* (quoting *Connick,* 461 U.S. at 147–48). As discussed above, Speech made "pursuant" to an employee's duties—such as addressing middle school students during a math class—is not accorded First Amendment protection. *Garcetti*, 547 U.S. at 420–21. Given the content, form, and context of Ricard's alleged speech defendants could have logically and rationally believed it was government and/or school-sponsored speech unprotected by the First Amendment. Thus, the individual defendants are entitled to qualified immunity. *Singh v. Cordle*, 936 F.3d 1022, 1036 (10th Cir. 2019) (administrator who could reasonably believe under Circuit precedent that speech was not protected was entitled to qualified immunity).

## Conclusion

For the foregoing reasons, the Complaint should be dismissed for failure to state a claim upon which relief may be granted.

**Fisher, Patterson, Sayler & Smith, LLP**
3550 S.W. 5th Street | Topeka, Kansas 66606
Tel: (785) 232-7761 | Fax: (785) 232-6604
dcooper@fpsslaw.com | cmoe@fpsslaw.com
**s/David R. Cooper**

| David R. Cooper | #16690 |
| Crystal Moe | #29168 |

**Attorneys for Defendants**

**Certificate of Service**

I hereby certify that I electronically filed the foregoing on the 27 day of May, 2022, with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to:

Joshua A. Ney, KS #24077
Ryan A. Kriegshauser, KS #23942
Alan M. Vester, KS #27892
KRIEGSHAUSER NEY LAW GROUP
15050 W. 138th Street, Unit 4493
Olathe, Kansas 66063
T: (913) 303-0639 | firm@knlawgroup.com

Tyson C. Langhofer, KS #19241
ALLIANCE DEFENDING FREEDOM
44180 Riverside Parkway
Lansdowne, Virginia 20176
T: (480) 444-0020 | tlanghofer@adflegal.org

**s/David R. Cooper**