**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

|  |  |
|---|---|
| **PAMELA RICARD**,<br><br>                                        *Plaintiff*,<br><br>                    *v.*<br><br>**USD 475 GEARY COUNTY SCHOOLS SCHOOL BOARD MEMBERS**—Ron Johnson, Kristy Haden, Anwar Khoury, Jim Schmidt—in their official and individual capacities; Beth Hudson, Mark Hatcher, Jason Butler—in their official capacities; **REGINALD EGGLESTON**, Superintendent, USD 475 Geary County Schools, in his official and individual capacities; **KATHLEEN BRENNAN**, Principal, Fort Riley Middle School, in her official capacity.<br><br>                                      *Defendants.* | Case No: 5:22-cv-04015-HLT-GEB |

<u>**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**</u>

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ................................................................................................................ 1

STATEMENT OF FACTS .................................................................................................... 3

   I.  Ms. Ricard is a woman of faith with a long, successful teaching career. ........................... 3

      A.  Ms. Ricard's faith guides her words and actions in all aspects of her life ............. 3

      B.  Ms. Ricard had a long, successful career as a public-school teacher. .................... 4

   II.  Defendants suspended Ms. Ricard even though she violated no existing policy. .............. 4

      A.  Defendants instructed teachers to use preferred names but did not bar teachers from using last names to address students. ............................................................ 5

      B.  Prior to Ms. Ricard's suspension, Defendants did not interpret any existing policies to require use of preferred pronouns or prohibit use of last names. .......... 5

      C.  Defendants suspended Ms. Ricard for addressing a student by last name ............. 7

   III. Defendants adopted new policies targeting Ms. Ricard's speech and religious practices .. 9

      A.  Days after Ms. Ricard's suspension, Defendants interpreted their policies to require use of names and pronouns for the first time ............................................ 10

      B.  Defendants adopted a new policy and denied Ms. Ricard any accommodation ... 11

   IV. Ms. Ricard is suffering ongoing injury as a result of Defendants' adverse actions against her. ................................................................................................................................. 12

ARGUMENT ..................................................................................................................... 12

   I.  Ms. Ricard has alleged sufficient facts to support all of her claims for relief. ................ 12

      A.  Defendants have violated Ms. Ricard's right to freedom of speech. .................... 13

         1.  Defendants unconstitutionally sought to compel Ms. Ricard to speak. .......... 13

           a.  Ms. Ricard was under no valid official duty to use preferred names and pronouns while misleading parents about that use. ................................. 14

              i.  *Garcetti*'s rule is designed for government restrictions on speech, not governmental compulsion to speak the government's message. ........ 15

              ii.  A rule compelling speech is subject to challenge under *Pickering*, not shielded by *Garcetti* .......................................................................... 16

              iii.  Ms. Ricard alleged that she wished to remain silent on a matter of public concern. ................................................................................... 17

iv. Ms. Ricard alleged that her interest in remaining silent outweighed any governmental interest in forcing her to express the government's message on sex and gender. ............................................................ 17

b. *Garcetti* does not authorize the government to compel employees to lie. 19

c. Ms. Ricard has alleged that teachers in the District had no official duty to use preferred names and pronouns instead of last names. ........................ 19

d. Ms. Ricard's speech was not school-sponsored speech. ........................... 20

2. Defendants subjected Ms. Ricard to unconstitutional conditions. .................. 22

3. Defendants unconstitutionally retaliated against Ms. Ricard. ........................ 22

4. Defendants' retaliation against Ms. Ricard amounts to unconstitutional content- and viewpoint-discrimination. .......................................................... 23

B. Defendants have violated Ms. Ricard's right to free exercise of religion. .......... 23

1. Defendants' Policies are subject to strict scrutiny. ......................................... 23

a. Defendants' Policies are not neutral. ....................................................... 24

b. Defendants' Policies are not generally applicable. .................................. 24

2. Defendants' Policies fail strict scrutiny. ....................................................... 25

a. Defendants have no compelling interest in enforcing their Policies against Ms. Ricard. ............................................................................................... 25

b. Defendants' Policies are not narrowly tailored to achieve any compelling interest. ..................................................................................................... 25

C. Defendants deprived Ms. Ricard of due process of law. ..................................... 26

D. Defendants denied Ms. Ricard equal protection of the law. ................................ 26

E. Ms. Ricard stated a claim for breach of contract. ................................................ 27

II. None of Ms. Ricard's claims are moot. ..................................................................... 28

III. Defendants are not entitled to qualified immunity. ................................................... 29

CONCLUSION ................................................................................................................. 30

CERTIFICATE OF SERVICE ........................................................................................ 31

## TABLE OF AUTHORITIES

CASES

*Alvarado v. KOB-TV, L.L.C.*,
    493 F.3d 1210 (10th Cir. 2007) .................................................................. 12

*API Americas, Inc. v. Miller*,
    380 F. Supp. 3d 1141 (D. Kan. 2019) ........................................................ 28

*Axson-Flynn v. Johnson*,
    356 F3d 1277 (10th Cir. 2004) ........................................................ 21, 22, 30

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) .................................................................................... 12

*Brammer-Hoelter v. Twin Peaks Charter Academy*,
    492 F.3d 1192 (10th Cir. 2007) ............................................................ passim

*Butler v. Board of County Commissioners for San Miguel County*,
    920 F.3d 651 (10th Cir. 2019) .................................................................... 17

*Casey v. West Las Vegas Independent School District*,
    473 F.3d 1323 (10th Cir. 2007) .................................................................. 30

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
    508 U.S. 520 (1993) .............................................................................. 24, 25

*Connick v. Myers*,
    461 U.S. 138 (1983) .................................................................................... 17

*Corder v. Lewis Palmer School District No. 38*,
    566 F.3d 1219 (10th Cir. 2009) ............................................................ 20, 21

*Cressman v. Thompson*,
    719 F.3d 1139 (10th Cir. 2013) ............................................................ 13, 18

*Employment Division, Department of Human Reources v. Smith*,
    494 U.S. 872 (1990) .................................................................................... 24

*Erickson v. Pardus*,
    551 U.S. 89 (2007) ...................................................................................... 12

*Flemming v. Jefferson County School District R-1*,
    298 F.3d 918 (10th Cir. 2002) .................................................................... 20

*Flint v. Dennison*,
    488 F.3d 816 (9th Cir. 2007) ...................................................................... 28

*Fulton v. City of Philadelphia*,
   141 S. Ct. 1868 (2021) ......................................................................... 24, 25

*Gaines v. Stenseng*,
   292 F.3d 1222 (10th Cir. 2002) ................................................................. 29

*Garcetti v. Ceballos*,
   547 U.S. 410 (2006) ...................................................................... passim

*Grace United Methodist Church v. City of Cheyenne*,
   451 F.3d 643 (10th Cir. 2006) ..................................................................... 24

*Grayned v. City of Rockford*,
   408 U.S. 104 (1972) ............................................................................ 26

*Hazelwood School District v. Kuhlmeier*,
   484 U.S. 260 (1988) ............................................................................ 13

*Helget v. City of Hays*,
   844 F.3d 1216 (10th Cir. 2017) ............................................................. 22, 23

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*,
   515 U.S. 557 (1995) ............................................................................ 19

*Jackler v. Byrne*,
   658 F.3d 225 (2d Cir. 2011) ................................................................. 1, 19

*Janus v. American Federation of State, County, and Municipal Employees, Council 31*,
   138 S. Ct. 2448 (2018) ................................................................... passim

*JP Morgan Trust Co. National Association v. Mid-America Pipeline Co.*,
   413 F. Supp. 2d 1244 (D. Kan. 2006) ............................................................. 27

*Lincoln v. Maketa*,
   880 F.3d 533 (10th Cir. 2018) ..................................................................... 19

*Masterpiece Cakeshop, LTD. v. Colorado Civil Rights Commission*,
   138 S. Ct. 1719 (2018) .......................................................................... 24

*Meiners v. University of Kansas*,
   359 F.3d 1222 (10th Cir. 2004) ............................................................. 19, 29

*Meriwether v. Hartop*,
   992 F.3d 492 (6th Cir. 2021) ................................................................. 17, 23

*Meyer v. Nebraska*,
   262 U.S. 390 (1923) ............................................................................ 18

*Montiero v. City of Yonkers*,
    890 F.3d 386 (2d Cir. 2018)........................................................................... 18

*National Institute of Family and Life Advocates v. Becerra*,
    138 S. Ct. 2361 (2018)................................................................................... 25

*Perry v. Sinderman*,
    408 U.S. 593 (1972)...................................................................................... 22

*Petrella v. Brownback*,
    787 F.3d 1242 (10th Cir. 2015) .................................................................... 26

*Pickering v. Board of Education of Township High School District 205*,
    391 U.S. 563 (1968)................................................................................. 16, 17

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015)...................................................................................... 23

*Ricard v. USD 475 Geary County, Kansas School Board*,
    No. 5:22-cv-04015, 2022 WL 1471372 (D. Kan. May 9, 2022) ...................... 29

*Riley v. National Federation of the Blind of North Carolina, Inc.*,
    487 U.S. 781 (1988)...................................................................................... 21

*Rosenberger v. Rector and Visitors of University of Virginia*,
    515 U.S. 819 (1995)...................................................................................... 23

*Shelton v. Tucker*,
    364 U.S. 479 (1960)...................................................................................... 22

*Tazewell County School Board v. Brown*,
    591 S.E.2d 671 (Va. 2004)............................................................................. 28

*Thomas v. City of Blanchard*,
    548 F.3d 1317 (10th Cir. 2008) ............................................................... 15, 19

*Tinker v. Des Moines Independent Community School District*,
    393 U.S. 503 (1969)............................................................................ 2, 15, 21

*Tonkovich v. Kansas Board of Regents*,
    159 F.3d 504 (10th Cir. 1998) ...................................................................... 27

*Uzuegbunam v. Preczewski*,
    141 S. Ct. 792 (2021).................................................................................... 28

*West Virginia Board of Education v. Barnette*,
    319 U.S. 624 (1943)........................................................................... 16, 18, 21

*Wooley v. Maynard*,
    430 U.S. 705 (1977)................................................................................................ 13

**STATUTES**

Kan. Stat. Ann. § 72-6147 ....................................................................................... 6, 9

## INTRODUCTION

At issue in this case is whether public school teachers retain *any* constitutional rights inside the schoolhouse gates against compelled speech. Defendants say the answer is "no," regardless of how unrelated that speech is to a teacher's core duties and regardless of whether it would compel a teacher to directly contradict her conscience and faith. That answer defies common sense, and squarely contradicts Supreme Court precedent.

Fifteen years ago, the United States Court of Appeals for the Tenth Circuit held that "speech relating to tasks within an employee's *uncontested* employment responsibilities is not protected from regulation." *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1203 (10th Cir. 2007) (emphasis added). *Brammer-Hoelter* follows the Supreme Court's decision in *Garcetti v. Ceballos*, in which the Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes." 547 U.S. 410, 421 (2006). But neither *Garcetti* nor *Brammer-Hoelter* address the more fundamental question of *what* the government *can* make an official duty in the first place. In other words, what happens when the validity of the duty itself is contested?

This case, especially Defendants' own attempted justification for their actions, shows why established compelled speech principles, not *Garcetti*, determine whether a duty is valid in the first place. Defendants interpret *Garcetti* and *Brammer-Hoelter* in an untenable fashion, asserting that the mere fact that the government has ordered an employee to speak makes reciting those words an official duty and, therefore, *Garcetti* bars all First Amendment challenges. In short, per Defendants, the government can order employees to say whatever it wants.

This interpretation contradicts *Garcetti* itself, which promised that "public employees do not surrender all their First Amendment rights by reason of their employment." 547 U.S. at 417. It goes so far as to say that the First Amendment permits government to compel employees to lie, a result *Garcetti* never suggested. *See Jackler v. Byrne*, 658 F.3d 225, 241–42 (2d Cir. 2011). And, more importantly for this case, it contradicts the seminal school speech case of *Tinker v. Des Moines Independent Community School District*, where the Supreme Court famously said that

neither "students [n]or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." 393 U.S. 503, 506 (1969).

In this case, Defendants attempted to compel Ms. Ricard to speak the government's preferred message about sex and gender identity by forcing her to participate in students' social transition at school and to address them with preferred names without prior permission from parents. Because expressing this message and deceiving parents violated Ms. Ricard's conscience, she sought to take a "neutral" approach by using the students' last name (something that other teachers did on a regular basis).

Knowing that Ms. Ricard did not agree with the school's viewpoint about sex and gender identity, the school suspended her, even though no policy at the time prohibited addressing students by last name. Immediately after her suspension, Defendants released documents (conveniently backdated to before Ms. Ricard's suspension) interpreting old policies to require use of preferred names and pronouns.

Then, Defendants adopted a new policy that continued to require using any name and pronoun a student preferred while expressly prohibiting notification of parents without the students' affirmative consent. As a result, this new policy obliged Ms. Ricard to violate her conscience and mislead parents by referring to students by their legal name in communications with parents and by their preferred names at school.

Defendants claim all of this is fine because of their expansive interpretation of *Garcetti* and move to dismiss all of Ms. Ricard's claims. But Ms. Ricard has alleged facts sufficient to show that Defendants violated her right to free speech, free exercise of religion, due process of law, equal protection of law, and the District's Negotiated Agreement with its employees. In addition, all Defendants are harming Ms. Ricard by continuing to maintain the record of her unlawful suspension and reprimand. Therefore, the Court should deny Defendants' Motion to Dismiss.

## STATEMENT OF FACTS

Ms. Ricard has pled facts to show that she did not violate any policy before her suspension, that she engaged in constitutionally protected speech and religious exercise, that Defendants violated her legal rights, and that Defendants' actions have caused and are causing her injury.

**I.   Ms. Ricard is a woman of faith with a long, successful teaching career.**

Plaintiff Pamela Ricard is a Christian. V. Compl. (hereinafter "Compl.") at ¶ 84, ECF No. 1.  Her beliefs direct her actions in every part of her life, including the way she interacts with students and their parents. *Id.* at ¶¶ 84, 86. Ms. Ricard taught in the USD 475 Geary County School District ("the District") since 2005. *Id.* at ¶ 1.

**A.   Ms. Ricard's faith guides her words and actions in all aspects of her life.**

Ms. Ricard's faith instructs her understanding of human nature, identity, and personhood and directs the way she treats and addresses other people. *Id.* at ¶¶ 85–88. Ms. Ricard believes that "God immutably creates each person as male or female; these two distinct, complementary sexes reflect the image of God; and rejection of one's biological sex is a rejection of the image of God within that person." *Id.* at ¶ 87. In addition to her religious belief, Ms. Ricard understands that available scientific evidence shows that human beings are a species with only two sexual organizations: male and female. *Id.* at ¶ 79.

Ms. Ricard believes that, regardless of a person's sex or beliefs about gender identity, it is her obligation to "treat every person with dignity, love, and care." *Id.* at ¶ 90. This obligation binds Ms. Ricard's words in two important respects. First, she cannot say things that are not true. *Id.* at ¶ 88. Second, she cannot speak to anyone in a way that is harmful. *Id.* at ¶ 89.

Ms. Ricard understands that some children may identify with a gender that is inconsistent with their sex. *See id.* at ¶¶ 70–71, 81–83. But children do not have a fully developed capacity to evaluate matters like how gender relates to sex (something with which most have no firsthand experience at all) or the potential long-term consequences of decisions they make now. *See id.* at ¶¶ 70–71. As a result, Ms. Ricard believes that she cannot participate in the "social transition" of a child. *Id.* at ¶¶ 71, 89. That is, she cannot address a biologically female child as "he" and she

cannot address a biologically male child as "she." Participating in a child's social transition is harmful because it subjects the child to risk of irreversible consequences to which the child is incapable of providing informed consent. *Id.* at ¶¶ 70–71. In addition, Ms. Ricard cannot participate in a child's social transition because doing so is lying. *Id.* at ¶¶ 88–89.

Ms. Ricard's beliefs also compel her to be honest with parents. Ms. Ricard's conscience bars her from complying with school policies that address gender identity issues at school in a way that is "deceptive" toward parents. *Id.* at ¶ 76. Ms. Ricard's obligation to be forthright with parents about the way a child is addressed at school stems both from her own duty to avoid deception and her respect for the parent's fundamental right to control the upbringing and education of their children. *Id.* at ¶¶ 74, 76, 88.

**B. Ms. Ricard had a long, successful career as a public-school teacher.**

Apart from Defendants' compulsion to the contrary, Ms. Ricard has taught consistently with her beliefs in the District since 2005. *Id.* at ¶ 1. She has always done her best to treat her students, including students who express a gender identity inconsistent with their sex, with dignity, love, and care. *Id.* at ¶ 90. For example, Ms. Ricard first learned that one of her students had requested to be addressed with a different name when she was trying to provide that student with a needed pair of blue jeans. *See id.* at ¶ 98–103. This student told Ms. Ricard that she only owned one pair of jeans and they were getting torn. *Id.* at ¶ 99. The student did not ask Ms. Ricard to address her with a different name. But when Ms. Ricard brought some jeans to school for the student, another teacher first informed Ms. Ricard that the student was using a different name. *Id.* at ¶ 103. Ms. Ricard's career as a teacher is characterized by her care for each student, regardless of how the student identifies, and Ms. Ricard never suffered any formal disciplinary action until April 2021.

**II. Defendants suspended Ms. Ricard even though she violated no existing policy.**

In April 2021, Defendants suspended Ms. Ricard for her speech even though no existing policy prohibited her speech and Defendants did not punish other staff for similar speech.

**A. Defendants instructed teachers to use preferred names but did not bar teachers from using last names to address students.**

On March 31, 2021, then-Principal Shannon Molt emailed all teachers at Fort Riley Middle School saying, "When we have a student that requests to go by a preferred name that is different than their given name, our district honors the request. Once you are aware of a preferred name, use that name for the student." *Id.* at ¶ 105; Compl. Ex. A, ECF No. 1-1 at 2. At the time, no board policy or other written policy required using a student's "preferred name." Compl. at ¶¶ 7, 106. Neither Ms. Molt's email nor any other policy defined "preferred name" or explained when a name was actually mandatory or whether a teacher might have discretion to refrain from using the name (for example, if a student asserted that his preferred name was an obscene term). *Id.* Ms. Molt's email did not say that using a student's legal last name was prohibited. *See* Compl. Ex. A, ECF No. 1-1 at 2.

On April 7, 2021, School Counselor Jason Lubbers emailed Ms. Ricard, saying that a student in Ms. Ricard's class ("Student 1") "would like to be called by [different first name.]" Compl. at ¶ 107; Compl. Ex. B, ECF No. 1-2 at 2. Like Ms. Molt's email, Mr. Lubbers's email did not reference any existing policy or say that use of a last name was prohibited. *See* Compl. at ¶ 108. Nor did Mr. Lubbers's email indicate that Student 1 wished to be called *only* by the new first name that the student requested. *Id.* at ¶ 109. Mr. Lubbers did not say anything about whether Ms. Ricard was required to use different pronouns to refer to the student. *See* Compl. Ex. B, ECF No. 1-2 at 2. In fact, Mr. Lubbers referred to Student 1 with the feminine pronoun, "she," which was consistent with Student 1's enrolled name and sex in the school's records and inconsistent with the student's new preferred first name. *See id.*; Compl. ¶¶ 107, 110.

**B. Prior to Ms. Ricard's suspension, Defendants did not interpret any existing policies to require use of preferred pronouns or prohibit use of last names.**

At the time of Ms. Molt's and Mr. Lubbers's emails, no school policy expressly addressed use of preferred names, preferred pronouns, or use of last names. Three policies addressing teacher conduct are relevant (based on Defendants' later application of these policies): Policy GAACB

(the "Diversity and Inclusion Policy"), Policy GAAE (the "Bullying Policy"), and Policy GAF (the "Staff-Student Relations Policy").

The Diversity and Inclusion Policy said,

> All employees, students and the Board of Education of Geary County USD 475 have a responsibility to treat others with dignity and respect. All employees, students and the Board of Education are expected to exhibit conduct that reflects dignity, respect and inclusion at all times during the instructional day and at all other district-sponsored programs and events.

Compl. Ex. D, ECF No. 1-4 at 4. Prior to April 15, 2021, no District policy, notice, or other document defined "conduct that reflects dignity, respect and inclusion at all times" as requiring use of preferred names or pronouns or prohibiting use of last names in response to a student's request to use a different first name. *See* Compl. at ¶¶ 7, 106.

The Bullying Policy "prohibits bullying in any form by any . . . staff member . . . towards a student" and provides that "the term 'bullying' shall have the meaning ascribed to it in Kansas law." Compl. Ex. R, ECF No. 1-18 at 3. Kansas law defines bullying as a "verbal . . . or physical act or threat . . . that is sufficiently severe, persistent or pervasive that such creates an intimidating, threatening or abusive educational environment that a reasonable person . . . knows or should know will have the effect of" harming a student, damaging their property, or placing the student in reasonable fear of that harm or damage. Kan. Stat. Ann. § 72-6147(a)(1)(A); *see* Compl. Ex. D, ECF No. 1-4 at 4. Prior to April 15, 2021, no District policy, notice, or other document stated that nonuse of a student's preferred name or pronoun or use of the student's last name rose to the level of "bullying" as defined in Kansas law. *See* Compl. at ¶¶ 7, 106.

The Staff-Student Relations Policy says, "Staff members shall maintain professional relationships with students which are conducive to an effective educational environment. . . . Staff members shall not have any interaction of a romantic and/or sexual nature with any student at any time regardless of the student's age or consent." Compl. Ex. R, ECF No. 1-18 at 4. Prior to April 15, 2021, no District policy, notice, or other document stated that nonuse of a student's preferred

name or pronoun or use of a student's last name was not "professional" or constituted a prohibited "interaction of a romantic and/or sexual nature." *See* Compl. at ¶¶ 7, 106.

Consistent with the absence of any policy or guidance prohibiting the use of last names, other teachers have addressed students by last name without incurring discipline. *See id.* at ¶ 267.

### C. Defendants suspended Ms. Ricard for addressing a student by last name.

After receiving Mr. Lubbers's email, Ms. Ricard considered how she might be able to act consistent with the email's directive, her own conscience, the student's wellbeing, and the parents' interests. *See* Compl. at ¶¶ 111–13. On April 7, 2021, she contacted Assistant Principal Terry Heina for advice, because "I felt like if the parents are not okay with their name change then I shouldn't be calling them anything but what is put in Skyward." Defs.' Resp. in Opp. to Pl.'s Mot. for Prelim. Inj., Ex. 13 (hereinafter "Defs.' Ex. 13"), ECF No. 11-14 at 49.[1] After this discussion Ms. Ricard determined "that the best and most neutral course of action would be to address Student 1 by her last name." Compl. at ¶ 113.

Later that day, Ms. Ricard addressed Student 1 as "Miss [last name]." *See id.* at ¶ 114. Ms. Ricard explained that her use of the gendered honorific "miss" was inadvertent. *See* Defs.' Ex. 13 at 50 ("I didn't realize I had [used "miss"] until I received the email from [Student 1's] friend . . . ."). Describing the incident to Mr. Heina, Ms. Ricard said, "I messed up and called her Miss [last name] instead of [last name] and" that she "would *correct it* tomorrow." *Id.* (emphasis added).

Student 1 never expressed any concern with Ms. Ricard's use of her last name. *See* Compl. at ¶ 116. Also on April 7, another student ("Student 2") emailed Ms. Ricard to complain. *See id.* at ¶ 115. Student 2 was also female but asked to be called by a masculine first name. *Id.* at ¶ 103. The next day, Ms. Ricard had to discipline Student 2 for emailing during class time. *Id.* at ¶ 118–19. Student 2 took offense at Ms. Ricard's use of Student 2's legal first and last name on the

---

[1] Defendants offer this document because it is referenced in, but not attached to, Plaintiff's Complaint. *See* Def.'s Mem. in Supp. of Mot. to Dismiss (hereinafter "Def.'s Mem."), ECF No. 27 at 9 n.2. Plaintiff does not object to the consideration of Document 11-14 on the Motion to Dismiss.

disciplinary form, so she scratched out those terms and threw the form in the trash. *Id.* at ¶¶ 120. Student 2 left a note on Ms. Ricard's desk accusing her of being "visibly transphobic." *Id.* at ¶ 123.

Ms. Ricard emailed Ms. Molt, Mr. Heina, and Defendant Brennan about Student 2's destruction of the discipline form and her accusatory note. *Id.* at ¶ 124. Ms. Molt initially said that she would have individual conversations with Student 2 and Ms. Ricard followed by a group conversation. *Id.* at ¶ 125. The following day, April 9, Ms. Molt called Ms. Ricard to a meeting at 10:30 a.m. *Id.*at ¶ 128. Ms. Ricard believed this to be the meeting in advance of the group conversation with Student 2 that Ms. Molt had originally promised. *See* Defs.' Ex. 13 at 51. Instead, this meeting included then-District HR Officer Dawn Toomey. *See* Compl. at ¶¶ 128–32. Ms. Toomey asked Ms. Ricard about what had happened and she explained that she addressed Student 1 as "Miss [last name]" on one occasion and as "[last name]" on one other occasion because she "didn't think we should be calling students different names without parental consent." Compl. at ¶ 131; Defs.' Ex. 13 at 51.

Later that day, Ms. Toomey suspended Ms. Ricard for three days, pending an investigation of claims that Ms. Ricard's use of Student 1's last name violated District policy. *See* Compl. at ¶ 132. Ms. Ricard returned to school on April 15, 2021. Ms. Molt delivered a Written Reprimand concluding that Ms. Ricard violated the Diversity and Inclusion, Bullying, and Staff-Student Relations policies. *See* Compl. Ex. D, ECF No. 1-4 at 4.

On the Diversity and Inclusion Policy, the Reprimand recited the language quoted above, *see supra* Part II.B, and claims that Ms. Ricard violated that Policy because "[t]he student [sic] preferred name was not used by Mrs. Ricard." *Id.* The Reprimand does not explain or point to any District policy explaining how Ms. Ricard's use of a last name violated the Diversity and Inclusion Policy.

Regarding the Bullying Policy, the Reprimand recited the definition of "bullying" from Kansas law quoted above, *see supra* Part II.B, and claims Ms. Ricard engaged in "bullying" because "Students felt discriminated against based on the teacher not using the preferred names." The Reprimand does not explain how Ms. Ricard's decision to use last names, which was based

on her concern about "calling students different names without parental consent," not the students' gender identity, constituted discrimination. *See* Defs.' Ex. 13 at 51. Nor did the Reprimand explain how Ms. Ricard's use of a last name was "sufficiently severe, persistent or pervasive that [it] creates an intimidating, threatening or abusive educational environment" that would place a student in reasonable fear of harm to their person or property, as required by Kansas law. *See* Kan. Stat. Ann. § 72-6147(a)(1)(A).

Respecting the Staff-Student Relations Policy, the Reprimand recited the language quoted above, *see supra* Part II.B, and asserts that Ms. Ricard violated this Policy because Student 1 "was not called by [Student 1's] preferred name after Mrs. Ricard received notification emails from a student and the counselor. Prior to the notification, Mrs. Ricard called the student by their legal name. After notification, Mrs. Ricard called the student by their last name." Compl. Ex. D, ECF No. 1-4 at 4–5. The Reprimand did not explain how use of a student's last name violated any provision of the Staff-Student Relations Policy.

With respect to all three claimed policy violations, the Reprimand only faulted Ms. Ricard for use of last names. The Reprimand did not allege that Ms. Ricard's single use of "miss" violated any policy. This reflects Ms. Ricard's explanation that her single use of "miss" was inadvertent. *See* Defs.' Ex. 13 at 50.

In addition to finding that Ms. Ricard's use of a last name violated three policies that say nothing about names at all, the Written Reprimand included future performance expectations that stated "[p]referred names *and pronouns* will be utilized." Compl. Ex. D, ECF No. 1-4 at 3 (emphasis added). Neither Ms. Molt's email about preferred names, Mr. Lubbers's email about Student 1's preferred name, or *any* District policy said anything about use of pronouns at the time of the suspension or the Written Reprimand. *See* Compl. at ¶ 7.

### III. Defendants adopted new policies targeting Ms. Ricard's speech and religious practices.

After Defendants interpreted their policies to (1) prohibit use of last names in place of preferred first names, and (2) require use of preferred pronouns for the first time in their suspension and reprimand of Ms. Ricard, Defendants moved to formalize these rules.

**A. Days after Ms. Ricard's suspension, Defendants interpreted their policies to require use of names and pronouns for the first time.**

On April 20, 2021, Ms. Ricard submitted her written rebuttal disputing her suspension to Assistant Principal Lacee Sell. Compl. at ¶ 138. In their account of the facts, Defendants claim "Ricard's rebuttal (1) confirms she intentionally refrained from using the preferred name of transgender students and (2) does not deny treating the transgender students differently in terms of means of address (first names versus last names)." Defs.' Mem. at 9. This contradicts both the document and the allegations in the Complaint. In her rebuttal, Ms. Ricard did not say she did not want to use "the preferred name of *transgender* students." *Id.* (emphasis added)*.* Rather, she said, "I don't think we should be calling *students* different names without parental consent." Defs.' Ex. 13 at 51 (emphasis added). *See also id.* at 49 ("I felt like if the parents are not okay with their name change then I shouldn't be calling them anything but what is put in Skyward."). Ms. Ricard was concerned about addressing students in ways parents disapproved or were unaware of, and this concern applied to *all students*, not "transgender students," as Defendants claim. In addition, Ms. Ricard *does* "deny treating transgender students differently" in the Complaint, alleging that she decided to use last names as "the best and *most neutral* course of action." Compl. at ¶¶ 113 (emphasis added). *See also* Compl. ¶ 208 ("use or non-use of a pronoun does not constitute prohibited discrimination").

The day after receiving Ms. Ricard's rebuttal, Ms. Molt emailed all Fort Riley Middle School Staff two documents. The first, "USD 475 Diversity Training on Gender Identity and Expression" was dated April 7, 2021 (the same day as Mr. Lubbers's email). *See* Compl. ¶ 139; Compl. Ex. F, ECF No. 1-6 at 2. The second, "Use of Preferred Names and Pronouns" was dated April 14, 2021 (the day before Ms. Ricard's written reprimand). *See* Compl. ¶ 139.

These policies, distributed for the first time on April 21, 2021, claimed that "refusing to call someone by their preferred name or pronoun" constituted "discrimination." *See* Compl. Ex. F, ECF No. 1-6 at 5. The documents do not address potential nondiscriminatory reasons someone might decline to use a "preferred name or pronoun." For example, one might simply use sex-based pronouns consistently. Or perhaps a teacher would decline all requests across the board without

parental consent. The document addressed neither these nor any other potential nondiscriminatory ways a person might not use a preferred name or pronoun.

The "Use of Preferred Names and Pronouns" document also established a procedure before new terms would be used by the school: (1) the student shares the request with a staff member, (2) the staff member notifies the administrator, (3) the administrator or counselor has a subsequent conversation with the student, (4) the building administration will notify the parents, and (5) the administration or counselor will notify all teachers or additional staff with regular contact with the student. *See* Compl. Ex. G, ECF No. 1-7 at 2.

**B. Defendants adopted a new policy and denied Ms. Ricard any accommodation.**

Throughout the spring and summer of 2021, Ms. Ricard pursued the grievance process under the Negotiated Agreement between the District and District employees. *See* Compl. ¶¶ 141–74. In connection with her appeals, Ms. Ricard offered a "Proposed Neutral Policy" wherein students would be allowed to use preferred names or pronouns but teachers would be allowed to (1) refrain from using pronouns that are inconsistent with sex and (2) use the preferred names if they are "listed in the official enrollment records of the district and maintained in the Skyward system." *Id.* at ¶ 169.

The Board initially denied Ms. Ricard's appeals in closed session, violating the Kansas Open Meetings Act. *See id.* at ¶¶ 175–79. Before the Board could take action in an open meeting, Defendants Eggleston and Brennan told Ms. Ricard to sign an acknowledgement of District policy and diversity training. *Id.* at ¶ 180. Through counsel, Ms. Ricard objected until the Board Defendants took action on her appeal. *Id.* at ¶¶ 181–82.

On September 7, 2021, the Board Defendants unanimously voted to deny Ms. Ricard's appeals and rejected her Proposed Neutral Policy. *Id.* at ¶ 184. Simultaneously, the Board amended the Diversity and Inclusion Policy to add a single sentence: "Students will be called by their preferred pronouns." *Id.* at ¶ 186.

Following the Board's policy change, Defendant Eggleston implemented a new practice displacing the procedure established in the "Use of Preferred Names and Pronouns" document,

which Defendant Brennan promulgated by email on October 8, 2021. Under the new policy and procedure, staff must use preferred names and pronouns and "USD 475 will not communicate this information to parents unless the student requests the administration or counsel to do so, per Federal FERPA Guidance." *Id.* at ¶ 189. Defendants' implementation of the Diversity and Inclusion Policy required (1) immediate, mandatory use of a student's preferred name and (2) nondisclosure of the use of that name to parents *unless* the student gives express consent for the disclosure. *Id.*

**IV. Ms. Ricard is suffering ongoing injury as a result of Defendants' adverse actions against her.**

Defendants injured Ms. Ricard by affirming the suspension and Written Reprimand. These are black marks on her professional record. Although she has left the school, *see* Defs.' Mem. at 12, these issues affect her ability to gain future employment. In addition, the Written Reprimand ordered her to use pronouns inconsistent with biological sex in violation of her conscience. Compl. Ex. D, ECF No. 1-4 at 3. Further, Ms. Ricard labored at the school under Defendant Eggleston's injunction against informing parents about students' use of different names from October 8, 2021, until the end of her employment. Compl. ¶ 189. Defendants' orders forced Ms. Ricard to violate her conscience.

**ARGUMENT**

Ms. Ricard has stated claims for relief, none of her claims are moot, and no Defendants are entitled to qualified immunity. This Court should thus deny Defendants' Motion to Dismiss.

**I.   Ms. Ricard has alleged sufficient facts to support all of her claims for relief.**

A motion to dismiss under Rule 12(b)(6) should be denied where the "specific allegations in the complaint . . . plausibly support a legal claim for relief." *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 n.2 (10th Cir. 2007). To satisfy this standard, "[s]pecific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). In evaluating the Complaint, the Court "must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most

favorable to the plaintiff." *Cressman v. Thompson*, 719 F.3d 1139, 1152 (10th Cir. 2013). Ms. Ricard's Complaint alleges sufficient facts to notify Defendants of the claims and to plausibly support all of her claims for relief.

### A. Defendants have violated Ms. Ricard's right to freedom of speech.

The threshold issue for all of Ms. Ricard's free speech claims is whether Ms. Ricard's decision to use a last name instead of a preferred name was speech pursuant to her "official duties" under *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006) or whether this was "school-sponsored" speech governed by *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260, 271 (1988). The distinction between the government's authority to restrict speech versus its ability to compel speech bears on the government's power to define employees' official duties or to sponsor speech in school. Ms. Ricard's third cause of action, the violation of Ms. Ricard's right to be free from compelled speech, is the logical place to start.

Defendants' attempt to compel Ms. Ricard to speak in violation of her conscience involved no valid "official duty" or school-sponsored speech. She thus had a constitutional interest in her ability to speak and to remain silent. Since Defendants punished her for her constitutional exercise, Ms. Ricard has also alleged facts sufficient to state a claim of retaliation (her first cause of action) and content and viewpoint discrimination (her second cause of action).

### 1. Defendants unconstitutionally sought to compel Ms. Ricard to speak.

"[T]he right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). Defendants' suspension of Ms. Ricard, the Written Reprimand's order to begin using preferred names and pronouns, and Defendant Eggleston's order to do so while concealing this fact from parents were attempts to compel Ms. Ricard to speak. The Written Reprimand does not claim Ms. Ricard was punished for what she said. Instead, it shows she was punished for what she did *not* say: "[t]he student preferred name was *not used* by Ms. Ricard"; "[s]tudents felt discriminated against based on the teacher *not using* preferred names";

"[Student 1] was *not called* by [the student's] preferred name . . . ." Compl. Ex. D, ECF No. 1-4 at 4 (emphasis added).

Defendants claim that "[c]ensorship of speech is no different than compelled or forced speech under the First Amendment." Defs.' Mem. at 16. That view is mistaken, both as it relates to *Garcetti*'s "official duties" test and *Hazelwood*'s concept of "school-sponsored speech."

### a. Ms. Ricard was under no valid official duty to use preferred names and pronouns while misleading parents about that use.

Under *Garcetti*, it is not the case that "all speech within the office is automatically exposed to restriction." 547 U.S. at 421. But "when public employees *make statements* pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes." *Id.* (emphasis added). Restricting this speech does not violate the Constitution because the employee's personal liberty interest is in speaking "as a citizen addressing matters of public concern," not in being able to spread her own preferred message while she "perform[s] the tasks [s]he was paid to perform." *Id.* at 417, 422. Thus, the *Garcetti* Court said, "*Restricting* speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen." *Id.* at 421–22 (emphasis added).

Defendants argue that (1) because compelled speech is no different from restricted speech, and (2) because everything a teacher says to students is a part of her official duties, the school can compel a teacher to say whatever it wants and teachers have no First Amendment claim. *See* Defs.' Mem. at 16–17. Under this reading of *Garcetti*, the *fact* that speech is compelled *shows* that it is an official duty and, therefore, means that there's no First Amendment claim. Under Defendants' rule, schools can order teachers to say anything.

Defendants' theory is wrong because it directly contradicts both *Garcetti* and *Tinker*. *Garcetti* assures that "public employees do not surrender all their First Amendment rights by reason of their employment" and warns against attempts by "employers [to] restrict employees' rights by creating excessively broad job descriptions." 547 U.S. at 417, 424. And *Tinker* promises

14

that *neither* "students [n]or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." 393 U.S. at 506.

Nor has the Tenth Circuit accepted Defendants' theory. In *Brammer-Hoelter*, the Tenth Circuit addressed the application of *Garcetti* to teacher speech and held, "speech relating to tasks within an employee's *uncontested* employment responsibilities is not protected from regulation." 492 F.3d at 1203 (emphasis added). But the court did not assume that every order claiming to constitute an official duty was valid. It simply followed *Garcetti* in acknowledging that an employee has limited personal interest in expressing her own message when she is doing what is part of her "uncontested" job. *Id.* The Tenth Circuit has also rejected arguments claiming that, wherever there is a legal duty to speak, all speech is automatically a part of the employee's official duties. *See Thomas v. City of Blanchard*, 548 F.3d 1317, 1326 (10th Cir. 2008) (finding no official duty resulting from legal duty to report wrongdoing because this "would effectively make the obligation to report and *seek the prosecution of* fraud part of every employee's job").

### i. *Garcetti*'s rule is designed for government restrictions on speech, not governmental compulsion to speak the government's message.

Breaking the circularity of Defendants' theory requires focusing where the Supreme Court focuses: on whether the state action implicates the person's interest as an employee or as a citizen. "*Restricting* speech" at work "does not infringe any liberties the employee might have enjoyed as a private citizen" because (1) that speech "owes its existence to a public employee's professional responsibilities" and (2) the employee still has the opportunity to express her own message outside of work. *Garcetti*, 547 U.S. at 421–22. Restricting speech uttered during the course of "official duties" only keeps the employee from speaking her own message while she is on the clock. It does not deprive the employee of the opportunity to speak her message on her own time.

But compelled speech, even in the workplace, implicates an employee's interest as a citizen in two ways. First, it compels her to say something that her conscience commands her *never* to say—at work *or* on her own time. The fact that she can speak her preferred message on her own time does not cure the harm of being forced to say something she would never say in any setting.

The compulsion violates the employee's conscience, both on the job and in her everyday life. As the Supreme Court said in its most recent opinion on employees' First Amendment interests, "[w]hen speech is compelled . . . additional damage is done." *Janus v. Am. Fed'n of State, Cty., and Mun. Emps. Council 31*, 138 S. Ct. 2448, 2464 (2018). The Court added, "[f]orcing free and independent individuals to endorse ideas they find objectionable is always demeaning . . . ." *Id.*

A second way compelled speech affects an employee's interest *as a citizen* is that it creates a barrier to seeking public employment in the first place. The employee must choose between her conscience and her eligibility for a job. This, again, is different from a restriction in the workplace, where the only thing the employee surrenders is the opportunity to speak her preferred message while working. For both these reasons, "a law commanding 'involuntary affirmation' of objected-to beliefs would require 'even more immediate and urgent grounds' than a law demanding silence." *Id.* (quoting *W. Va. Bd. of Ed. v. Barnette*, 319 U.S. 624, 633 (1943)).

### ii. A rule compelling speech is subject to challenge under *Pickering*, not shielded by *Garcetti*.

Because compelled speech at work implicates the employee's interests "as a citizen" outside work, the question is whether "the order [is] justified on the ground that the effective operation of the office demanded that the [employee] voice" the required "sentiments with which she disagree[s]." *Janus*, 138 S. Ct. at 2473. In other words, the way to distinguish between a prohibited compulsion of speech under *Janus* and the typical "*uncontested* employment responsibilit[y]" under *Brammer-Hoelter* is through the balancing test set forth in *Pickering v. Board of Education of Township High School District 205*, 391 U.S. 563, 568 (1968). If the government's interest "as an employer, in promoting the efficiency of the public services it performs through its employees" outweighs the employee's interest in remaining silent, then the government "has a legitimate need to demand that its employees recite words with which they disagree." *Janus*, 138 S. Ct. at 2471, 2473. The key: because the compelled speech implicates the employee's interest outside of work, *Garcetti*'s rule about "[r]estricting speech" does not apply, 547 U.S. at 421, and the traditional *Pickering* rule is what's left.

### iii. Ms. Ricard alleged that she wished to remain silent on a matter of public concern.

Since compelled speech implicates the *Pickering* standard, the employee must still show that the matter on which she wishes to remain silent is a "matter[] of public concern." 391 U.S. at 568. An order to fulfill a rudimentary task at work, like calling out the number of the next customer in line, might seem like "compelled speech," but this need not undergo *Pickering* balancing because it does not address a matter of public concern. Most duties in the workplace *are* "uncontested employment responsibilities," and the reason they are uncontested is that they simply do not implicate a matter of public concern. *Brammer-Hoelter*, 492 F.3d at 1203.

But that's not always the case. A matter of public concern is "any matter of political, social, or other concern to the community." *Butler v. Bd. of Cty. Comm'rs for San Miguel Cty.*, 920 F.3d 651, 653 (10th Cir. 2019). Use or nonuse of names and pronouns addresses a matter of public concern. *See Janus*, 138 S. Ct. at 2476 (listing "sexual orientation and gender identity" as "sensitive political topics" and "matters of profound '. . . concern to the public.'" (internal citation omitted). *See also Meriwether v. Hartop*, 992 F.3d 492, 508 (6th Cir. 2021) ("Pronouns can and do convey a powerful message implicating a sensitive topic of public concern."). Ms. Ricard has alleged that, by initially using last names rather than preferred names (out of her concern for parental interests) and then by avoiding pronouns inconsistent with a students' sex, she was addressing a matter of public concern. *See* Compl. at ¶¶ 11, 85, 204–05.

### iv. Ms. Ricard alleged that her interest in remaining silent outweighed any governmental interest in forcing her to express the government's message on sex and gender.

Since pronouns convey a message addressing a matter of public concern, the next question is whether the school's "order [is] justified on the ground that the effective operation of the office demanded that the [teacher] voice . . . sentiments with which she disagreed." *Janus*, 138 S. Ct. at 2473. The government bears the burden of showing that its interests outweigh the employee's. *See Connick v. Myers*, 461 U.S. 138, 150 (1983). On a motion to dismiss, Defendants can only prevail by showing that, even when taking Ms. Ricard's allegations as true, their interests outweigh hers.

*See Montiero v. City of Yonkers*, 890 F.3d 386, 401 n.4 (2d Cir. 2018) (noting that assessing the *Pickering* balance "requires determining matters of fact").

Using the facts alleged in the Complaint, Defendants cannot make this showing. Defendants claim that Ms. Ricard's attempt to resist their "commands that [she] mouth a message on [their] own behalf," *Janus*, 138 S. Ct. at 2473, is discriminatory and, therefore, that the school has an interest in punishing her. *See* Defs.' Mem. at 23. Defendants claim, "Ricard never denied the factual basis for her suspension—that she discriminated by treating transgender students differently than cisgender students." *Id.* The Complaint says otherwise, and it must be taken as true. *See Cressman*, 719 F.3d at 1152. Ms. Ricard said at the time that her concern was with using preferred names for *students* generally without parental permission and has alleged that her practice was "neutral." *See supra* Facts III.A. Defendants offer no explanation for why Ms. Ricard's practice—which is to treat all students the same unless *the student requests* to be addressed differently—is discriminatory. Because Ms. Ricard has alleged specific facts showing that she does not treat students differently on the basis of gender identity, the court must treat that allegation as true for purposes of determining whether she has stated a legal claim for relief. *Cressman*, 719 F.3d at 1152. Thus, any interest Defendants may have in combatting discrimination is not implicated by Ms. Ricard's desire to avoid repeating Defendants' preferred message about sex and gender. *See* Compl. ¶¶ 207–11.

In addition, Defendants' have no interest because they are pursuing an unlawful objective. The government has no interest in forcing Ms. Ricard to convey the school's preferred message about sex and gender—that is, that what makes a student a boy or girl is exclusively the student's expressed identity—because the government has *no* interest in using compulsive methods "to foster a homogeneous people with [its preferred] ideals." *Meyer v. Nebraska*, 262 U.S. 390, 402 (1923). Even in the public school context there is a "right to differ as to things that touch the heart of the existing order." *Barnette*, 319 U.S. at 642. Since "[c]ompulsory unification of opinion achieves only the unanimity of the graveyard," *id.* at 641, any coercive attempt "to produce a

society free of . . . biases . . . . is a decidedly *fatal* objective." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 578–79 (1995) (emphasis added).

In sum, the Diversity and Inclusion Policy did not create a valid official duty for Ms. Ricard because (1) Defendants' attempt to compel Ms. Ricard to speak the government's message implicates her interest as a private citizen, (2) the topic addressed a matter of public concern, and (3) no governmental interest outweighs Ms. Ricard's interests.

### b. *Garcetti* does not authorize the government to compel employees to lie.

Ms. Ricard's free speech claims are not barred by *Garcetti* for a second independent reason: employees may challenge an order to tell a lie, even where the lie involves speech that is a part of the employee's official duties. *See Jackler*, 658 F.3d at 242 (holding that employee's claim that he was "terminat[ed] in retaliation for his refusal to . . . make false statements" was not barred by *Garcetti*).[2] When the Board updated the Diversity and Inclusion Policy and Defendants Eggleston and Brennan ordered teachers to use students' preferred names and pronouns without notifying parents, they ordered Ms. Ricard to lie in violation of her conscience. *See* Compl. ¶¶ 88, 189. This is sufficient to state a free speech claim.

### c. Ms. Ricard has alleged that teachers in the District had no official duty to use preferred names and pronouns instead of last names.

Generally, "[t]he question of whether speech is protected is a question of law, not of fact." *Thomas*, 548 F.3d at 1322. However, the question of whether speech is made pursuant to an official duty "is a practical one." *Garcetti*, 547 U.S. at 424. Since "the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes," *id.* at 425, this question also should not be decided on a motion to dismiss. Ms. Ricard has alleged that other District staff have not used preferred names or pronouns for a variety of

---

[2] While "[t]he Tenth Circuit has not spoken on this issue," *Lincoln v. Maketa*, 880 F.3d 533, 539 (10th Cir. 2018), the Tenth Circuit's finding that the law on compelled false statements was not clearly established for purposes of qualified immunity does not prohibit this Court from granting prospective injunctive relief on that basis. "Qualified immunity . . . it is not a defense against claims for injunctive relief against officials in their official capacities." *Meiners v. Univ. of Kan.*, 359 F.3d 1222, 1233 n.3 (10th Cir. 2004).

reasons and were not punished. *See* Compl. at ¶¶ 25, 197, 267, 272. It remains a question of fact what, exactly, each teacher's official duties were with respect to students' names.

### d. Ms. Ricard's speech was not school-sponsored speech.

Defendants also claim all of Ms. Ricard's free speech claims fail as a matter of law because all of her speech to students is "school-sponsored speech." *See* Defs.' Mem. at 16, 18. That argument, too, assumes the mistaken view that there is no distinction between compelled speech and restricted speech, and so any speech that the school can restrict it can also compel. *See id.*

Generally, school-sponsored speech "mean[s] activities that might reasonably be perceived to bear the imprimatur of the school and that involve pedagogical concerns." *Flemming v. Jefferson Cty. Sch. Dist. R-1*, 298 F.3d 918, 924 (10th Cir. 2002). In *Corder v. Lewis Palmer School District No. 38*, the Tenth Circuit did say that "forced speech is no different than censored speech" when addressing school-sponsored speech. 566 F.3d 1219, 1231 (10th Cir. 2009). But the court made that statement nine years before *Janus*, and was addressing student speech within an uncontestedly school-sponsored event. *Corder* itself illustrates why Defendants' rule is unworkable.

In *Corder*, the school recognized fifteen valedictorians for the graduating class. *Id.* at 1222. Since there would be no time for fifteen full valedictorian addresses, the valedictorians agreed to each speak for thirty seconds, delivering remarks they submitted to the principal for prior approval. *Id.* One student deviated from her pre-written speech and shared her faith. *Id.* The school refused to deliver her diploma until she published an apology, part of which was written by the school. *Id.* at 1222–23.

*Corder*'s statement about the similarity of compelled and restricted speech in the school-sponsored speech context made sense in that context because most of the time a student does *not* speak during an uncontestably school-sponsored event like the valedictorian program. The court simply recognized that, since Corder breached the rules of a school-sponsored event, she could also be compelled to apologize "because Corder's apology was directly related to her school-

sponsored speech at the high school graduation." *Id.* at 1231.[3] Since students have ample avenues for expression *outside* of school-sponsored events, this rule makes sense.

But Defendants' theory is that *all* teacher speech to students "bears the imprimatur of the school" and that *all* school orders about teacher speech to students "embod[y] legitimate pedagogical concerns." Defs.' Mem. at 18. If that is true, then *Tinker* is wrong and teachers *do* in fact "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker*, 393 U.S. at 506. That cannot be. The right answer is that *Corder*'s rule makes sense as to students, who are usually not taking part in school-sponsored speech. But when they do, students may need to be told what to say in order to participate in a program or complete an assignment. *See, e.g.*, *Axson-Flynn v. Johnson*, 356 F3d 1277, 1286 (10th Cir. 2004) ("student speech that takes place inside the classroom, as part of a class assignment, can also be considered school-sponsored speech"). But, for teachers, who are present as employees (and not because of compulsory attendance laws), the proper question is whether the school's rule implicates the teacher's interest as a citizen. Since compelled speech forces a teacher to say something she would not say even on her private time, such rules implicate that interest. So the proper question is whether the rule is justified under *Pickering*, not the school-sponsored speech rubric. *See supra* Part I.A.1.a. This is the only approach consistent with *Tinker*'s guarantee that teachers retain at least *some* constitutional rights even at school. *See* 393 U.S. at 506.

Even under the "school-sponsored speech" doctrine, Ms. Ricard has stated a claim. A school's action is not "reasonably related to legitimate pedagogical goals" if it is a "sham pretext

---

[3] The court's language appears to sweep more broadly. *See Corder*, 566 F.3d at 1231 ("The Supreme Court has long recognized that, for purposes of the First Amendment, forced speech is no different than censored speech."). But the Supreme Court cases *Corder* cites only say that there is no difference between compulsion and censorship *in the sense that the* Constitution protects against both. *See id.* (quoting *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796–97 (1988) to say that, "in the context of protected speech, the difference is without constitutional significance, for the First Amendment guarantees 'freedom of speech,' a term necessarily comprising the decision of both what to say and what *not* to say."). *Janus*, decided nine years after *Corder*, acknowledges that in the public employee context, "a law commanding 'involuntary affirmation' of objected-to beliefs would require '*even more immediate and urgent grounds*' than a law demanding silence." 138 S. Ct. at 2464 (quoting *Barnette*, 319 U.S. at 633) (emphasis added).

for an impermissible ulterior motive." *Axson-Flynn*, 356 F.3d at 1289, 1293. As Ms. Ricard alleges, other District staff have not used preferred names or pronouns for a variety of reasons and were not punished. *See* Compl. at ¶¶ 25, 197, 267, 271–73. In contrast, Ms. Ricard was punished and the District's reason was because of her religious views. *See id*. at ¶¶ 271–73. Since these allegations must be taken as true, Ms. Ricard's free speech claim is not barred as "school-sponsored speech" because Defendants have no legitimate pedagogical interest in enforcing a rule that is a "pretext for religious discrimination." *Axson-Flynn*, 356 F.3d at 1293.

### 2.   Defendants subjected Ms. Ricard to unconstitutional conditions.

The unconstitutional conditions doctrine provides a separate, but equally helpful, method for addressing orders by employers other than the typical, "uncontested employment responsibilities." *Brammer-Hoelter*, 492 F.3d at 1203. Indeed, this doctrine was developed in the context of teachers and professors who were required to surrender their constitutional rights as a condition of securing a teaching position. *See Perry v. Sinderman*, 408 U.S. 593, 597 (1972) (professor's contract renewal cannot be denied because of professor's speech); *Shelton v. Tucker*, 364 U.S. 479, 489–90 (1960) (teacher cannot be compelled to disclose association in order to teach at public school). Because compulsion to speak a message that one would not convey even on one's own time affects a person in her private capacity—that is, she must choose between her conscience and her ability to seek public employment at all—the condition is an impermissible attempt by "a public employer to leverage the employment relationship to restrict, incidentally or intentionally, the liberties employees enjoy in their capacities as private citizens." *Garcetti*, 547 U.S. at 419. Ms. Ricard has stated a claim that Defendants conditioned her ability to work on her willingness to surrender her constitutional rights. *See* Compl. at ¶¶ 250–54.

### 3.   Defendants unconstitutionally retaliated against Ms. Ricard.

Ms. Ricard has stated a claim for unconstitutional retaliation under the Tenth Circuit's five-part framework. *See Helget v. City of Hays*, 844 F.3d 1216, 1221 (10th Cir. 2017). The first three parts ask whether the employee's speech is protected under *Pickering/Garcetti*. *Id.* Since Ms. Ricard has already shown how the Written Reprimand unconstitutionally sought to compel her

speech, those elements are satisfied. And Defendants do not contest the fourth and fifth elements: whether the "speech was a motivating factor in the adverse employment action" and "whether the defendant would have reached the same employment decision in the absence of the protected conduct." *Id.* The Written Reprimand expressly roots all of its adverse consequences in Ms. Ricard's refusal to use terms the District demanded. *See supra* Part I.A.1. Therefore, Ms. Ricard has stated a claim that Defendants unconstitutionally retaliated against her.

### 4. Defendants' retaliation against Ms. Ricard amounts to unconstitutional content- and viewpoint-discrimination.

The First Amendment prohibits state action restricting speech because of its content or viewpoint. "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). Viewpoint discrimination exists where one viewpoint on a subject, or "an entire class of viewpoints," is excluded by the government's action. *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 831 (1995). Ms. Ricard has alleged that other teachers— who either do not share her beliefs or whose beliefs are unknown to Defendants—have not used students' preferred names or pronouns and have not been punished. *See* Compl. at ¶¶ 25, 197, 267, 272. Teachers, like Ms. Ricard, who do not use preferred names or pronouns because these terms "can and do convey a powerful message implicating a sensitive topic of public concern" face punishment. *Meriwether*, 992 F.3d at 508. Ms. Ricard has alleged that Defendants discriminated against her by punishing her based on the content and viewpoint of her speech.

### B. Defendants have violated Ms. Ricard's right to free exercise of religion.

Ms. Ricard has stated a claim that Defendants violated her right to free exercise of religion through the Written Reprimand and by commanding her to address students by preferred pronouns at school while concealing this fact when communicating with parents.

### 1. Defendants' Policies are subject to strict scrutiny.

Governmental rules that substantially burden a religious exercise must withstand strict scrutiny if they fail to be both "neutral and generally applicable." *See Fulton v. City of*

*Philadelphia*, 141 S. Ct. 1868, 1876 (2021). Ms. Ricard has alleged that Defendants' actions compelling her to use pronouns inconsistent with sex and to dishonestly conceal this use from parents have burdened her sincere religious beliefs. *See* Compl. ¶¶ 71–90, 246–47. And Defendants' policies and enforcement are nether neutral nor generally applicable.

### a. Defendants' Policies are not neutral.

The state cannot treat religiously motivated practice differently from similar, secularly-motivated activity. "Official action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality. The Free Exercise Clause protects against governmental hostility which is masked, as well as overt." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993). Ms. Ricard has alleged that Defendants treated her differently than they treated teachers that used students' last names for secular reasons. And that they did so because of her religious reasons. *See* Compl. at ¶¶ 25, 197, 267, 272. Ms. Ricard has also alleged that the policies in question were promulgated and "backdated" in an attempt to retroactively justify the school's retaliation against her. *See id.* at ¶¶ 9, 140. These allegations, taken as true, show "a clear and impermissible hostility toward the sincere religious beliefs that motivated" Ms. Ricard's expression, and state a claim for a violation of the Free Exercise Clause. *See Masterpiece Cakeshop, LTD. v. Colo. C.R. Comm'n*, 138 S. Ct. 1719, 1729 (2018).

### b. Defendants' Policies are not generally applicable.

A law is not generally applicable and triggers strict scrutiny if it offers a "system of individualized exceptions." *Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 653 (10th Cir. 2006). A "classic example" of such a system is one that offers exemptions based on "consideration of the particular circumstances" by enforcing officials. *Id.* (quoting *Emp. Div., Dept. of Human Res. v. Smith*, 494 U.S. 872, 884 (1990)). Ms. Ricard has alleged that Defendants decide who gets punished for using last names or for avoiding use of pronouns depending on their assessment of the teacher's reason for doing so. *See* Compl. at ¶¶ 25, 197, 267, 272. Because Defendants' Policies and practices are not generally applicable, they must withstand strict scrutiny.

### 2.  Defendants' Policies fail strict scrutiny.

"A government policy can survive strict scrutiny only if it advances 'interests of the highest order' and is narrowly tailored to achieve those interests." *Fulton*, 141 S. Ct. at 1881 (quoting *Lukumi*, 508 U.S. at 546). Defendants' Policies and practices cannot satisfy either element.

### a.  Defendants have no compelling interest in enforcing their Policies against Ms. Ricard.

Defendants have no compelling interest justifying their treatment of Ms. Ricard. Defendants repeatedly invoke an interest in prohibiting discrimination. But Ms. Ricard has alleged that her practice is nondiscriminatory and alleged facts showing that she does not treat students differently based on their gender identity. *See supra* Facts III.A. In any event, Defendants must show "not [that] the [Defendants have] a compelling interest in enforcing [their] non-discrimination policies generally, but whether [they have] such an interest in *denying an exception* to" Ms. Ricard in particular. *Fulton*, 141 S. Ct. at 1881 (emphasis added). Defendants offer no compelling interest in forcing Ms. Ricard to use pronouns inconsistent with sex and to mislead parents while allowing other teachers to use last names for various reasons or allowing building administrators to notify parents but not Ms. Ricard.

### b.  Defendants' Policies are not narrowly tailored to achieve any compelling interest.

Defendants' enforcement of their Policies (or lack thereof) also shows the lack of narrow tailoring. A regulation that leaves "unburdened those speakers whose messages are in accord with [the government's] own views" while burdening those that disagree is not narrowly-tailored. *Nat'l Inst. of Fam. and Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2378 (2018). Defendants do exactly this: letting employees like Mr. Lubbers (who they know shares their view) use the "incorrect" pronoun to refer to Student 1 while *punishing* Ms. Ricard for simply trying to *avoid* pronouns that violate her conscience. *See* Compl. Ex. B, ECF No. 1-2 at 2.

Ms. Ricard has stated a claim for violation of her right to free exercise of religion because (1) she has alleged facts showing that Defendants' Policies were both adopted and enforced to target her religious views and excuse similar conduct with a secular motivation, (2) Defendants

have no compelling interest in doing so, and (3) Defendants' means are not narrowly tailored to any legitimate end.

## C. Defendants deprived Ms. Ricard of due process of law.

Ms. Ricard has stated a claim that Defendants deprived her of due process of law, both through the Written Reprimand and through the ongoing application of the Diversity and Inclusion Policy. The Due Process Clause requires "that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that [s]he may act accordingly." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). Ms. Ricard has alleged that, at the time Defendants punished Ms. Ricard for using a student's last name, *no* policy prohibited use of last names and *no* policy interpreted use of last names in place of preferred pronouns to constitute prohibited discrimination. *See supra* Facts II.A–B. And, once Defendants did adopt a written policy, it still denied Ms. Ricard due process. The revised policy merely stated, "[s]tudents will be called by their preferred name and pronouns." Compl. at ¶ 186. But Ms. Ricard has alleged that Defendants did not interpret this to mean *all* "preferred name[s]," since vulgar terms did not have to be used. *See* Compl. at ¶ 159. As a result, Ms. Ricard had no "reasonable opportunity to know what [was] prohibited" and, therefore, was denied due process. *Grayned*, 408 U.S. at 108.

## D. Defendants denied Ms. Ricard equal protection of the law.

"When a plaintiff demonstrates that a challenged law burdens a fundamental right, courts apply strict scrutiny in assessing the validity of the law" under the Equal Protection Clause. *Petrella v. Brownback*, 787 F.3d 1242, 1261 (10th Cir. 2015). Ms. Ricard has alleged facts to show that Defendants targeted the content and viewpoint of her speech and her religious beliefs in the way they framed and enforced their Diversity and Inclusion Policy. *See supra* Part I.A–B. In addition, Ms. Ricard has alleged facts to show that other similarly situated teachers who engaged in identical behavior as Ms. Ricard—addressing students by last name—were treated differently than her simply because their *reason* for engaging in identical expression was different. *See* Compl. at ¶¶ 25, 197, 267, 272. Because Defendants can state no valid reason for treating her speech different from other employees' identical speech, *see supra* Parts I.A.1.a.iv, I.B.2.a, Ms.

Ricard states a claim under the Equal Protection Clause even without any burden on another fundamental liberty. *See Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 532 (10th Cir. 1998).

**E. Ms. Ricard stated a claim for breach of contract.**

The elements of a breach of contract claim under Kansas law are: "(1) the existence of a contract between the parties; (2) sufficient consideration to support the contract; (3) the plaintiff's performance or willingness to perform in compliance with the contract; (4) the defendant's breach of the contract; and (5) damages to the plaintiff caused by the breach." *JP Morgan Tr. Co. Nat. Ass'n v. Mid-Am. Pipeline Co.*, 413 F. Supp. 2d 1244, 1272 (D. Kan. 2006). Defendants do not contest the validity of the Negotiated Agreement or the fact that it protects Ms. Ricard. They only argue that there was no breach. *See* Defs.' Mem. at 30–32.

To contest Ms. Ricard's claim that Defendants breached the Agreement by immediately resorting to a suspension and Written Reprimand, Defendants focus on two provisions of the Agreement. First, Defendants note that "situations that constitute a breach of board policy that could impair the effective operation of the school, or constitute a criminal violation" excuse deviations from the regular disciplinary process. Defs.' Mem. at 31. But Defendants emphasize the wrong part of that provision: what matters is not Defendants' claim that Ms. Ricard's use of last names might "impair the effective operation of the school" (a disputed fact that cannot be the basis of dismissal), but that this provision that this provision only applies where an employee has committed "a breach of *board* policy." Compl. Ex. H, ECF No. 1-8 at 34 (emphasis added). All parties agree that there was no *board* policy on preferred names and pronouns until September 2021, five months after Ms. Ricard's suspension. *See* Compl. ¶¶ 183–86. And Ms. Ricard has alleged that, at the time of her suspension and reprimand, no other board policies had been interpreted to prohibit use of last names or require use of preferred names or pronouns. *See supra* Facts II.A–B.

Next, Defendants argue that there was no breach because Ms. Ricard's alleged policy violation was not a "minor infraction." Defs.' Mem. at 31. Defendants assert Ms. Ricard's use of a last name was not a minor infraction because it disrupted school operations simply because some

students complained. *See id.* But student complaints are not *inherently* disruptive to school (students complain about countless matters), and Ms. Ricard has alleged that her actions did not interfere with school operations, allegations which must be taken as true at this stage. *See* Compl. ¶ 207. Because Ms. Ricard has alleged that she did not violate any existing board policy and that her actions were not disruptive, she has stated a claim that Defendants breached the Agreement in immediately suspending her and placing a Written Reprimand in her file.[4]

## II.  None of Ms. Ricard's claims are moot.

Defendants claim that Ms. Ricard's free exercise claim for nominal damages "fails because she was not subjected to any adverse action or injury because of the Communication with Parents Policy" and that her claim for injunctive relief fails because the policy was rescinded after this Court's ruling that that aspect of the policy was likely unconstitutional. Defs.' Mem. at 23–24. This is incorrect.

First, Defendants incorrectly apply this argument to all of Ms. Ricard's "free exercise claim[s]." *Id.* But Ms. Ricard has also claimed that her original suspension and Written Reprimand violated her free exercise rights. *See supra* Part I.B. Ms. Ricard's claim for nominal damages arising from that completed violation of her rights is still live. *See Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 802 (2021). And because Defendants are causing ongoing reputational injury to Ms. Ricard by maintaining a record of that unlawful discipline, Ms. Ricard can seek declaratory and injunctive relief to remedy that wrong. *See Flint v. Dennison*, 488 F.3d 816, 824 (9th Cir. 2007) (as long as a "record contains evidence of disciplinary sanctions" and the plaintiff seeks "an order requiring school officials to expunge from school records all mention of the disciplinary action, the action is not moot." (cleaned up)); *see also Tazewell Cty. Sch. Bd. v. Brown*, 591 S.E.2d 671, 674 (Va. 2004) (finding no mootness since "[t]he fact of and reasons for [the] suspension are

---

[4] Defendants do not contest the damages element of the breach of contract claim, but Ms. Ricard has pled that element as well. *See* Compl. at ¶¶ 197a–b, 198–200. Ms. Ricard's claims for nominal damages and injunctive relief are sufficient for a breach of contract action. "Plaintiff is thus not required to prove monetary damages to establish its breach of contract claims. Rather, [she] may—as [she] has—seek injunctive relief for the alleged breach." *API Americas, Inc. v. Miller*, 380 F. Supp. 3d 1141, 1152 (D. Kan. 2019).

contained in his personnel file and will remain there unless removed based upon a determination that the information therein was unfounded.").

Second, Ms. Ricard has alleged that she suffered a completed violation of her rights at Defendants' hands through their enforcement of the "communication with parents" component of the Diversity and Inclusion Policy while it was still in force. *See* Compl. ¶¶ 74–76, 88;[5] *see also Ricard v. USD 475 Geary Cty., Kan. Sch. Bd.*, No. 5:22-cv-04015, 2022 WL 1471372, at *9 (D. Kan. May 9, 2022). Therefore, none of Ms. Ricard's claims for relief are moot.

## III. Defendants are not entitled to qualified immunity.

Defendants are not entitled to qualified immunity from any of Ms. Ricard's claims for relief. Defendants' maintenance of the unlawful Written Reprimand is causing Ms. Ricard ongoing injury and she has stated a claim for injunctive relief against this wrongdoing. *See supra* Part II. "Qualified immunity . . . it is not a defense against claims for injunctive relief against officials in their official capacities," so Defendants have no qualified immunity from these claims. *Meiners*, 359 F.3d at 1233 n.3.

As to damages, Defendants only assert qualified immunity from Ms. Ricard's speech claims, arguing that the issues surrounding the application of the "school-sponsored speech" question and the applicability of *Garcetti*'s "official duties" test are not clearly established. Defs.' Mem. at 34.

On school-sponsored speech, Defendants are wrong because Ms. Ricard has alleged that Defendants' Policies were adopted and enforced as a pretext to suppress her viewpoint and religious exercise. In *Axson-Flynn*, the Tenth Circuit denied qualified immunity where such

---

[5] Ms. Ricard testified in more detail at the Court's hearing on her motion for preliminary injunction and explained that she had, in fact, been forced to communicate with parents in a dishonest fashion as a result of the Policy. While she did not allege this particular fact in the Complaint, the Court must "construe [her] allegations, *and any reasonable inferences that might be drawn from them*, in the light most favorable to the plaintiff." *Gaines v. Stenseng*, 292 F.3d 1222, 1224 (10th Cir. 2002) (emphasis added). It is reasonable to infer that Ms. Ricard, like any teacher, would communicate with parents between October 2021 and May 2022. Therefore it is reasonable to infer that she had to breach her beliefs about honesty, parental rights, and student wellbeing as plead in the Complaint. If the Court disagrees, Ms. Ricard requests that she be afforded an opportunity to file an amended complaint to include allegations of the facts to which she has already testified.

allegations were made. 356 F.3d at 1300. The court held, "it is clearly established that a pretextual speech restriction that is not justified by a legitimate pedagogical concern, and is based rather on religious discrimination, would violate [Plaintiff's] First Amendment rights." *Id.* Because Ms. Ricard makes precisely this allegation, Defendants have no qualified immunity.

On her employee speech claim, Ms. Ricard's "right to be free from retaliatory employment action based on her protected First Amendment activit[y]" is also clearly established. *Casey v. W. Las Vegas Indep. Sch. Dist.*, 473 F.3d 1323, 1334 (10 Cir. 2007). It is Defendants' theory of *Garcetti*—that schools may order teachers to say anything and the *fact* that it is compelled renders it an "official duty" immune from First Amendment challenge—that is anomalous. As *Brammer-Hoelter* makes clear, *Garcetti* is about the government's ability to restrict an employee from trying to speak her *own* message when she is carrying out her "uncontested employment responsibilities." 492 F.3d at 1203. *Garcetti* does not say that the government has the power to command whatever it wants in the first place and then let the fact that it was commanded serve as the rule's own legal defense. *This* theory is certainly not clearly established. But what *is* clearly established is that "[c]ompelling individuals to mouth support for views they find objectionable violates [the] cardinal constitutional command," even in the employment context. *Janus*, 138 S. Ct. at 2463. Because Defendants' Policies sought to compel Ms. Ricard to voice views she objected to on what is unquestionably a matter of public concern, Defendants are not entitled to qualified immunity.

## CONCLUSION

This Court should deny Defendants' motion to dismiss Ms. Ricard's Complaint.

Respectfully submitted this 17th day of June, 2022.

By: *s/ Tyson C. Langhofer*

Tyson C. Langhofer, KS Bar No. 19241
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(480) 444-0020
tlanghofer@adflegal.org

Joshua A. Ney, KS Bar No. 24077
Ryan A. Kriegshauser, KS Bar No. 23942
Alan M. Vester, KS Bar No. 27892
15050 W. 138th St., Unit 4493
Olathe, KS 66063
Telephone: 913 303-0639
firm@knlawgroup.com

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 17th day of June, 2022, I electronically filed the foregoing with

the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to:

David R. Cooper
Fisher, Patterson, Sayler & Smith, LLP
3550 S.W. 5th Street
Topeka, KS 66606
(785) 232-7761
dcooper@fpsslaw.com

Attorney for Defendants


_s/ Tyson C. Langhofer_____
Tyson C. Langhofer

_Attorney for Plaintiff_